UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**NIGHT BOX**
**FILED**

NOV 1 9 2001

CASE NO. 00-CR-6309-SEITZ

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| JOSEPH RUSSO AND | : |
| DOREEN RUSSO, | : |
| | : |
| Defendants. | : |
| . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | : |

## JOINT APPENDIX IN SUPPORT OF JOINT MOTION BY JOSEPH RUSSO AND DOREEN RUSSO TO SUPPRESS FRUITS OF WIRETAPS

Defendants JOSEPH RUSSO and DOREEN RUSSO, through undersigned counsel

files this Appendix with the following exhibits:

Exhibit A  -   Affidavit in Support of Application, dated January 7, 2000;

Exhibit B  -   Affidavit in Support of Application, dated February 11, 2000; and

Exhibit C  -   Affidavit in Support of Application, dated September 23, 1999.

Respectfully submitted,

**BLACK, SREBNICK & KORNSPAN, P.A.**
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131
(305) 371-6421; Fax: (305) 358-2006

For
By: _____

**HOWARD M. SREBNICK, ESQ**
Florida Bar Number 919063
Counsel for Doreen Russo

-1-

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on _Nov. 19 TH_____, 2001 a true and correct copy of the

foregoing was furnished by mail to:

Brian McCormick, Esq.
Assistant United States Attorney
500 East Broward Boulevard
7th Floor
Fort Lauderdale, Florida 33394-3002

Jayne Weintraub, Esq.
100 S.E. 2nd Street, Suite 3550
Miami, Florida 33131

John Howes, Esq.
633 S.E. 3rd Avenue, Suite 4F
Ft. Lauderdale, FL 33302

Ana M. Jones, Esq.
Bayside Plaza, Suite 625
330 Biscayne Boulevard
Miami, Florida 33132

Emmanuel Perez, Esq.
2121 Ponce de Leon Boulevard
Suite 290
Coral Gables, FL 33134-5222

Brian L. Tannebaum, Esq.
First Union Financial Center
200 South Biscayne Blvd., Suite 2690
Miami, Florida 33131

Jeffrey M. Harris, Esq.
One East Broward Boulevard, Suite 1500
Ft. Lauderdale, Florida 33301

Kenneth M. Swartz, Esq.
100 N. Biscayne Boulevard
21st Floor, New World Tower
Miami, Florida 33132

Philip R. Horowitz, Esq.
12651 S. Dixie Highway
Suite 328
Miami, Florida 33156

James Benjamin, Esq.
One Financial Plaza, Suite 1615
Ft. Lauderdale, FL 33394

Joseph S. Rosenbaum, Esq.
2400 South Dixie Highway
Suite 105
Miami, Florida 33133

David Tarlow, Esq.
801 Brickell Avenue, Suite 1901
Miami, Florida 33131-2900

Jon May, Esq.
200 East Broward Boulevard, Suite 1200
Ft. Lauderdale, FL 33301

David Rothman, Esq.
First Union Financial Center
200 South Biscayne Blvd., Suite 2690
Miami, Florida 33131

For
By: _____
**HOWARD M. SREBNICK, ESQ.**
Attorney for Doreen Russo

-2-

DLWF:df

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

NO._____

IN THE MATTER OF THE APPLICATION    )
OF THE UNITED STATES OF AMERICA     )     UNDER SEAL
FOR AN ORDER AUTHORIZING THE        )
INTERCEPTION OF WIRE COMMUNICATIONS )

AFFIDAVIT IN SUPPORT OF APPLICATION

I, Patrick G. Brodsky, Special Agent, Federal Bureau of
Investigation, Miami, Florida, being duly sworn, depose and say:

1.   I am a Special Agent of the Federal Bureau of
Investigation (FBI).  As such, I am an "investigative or law
enforcement officer of the United States" within the meaning of
Title 18, United States Code, Section 2510(7), that is, an officer
of the United States who is empowered by law to conduct
investigations of, and to make arrests for, offenses enumerated in
Title 18, United States Code, Section 2516.

2.   I have been employed as a Special Agent of the FBI for
over four years.  For the past four years, I have been assigned
primarily to investigations of organized crime, including
investigations of an organized criminal enterprise known as the La
Cosa Nostra (LCN).  As a result of my participation in these
investigations, conversations with other FBI agents familiar with
the criminal activities of the LCN, reviews of reports concerning
LCN, reviews of reports concerning LCN activities, members and
associates, and reliable informant information, I know that the

**EXHIBIT A**

criminal activities of the LCN include, but are not limited to, gambling, trafficking in narcotics, loansharking, money laundering, extortion, labor racketeering, and murder. I have also become familiar with many of the methods used by the LCN in the commission of these offenses.

3. This Affidavit is being submitted in support of an application which seeks an Order authorizing the interception of wire communications of STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, and others yet unknown, occurring over the following telephone numbers for a period of thirty (30) days:

A. Cellular telephone number (954) 614-1821, electronic serial number (ESN) EB6391C2, subscribed to by Gateway Transportation, 7770 West Oakland Park Boulevard, Apartment 450, Fort Lauderdale, Florida, and utilized by JOHN MAMONE; and,

B. Cellular telephone number (954) 557-3651, ESN 25314057896, subscribed to by Kinsman Merchant & Associates, 4901 N.W. 17th Way, #407, Fort Lauderdale, Florida (mailing address), and utilized by FRED MORGENSTERN.

C. Authorization is also sought to intercept communications from any telephone numbers subsequently assigned to or used by the instruments bearing the same ESN as the target cellular telephones and notwithstanding any changes in the ESN of the target cellular telephones so long as its assigned telephone

2

number remains the same.

D.    Authorization is also sought so that, in the event that the target cellular telephone is transferred outside the territorial jurisdiction of the Court, interceptions may take place in any other jurisdiction within the United States.

4.    The wire interceptions sought herein will be conducted pursuant to Title 18, United States Code, Section 2518, concerning the following offenses enumerated in Title 18, United States Code, Section 2516:

A.    Conspiracy to conduct and participate, and conducting and participating, directly and indirectly in the affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4), i.e., a group of individuals associated in fact, that is, the named interceptees and others, the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity which includes the offenses set forth in paragraphs 4(B) through 4(I) below, and through the collection of unlawful debt, in violation of Title 18, United States Code, Sections 1962(c) and (d);

B.    Making extortionate extensions of credit, financing extortionate extensions of credit, collecting extensions of credit by extortionate means and conspiracy to do so, in violation of Title 18, United States Code, Sections 892, 893 and 894;

C.    Wire fraud and mail fraud in violation of Title 18, United States Code, Sections 1341 and 1343;

D.    Interference with commerce by threats or violence,

3

in violation of Title 18, United States Code, Section 1951;

     E.    Interstate Gambling Business, in violation of Title 18, United States Code, Section 1955;

     F.    Money laundering, in violation of Title 18, United States Code, Section 1956 and 1957;

     G.    Transportation of stolen goods, securities, moneys, in violation of Title 18, United States Code, Section 2314;

     H.    Bank Fraud, in violation of Title 18, United States Code, Section 1344;

     I.    Interstate and Foreign Travel in Aid of Racketeering, in violation of Title 18, United States Code, Section 1952; and,

     J.    Conspiracy, in violation of Title 18, United States Code, Section 371.

     5.    I have personally participated in this investigation of the offenses referred to in paragraph 4 of this affidavit. From that personal participation in this investigation, and through oral and written reports made to me by agents and analysts of the FBI and other state and local law enforcement agencies, I am familiar with the facts and circumstances of the investigations.

     6.    Since this affidavit is being submitted for the limited purpose of securing authorization for the interception of wire communications, I have not included each and every fact known to me concerning this investigation. I have only set forth those facts believed to be necessary to establish the requisite foundation for the issuance of the order requested herein.

7.   The facts and circumstances of this affidavit as set forth below demonstrate that:

A.   There is probable cause to believe that STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, and others as yet unknown, have committed, are committing and will continue to commit the offenses enumerated herein above in paragraphs 4(A) through 4(I).

B.   There is probable cause to believe that STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, and others as yet unknown, have used, are using, and will continue to use cellular telephone number (954) 614-1821, ESN EB6391C2, subscribed to by Gateway Transportation, 7770 West Oakland Park, Apartment 450, Fort Lauderdale, Florida, and utilized by JOHN MAMONE, and, cellular telephone number (954) 557-3651, ESN 25314057896, subscribed to by Kinsman Merchant & Associates, 4901 N.W. 17th Way, #407, Fort Lauderdale, Florida (mailing address), and utilized by FRED MORGENSTERN, for the purpose of facilitating the offenses enumerated in paragraph 4.

C.   The interception of wire communications of STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES,  MICHAEL BUCCINNA, VIRGIL WOMACK,

5

CHARLOTTE WOMACK, and others yet unknown, will yield relevant information and admissible evidence of those offenses, including communications concerning:

   (i)  the precise nature and scope of the illegal activities;

   (ii)  the identities and roles of the coconspirators and other participants in these illegal activities;

   (iii)  the locations and means used in furtherance of these illegal activities;

   (iv)  the location of records maintained by or in relation to these illegal activities;

   (v)  the location of assets derived as a result of these criminal activities and the distribution of money received through these illegal activities, including the methods used to transport and transfer money between and among conspirators and the current location of money and other assets derived from or used to promote these illegal activities; and,

   (vi)  the location of resources and operations leading to the discovery of the identities of other co-conspirators, aiders and abettors, and victims, and the role of each participant in the conspiracies and in the substantive violations set forth above in paragraph 4.

  D. In addition, the wire communications are expected to constitute admissible evidence of the commission of the above-enumerated offenses.

  8. Normal investigative procedures have been tried and have

not fully succeeded in achieving the objectives of the investigation, or reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ. These investigative procedures are discussed more fully below.

### DESCRIPTION OF FACILITIES
### TO BE INTERCEPTED

9.    AT&T Wireless records reveal that cellular telephone number (954) 614-1821, ESN EB6391C2, is subscribed to by Gateway Transportation, 7770 West Oakland Park Boulevard, Apartment 450, Fort Lauderdale, Florida.

10.    Sprint telephone records reveal that cellular telephone number (954) 557-3651, ESN 25314057896, is subscribed to by Kinsman Merchant & Associates, 4901 N.W. 17th Way, #407, Fort Lauderdale, Florida (mailing address).

### BACKGROUND OF THE INTERCEPTEES

11.    **STEVE BRUNO RAFFA**, a/k/a "Uncle Steve", was born on October 2, 1941, in the city of Ciancianna, in the province of Agrigento, Sicily, Italy.  **RAFFA** currently resides at 15641 SW 16th Street in Pembroke Pines, Florida.  According to the Italian law enforcement authorities, **RAFFA's** brother, Pietro Raffa (now thought to be deceased), was documented as being a member of the Sicilian Cosa Nostra (Sicilian Mafia) based in the Agrigento Province of Sicily.  **RAFFA** is now the Boss of the Trafficante LCN family in South Florida.  The Trafficante LCN family exercises considerable power and influence in South Florida.  No arrest record for **RAFFA**

7

could be located.

12.   JOHN MAMONE was born on June 12, 1951, in New Jersey.
MAMONE currently resides at 1960 Augusta Terrace in Coral Springs,
Florida.  MAMONE is a made member in the Trafficante LCN family and
is considered to be one of RAFFA's closest confidantes.  MAMONE has
the following criminal record: He was arrested on December 16,
1991, in New Jersey for Intimidation and the case was dismissed.
MAMONE was arrested on August 16, 1993, for mail fraud; he was
subsequently convicted and was sentenced on March 31, 1995, to 48
months probation and restitution in the amount of $94,444.   On
October 3, 1994, MAMONE was arrested by the New Jersey State Police
and charged with one count of terrorist threats, one count of theft
by extortion, one count of commercial bribery, one count of
tampering with a witness/informant, one count of racketeering and
one count of racketeering conspiracy; MAMONE was sentenced on
September 9, 1998, to four years probation and a fine of $7,500.
Until approximately August of 1999, MAMONE operated Check Cashing
Unlimited, a check cashing store, located at 5701 Margate
Boulevard, Margate, Florida (hereinafter referred to as Check
Cashing Unlimited).  In August of 1999, Check Cashing Unlimited was
purchased by FRED MORGENSTERN and is now called Gold Coast Check
Cashing.

13.   FRED MORGENSTERN was born on October 28, 1948, and
resides at 23170 Floral Wood Lane in Boca Raton, Florida.

8

MORGENSTERN incorporated Gold Coast Check Cashing, Inc., in April of 1998. In approximately August of 1999, MORGENSTERN took over the operation of Cash 96, 3591 North Andrews Avenue, Oakland Park, Florida, and Check Cashing Unlimited and is presently operating both under the name of Gold Coast Check Cashing. MORGENSTERN has a criminal record which includes the following: MORGENSTERN was arrested on June 5, 1976, for theft and was convicted and sentenced to five years probation. MORGENSTERN was arrested on December 22, 1976, in Cincinnati, Ohio, for passing bad checks and the case was dismissed. On January 30, 1989, MORGENSTERN began serving a three year sentence for transportation of stolen securities. On October 18, 1994, MORGENSTERN was arrested for grand larceny and the charges were later dropped. As described below, MORGENSTERN is also associated with VIRGIL WOMACK in a scheme to defraud investors, which the Trafficante LCN family is also involved with at least to the extent of laundering the investors' funds.

14. PEGGY PRESTON was born on August 17, 1964, and resides at 4717 N. W. 82nd Avenue, Fort Lauderdale, Florida. Based on electronic surveillance information, PRESTON is an associate of both MORGENSTERN and CROSSEN and assists MORGENSTERN with financial transactions. PRESTON is employed at Gold Coast Check Cashing, Inc., 5701 Margate Boulevard, Margate, Florida, and has no criminal record.

9

15.  **MARK WEISS** was born on August 25, 1962, and resides at 21190 Mainsail Circle Apartment 11, Aventura, Florida.  **WEISS** is involved in the management of Gold Coast Check Cashing, 5701 Margate Boulevard, Margate, Florida. He was arrested for assault and battery on January 7, 1999; this case was later dismissed. **WEISS** is a collector of extortionate loans for Bellitto made through Gold Coast Check Cashing.

16.  **ISRAEL TORRES**, also known as "Buddy", was born on July 10, 1950, in Manhattan, New York, and has a registered address of 5100 Las Verde Circle, #318, Delray Beach, Florida.  Anthony Graziano is a Capo in the Bonanno LCN Family and is **TORRES'** principal contact for the criminal crew operating in South Florida. On October 6, 1994, **TORRES** was arrested by Broward County Sheriff's Office, Florida, for two counts of Grand Larceny and Tampering With/Destroying Evidence.  On December 2, 1994, **TORRES** was arrested by Palm Beach County Sheriff's Office, Florida, for Fraud, Illegal Use of Credit Cards and Forgery of Credit Card.  On December 23, 1994, **TORRES** plead nolo contendre to the October 6, 1994 charges and plead guilty to the December 2, 1994 charges; **TORRES** was sentenced to four years probation, suspension of his driver's license, and restitution of $8,460.  On March 31, 1998, **TORRES** was arrested by Palm Beach County Sheriff's Office, Florida, for Grand Theft; those charges were subsequently dismissed.

17.  **MICHAEL BUCCINNA** was born on April 30, 1959, and resides

10

at 6363 N.W. 39th Street, Coral Springs, Florida. **BUCCINNA** works at Gold Coast Check Cashing, Inc., 5701 Margate Boulevard, Margate, Florida. **BUCCINNA** has no criminal record, but as described below, **BUCCINNA** helps to collect extortionate loans for **MAMONE.**

18. **VIRGIL WOMACK**, also known as Lewey L. Catoe, III, George H. Williamson, and Clifton Wilkinson, was born on July 24, 1941, in Georgia. **WOMACK** currently resides at 11052 Watson Drive, Suite C in Seneca, South Carolina. **WOMACK** has a criminal record which includes the following: **WOMACK** was arrested on March 10, 1986, for battery and the case was dismissed; **WOMACK** was arrested on April 17, 1990, for battery, criminal damage to property second degree, aggravated assault and terrorist threats and acts. **WOMACK** received a suspended sentence upon payment of a fine of $120.00 and restitution.

19. **CHARLOTTE WOMACK**, the spouse of **VIRGIL WOMACK**, was born on November 23, 1948. **CHARLOTTE WOMACK** currently resides at 11052 Watson Drive, Suite C, Seneca, South Carolina. **CHARLOTTE WOMACK** has no criminal history.

### PREVIOUS APPLICATIONS

20. I caused a search to be made of the electronic Surveillance Indices of the Federal Bureau of Investigation and the Drug Enforcement Administration during the week of December 27, 1999, in order to determine whether previous applications have been

11

made to intercept wire, oral or electronic communications of **STEVE BRUNO RAFFA**, **JOHN MAMONE**, **FRED MORGENSTERN**,  **PEGGY PRESTON**, **MARK WEISS**, **ISRAEL "BUDDY" TORRES**, **MICHAEL BUCCINNA**, **VIRGIL WOMACK**, **CHARLOTTE WOMACK**, or of any of the communication facilities named in this Affidavit.  These searches did not reveal any previous applications to intercept wire, oral or electronic communications of any of those persons, or for any the communication facilities for which authorization is herein sought, other than the following:

21.  On January 16, 1991, the Honorable Robert J. Ward, United States District Judge, Southern District of New York, signed a Court Order which authorized the interception of oral communications of **JOHN MAMONE** and others for a period of thirty (30) days. Extension Orders authorizing the continued interception of oral communications of **JOHN MAMONE** and others each for periods of thirty days were issued on February 16, 1991, March 13, 1991, April 17, 1991, and May 16, 1991.

22.   On September 12, 1991, the Honorable Nicholas H. Politan, United States District Judge, District of New Jersey, entered an Order authorizing the interception of wire communications of **JOHN FRANCIS MAMONE** and others occurring over telephone number (908) 469-1657 and (908) 469-8424, for a period of thirty (30) days.  On October 16 and November 15, 1991, the Honorable Nicholas H. Politan, United States District Judge, District of New Jersey, entered Orders authorizing extensions of time for the above described interception of wire communications

12

for additional thirty (30) day periods.

23.   On November 19, 1998, the Honorable Wilkie D. Ferguson, Jr., United States District Judge, Southern District of Florida, entered an Order authorizing the interception of the wire communications of **JOHN MAMONE** and others occurring over telephone number (954) 295-6672, 1700 N. State Road 7, Hollywood, Florida, for a thirty (30) day period.

24.   On September 23, 1999, the Honorable William P. Dimitrouleas, United States District Judge, Southern District of Florida, entered an Order authorizing the interception of the wire communications of **STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN,** and others occurring over telephone number (954) 564-5599, for a period of thirty (30) days.

25.   On November 12, 1999, the Honorable Wilkie D. Ferguson, Jr., United States District Judge, Southern District of Florida, entered an Order authorizing the interception of the wire communications of **ISRAEL "BUDDY" TORRES, JOHN MAMONE,** and others occurring over cellular telephone numbers (561) 350-5824 and (917) 414-7111, for a period of thirty (30) days.

26.   On December 28, 1999, the Honorable Wilkie D. Ferguson, Jr., United States District Judge, Southern District of Florida, entered an Order authorizing the continued interception of the wire communications of **ISRAEL "BUDDY" TORRES, JOHN MAMONE,** and others occurring over cellular telephone numbers (561) 350-5824 and (917)

13

414-7111, for a period of thirty (30) days, which is ongoing at this time.

## FACTS AND CIRCUMSTANCES
## ESTABLISHING PROBABLE CAUSE

27. Based on my investigative training and experience, coupled with information provided by various sources, including other agents of the FBI, I have learned the following information about the La Cosa Nostra (LCN), a nationwide secret criminal association crime group in the United States.

A.   The LCN is the most powerful and sophisticated organized crime group in the United States.

B.   The LCN consists of approximately twenty-four separate organizational units, known as "families," functioning in different cities throughout the United States.

C.   The hierarchy of each LCN family is very rigidly structured in the form of a pyramid. At the top of the pyramid for each LCN family is the Boss. The second-in-command is known as the Underboss. Beneath the Underboss is the Consigliere, or counselor. The fourth highest rank in each LCN family's hierarchy is the position of Caporegime, often referred to simply as "Capo," "Captain," or "Skipper." Caporegime are supervisors over "crews," i.e., groups of Soldiers, the lowest ranking members of the LCN family. Finally, LCN members frequently have nonmember associates who operate under their direction.

D.   There are five LCN families operating in the New York metropolitan area. They are the Bonanno, Colombo, Gambino,

14

Genovese, and Lucchese LCN families.   Each of these families is involved in a wide variety of criminal activities including murder, arson, gambling, loansharking, extortion, labor racketeering, robbery, money laundering, and narcotics trafficking.   The Miami/Fort Lauderdale area is considered an "open city" in which any LCN family may operate without paying tribute to any other LCN family.   Each of the five New York families has representatives in South Florida.   In addition to the five New York LCN families, the Trafficante and DeCavalcante Families, along with representatives of the Sicilian Mafia, operate in the South Florida area.   Often members of these families will operate and invest together in business and/or illegal operations.

E.    The Trafficante LCN Family, with approximately nine documented members and a multitude of unconfirmed members and associates, is one of the more powerful LCN families in the Tampa and South Florida areas.   Source information reveals that the Trafficante LCN family and its associates engage in drug trafficking and money laundering, and additionally are involved in traditional racketeering activities, such as murder, gambling, loansharking, public corruption and obstruction of justice, among other racketeering offenses.

28.   **RAFFA** is the Boss of the Trafficante Organized Crime Family in South Florida.   **RAFFA** assumed his present position following the death of Santo Trafficante in 1987.   Vincent Loscalzo is the Boss of the Trafficante family located in Tampa, Florida.

15

RAFFA and Loscalzo share power in the family and divide the territory of the family. MAMONE reports to RAFFA.

29. From approximately 1994 to approximately 1995, cooperating witness Louis Maione, an associate of the Gambino Crime family, pretended to act on behalf of the Gambino Family while he, in fact, was cooperating with the FBI. Maione has provided information to the FBI for approximately ten years. Maione had been associated with the Gambino Family for approximately forty years. The information provided by Maione has been corroborated by independent investigation, e.g., information supplied by other sources of information, physical surveillances, pen register information, and has been determined to be reliable. Information supplied by Maione has been used to obtain four orders for electronic surveillance.

30. Information supplied by Maione also resulted in the indictment of Nicholas Corozzo, the acting head of the Gambino LCN family and eight other persons. Ultimately Corozzo and eight others entered guilty pleas in the Southern District of Florida to violations of the Racketeering Influenced and Corrupt Organizations statute (RICO).

31. On June 13, 1996, Maione recorded a meeting attended by RAFFA, MAMONE, and Augustus Corrao, a soldier in the Gambino LCN family, concerning a financial debt owed to MAMONE by Louis Last Name Unknown (LNU), an associate of the Gambino LCN family, which occurred at Corrao's residence in Miami, Florida. In that meeting,

16

Corrao referred to **RAFFA** as the Boss of the Santo Trafficante crew. **RAFFA** stated to Maione that he (**RAFFA**) did not interfere in shakedowns, or extortions, undertaken by Nicholas Corozzo, then the Acting Boss of the Gambino LCN family, and in return he (**RAFFA**) expected that Corrozo would not involve himself in the shakedowns conducted by **RAFFA**. Maione informed **RAFFA** that he would communicate this position to Corozzo.

32. On June 26, 1996, Maione met with Corozzo, the acting head of the Gambino LCN family, at the Arch Diner in Brooklyn, New York. During this meeting, Maione asked Corozzo if **RAFFA** was, in fact, the Boss of the Trafficante LCN family and if **RAFFA** had power in Florida; Corozzo replied that **RAFFA** was now the leader of the Trafficante LCN family and that he had a crew of six or eight persons.

33. Confidential Source Number One (CS-1) has been associated with members of all five of the New York LCN and the Trafficante LCN family for over 15 years. The information provided by CS-1 has been corroborated by independent investigation, e.g., information supplied by other sources of information, physical surveillances, and pen register information, and, has been determined to be reliable. Information supplied by CS-1 has been used to obtain over 30 orders for electronic surveillance and over 45 search warrants. Information supplied by CS-1 has resulted in more than twenty-five persons being charged with criminal offenses.

34. On January 25, 1996, CS-1 advised that **RAFFA** and **MAMONE** are members of the Trafficante LCN family. CS-1 further advised that **RAFFA** is a captain in the Trafficante LCN family and is involved in narcotics trafficking and extortionate extensions of credit to legitimate businesses and persons. CS-1 further stated that **MAMONE** works for **RAFFA** and is involved in narcotics trafficking with **RAFFA**. CS-1 learned this information based on his conversations and association with members and associates of the five New York LCN families and the Trafficante LCN family.

35. On August 16, 1999, CS-1 advised that CS-1 is still in regular contact with members and associates of the five LCN families and the Trafficante LCN family. CS-1 advised that **RAFFA** and **MAMONE** are still made members of the Trafficante LCN family and that **RAFFA** continues to be involved in making extortionate extensions of credit.

36. Confidential Source Number Two (CS-2) has been associated with a New York LCN family for approximately 20 years. CS-2 has known **RAFFA** since approximately 1990. The information provided by CS-2 has been corroborated by independent investigation, e.g., information supplied by other sources of information, physical surveillances, pen register information, and, has been determined to be reliable. Information from CS-2 has been utilized in one prior application for electronic surveillance, which was authorized by the Court.

18

37. On August 16, 1999, CS-2 advised that **RAFFA** has previously admitted to CS-2 that he (**RAFFA**) is a member of the Trafficante LCN family. CS-2 advised that **RAFFA** and Vincent Loscalzo divide the territory of the Trafficante LCN family, with **RAFFA** being located in South Florida and Loscalzo being located in Tampa. **RAFFA** operates a crew of members and associates of the Trafficante LCN family in South Florida. CS-2 advised that **JOHN MAMONE** is a member of **RAFFA's** crew and engages in illegal gambling.

38. Confidential Source Number Three (CS-3) has been associated with **MAMONE** for approximately four years. Although CS-3 is no longer a source for the FBI, the information provided by CS-3 has been corroborated by independent investigation, e.g., information supplied by other sources of information, physical surveillances, pen register information, and has been determined to be reliable.

39. In the fall or winter of 1995, CS-3 approached **JOHN MAMONE** and his associate, Joseph Russo, and took out an extortionate loan for approximately $40,000. CS-3 described the loan as a wholesale type loan that would usually run about a point to a point and a half per week. This loan was later forgiven when **MAMONE** became CS-3's silent partner in CS-3's business.

A. Based on my training, experience, and information form other agents, it is my understanding that this refers to one to one and one-half percent interest per week on the total loan or

19

over fifty-two percent interest per year.

40.    CS-3 stated that in May 1997, **MAMONE** and Joseph Russo physically assaulted CS-3 in connection with a debt owed by a third party to **MAMONE** and Russo.  **MAMONE** and Russo blamed CS-3 for the failure of the third party to pay approximately $150,000 that **MAMONE** and Russo thought they were owed as a result of a business dispute.  CS-3 further stated that **MAMONE** and Russo also assaulted the third party with a baseball bat.

A.    Agents from the FBI interviewed the third party who confirmed that he/she had been assaulted by **MAMONE** and Russo.

41.    Confidential Source Number Four (CS-4) has provided information to the FBI for approximately eight months.  CS-4 has been meeting with members and associates of various LCN families in South Florida since in or about 1995.  CS-4 has provided information on loansharking, gambling, extortion and stolen property activities engaged in by members and associates of LCN families operating in South Florida and elsewhere.

42.    Where possible CS-4 has consensually recorded meetings with various organized crime members and associates including, among other individuals, **MAMONE**.  CS-4 consensually recorded conversations whenever the circumstances permitted, depending upon safety concerns and practical considerations.  The information provided by CS-4 has been proven to be truthful and reliable.  This information has been corroborated by information from other cooperating witnesses, confidential sources and the consensually

20

recorded conversations made by CS-4 with targets of the investigation. Information provided by CS-4 has previously been included in two applications for electronic surveillance, both of which were granted.

43. CS-4 has been involved in illegal gambling activities with associates of the Colombo and Bonanno LCN families since approximately 1992. Prior to his cooperation, CS-4 had been regarded by the Colombo and Bonanno LCN families as an expert in operating bookmaking businesses in South Florida.

44. On November 3, 1999, CS-4 informed me that CS-4 has known Frank Ruggiero, a close associate of MAMONE for several years and during that time Frank Ruggiero told CS-4 that RAFFA and MAMONE are members of the Trafficante LCN family and that MAMONE reports to RAFFA.

45. On December 10, 1999, CS-4 informed me that CS-4 has known MAMONE since approximately 1996. During the last three years, CS-4 has collected checks for MAMONE from gamblers who have owed money to MAMONE for their gambling losses. CS-4 has also referred several individuals to MAMONE for loans, which were subsequently extended to them at extortionate interest rates. Through his conversations with MAMONE and these individuals, CS-4 is aware that MAMONE charges three points for loan amounts under $10,000 and two and one-half points for loan amounts over $10,000.

A. Based upon my experience and information from other

21

law enforcement officers, I am aware that points refers to the weekly interest being charged on the total amount of the loan, normally referred to as vigorish. Three points converts to 156% per annum, and, two and one-half points would convert to 130% per annum.

46. CS-4 informed me on December 10, 1999, that CS-4 is aware through conversations with MAMONE and personal observations that MAMONE is involved in a variety of criminal activities, including the laundering of checks, loansharking, gambling and collection of gambling debts, and, possession of stolen property, including stolen credit cards. As to the gambling business, CS-4 stated that MAMONE helps finance at least two separate bookmaking offices. CS-4 is aware that one of the offices, which is managed by Jackie Baruch, has been in operation for at least the last year of which CS-4 is aware and that there are at least five individuals involved in the operation of that bookmaking office.

47. CS-4 further informed me on December 10, 1999, that CS-4 is aware through conversations with MAMONE and TORRES that they have been partners in the extortionate loan business for many years. In addition, TORRES has received money from MAMONE at a low rate of interest and extended the money at extortionate rates to other individuals.

48. CS-4 also stated that MAMONE regularly makes extortionate extensions of credit in South Florida to several individuals associated with illegal gambling businesses, in particular

22

bookmaking operations.  Many of these loans were originally debts owed by individuals which were then converted into extortionate loans.  Specifically, CS-4 is aware that Alan Epstein currently has an extortionate loan of approximately $20,000.00 incurred through an unpaid gambling debt, and that Ralph Lento currently has an extortionate loan through MAMONE for approximately $20,000.00 on which Lento has made payments.

49.  In approximately January of 1999, prior to the time CS-4 began cooperating with the government, CS-4 received an extortionate extension of credit from MAMONE in the amount of $20,000.00 at an interest rate of 2% per week, for a total interest rate of approximately 104% per year.  CS-4 has been repaying the loan on a weekly basis and continues to do so.  CS-4 normally makes the payments to MAMONE at Gold Coast Check Cashing, Margate. MAMONE has advised CS-4 that with respect to CS-4's extortionate loan, that it is not just him (MAMONE) that is being paid, but MAMONE's people as well.

A.    CS-4 informed me that CS-4 understands this statement by MAMONE to mean that RAFFA and the Trafficante LCN family are also receiving monies from the extortionate loan.

B.    Although CS-4 has known MAMONE for a lengthy period of time, when CS-4 has been late on the payments to MAMONE, MAMONE has been unpleasant.  For example, on October 7, 1999, at approximately 11:51 a.m., MAMONE left a message on an answering

23

machine for CS-4 concerning the outstanding extortionate loan MAMONE had extended to CS-4. CS-4 had not been making payments on the loan. MAMONE stated that CS-4 was a "fat motherfucker" and further remarked "wait till I see you" (CS-4). This message was related in an angry tone of voice, and clearly carried an implied threat of violence.

50. CS-4 has made payments on his extortionate loan from MAMONE at Gold Coast Check Cashing, Margate, Florida. CS-4 informed me that prior to each of the dates described below, CS-4 would call MAMONE at his cellular telephone number (954) 614-1821 to arrange the meetings to make payments on the extortionate loan. In addition, CS-4 had received a number of telephone calls from MAMONE concerning repayment on the loan which MAMONE placed from his cellular telephone, (954) 614-1821, which CS-4 determined from the caller identification function on CS-4's telephone. The telephone records for the telephone of CS-4 has not been obtained. CS-4 has made payments to MAMONE on the extortionate loan on the following dates: 6/24/99 - $400; 6/30/99 - $400; 7/15/99 - $400; 8/4/99 - $400; 8/12/99 - $400; 8/19/99 - $1,000; and, 10/7/99 - $300. In addition, on 06/14/99, CS-4 made a payment of $200 to BUCCINNA, which was to be credited towards CS-4's loan from MAMONE.

A. On December 10, 1999, CS-4 informed me that BUCCINNA works at Gold Coast Check Cashing, Margate, and acts as a collector of extortionate loans at the behest of MAMONE.

24

B.    A law enforcement officer has been present with CS-4 at the time that many of the calls have been received from or made to MAMONE's cellular.  In particular, over the last thirty days, a law enforcement officer observed CS-4 place calls to MAMONE's cellular telephone number, (954) 614-1821, and/or receive calls from MAMONE's cellular no less than twenty separate times, the last occasion being on January 5, 2000.  The majority of these conversations over the last thirty days involved the extortionate loan and payments on it as well as arranging meetings with MAMONE concerning the loan.  Some of the conversations have also concerned checks which CS-4 has cashed at MAMONE's behest.

C.    In addition to the payments described above, on November 29, 1999, CS-4 met with MAMONE at Check Cashing Unlimited and provided MAMONE with seven items which CS-4 represented to MAMONE to have been stolen from Maryland.  Specifically, CS-4 provided four Rolex watches, one Baume & Mercier watch, a ladies tennis bracelet, and a ladies emerald and diamond ring.  MAMONE was to sell these items through MAMONE's unidentified fence and the amount received by MAMONE was to be deducted from CS-4's payments on the outstanding extortionate loan.  The following day, November 30, 1999, CS-4 reached MAMONE at his cellular telephone, (954) 614-1821, and during this recorded conversation, which was made while law enforcement was present, MAMONE informed CS-4 that he (MAMONE)

25

would credit $4,500 towards the principal on CS-4's loan as the value of the "stolen" jewelry that CS-4 had provided **MAMONE** the previous day.

51. On March 25, 1999, CS-4 met with **MAMONE** and consensually recorded their conversation. CS-4 and **MAMONE** discussed monies owed by bettors in an illegal gambling business, a bookmaking operation, as a result of losing wagers. CS-4 and **MAMONE** further discussed the repayment of extortionate loans to **MAMONE** by various individuals.

52. On December 10, 1999, CS-4 stated that CS-4 is aware that Scarola currently has an extortionate loan of approximately $10,000.00 through **MAMONE**. CS-4 is specifically aware that Scarola has received at least four extortionate loans from **MAMONE** in the past in the amounts of approximately ten to fifteen thousand dollars.

A. During electronic surveillance conducted pursuant to the court's Order dated November 22, 1999, described above, Scarola was intercepted in conversations in late November, 1999, with **TORRES** discussing a bookmaking operation in which Scarola is participating.

B. Although Scarola is a named interceptee and has been identified through the November 22, 1999 electronic surveillance and its extension as a bookmaker, your affiant has no evidence to indicate that Scarola's relationship to **MAMONE** is anything but a

victim of an extortionate loan. Therefore it is not anticipated that the conversations with MAMONE will involve any federal crimes being committed by Scarola notwithstanding the fact that Scarola is a named interceptee in the other ongoing electronic surveillance.

53. On December 10, 1999, CS-4 reported that he has been present with MAMONE when MAMONE has called or received calls from Scarola on his (MAMONE's) cellular telephone. CS-4 is aware that many of these conversations refer to Scarola's outstanding loan.

A. Pen register information shows two incoming telephone calls to MAMONE's cellular telephone number (954) 614-1821 from Scarola's telephone number (954) 802-4510.

54. CS-4 informed me on December 10, 1999, that in or about July 1999, CS-4 overheard TORRES engaging in conversations utilizing his own cellular telephone. After such conversations, TORRES informed CS-4 that he (TORRES) had just spoken with MAMONE. TORRES advised CS-4 that he (TORRES) had discussed with MAMONE monies loaned to individuals as extortionate extensions of credit.

A. CS-4 advised that CS-4 could not overhear the substance of TORRES telephone conversations, but was informed by TORRES thereafter.

55. On May 5, 1999, CS-4 met with MAMONE and consensually recorded their conversation. At the direction of the FBI, CS-4 and MAMONE discussed the laundering of money through MAMONE's check cashing store in Margate, Check Cashing Unlimited, in the form of

27

checks provided by losing bettors to CS-4. **MAMONE** informed CS-4 that CS-4 should charge two points to launder the gambling proceeds.

A. I know, based upon my training and experience and conversations with CS-4 that "two points" refers to two percent of the total amount of money laundered.

56. On or about July 29, 1999, **MAMONE** gave CS-4 a check in the amount of $150,141.12 and requested that CS-4 cash it at Akel's Market, a check cashing store located at 502 NW 6th Street in Pompano Beach, Florida. **MAMONE** told CS-4 that CS-4 should wipe his (**MAMONE's**) fingerprints off of the check. CS-4 attempted to cash this check but was informed that the bank had identified it as counterfeit. CS-4 advised **MAMONE** of the problem and CS-4 retreived the check from Kaiser and returned it to **MAMONE**.

A. Investigation by the FBI confirmed that the check was counterfeit and the transaction was not completed.

57. According to public records, Cash 96 was owned and operated by **RAFFA** from approximately 1998. According to CS-4, **MAMONE** owned and operated Check Cashing Unlimited from approximately 1995. CS-4 stated that both Cash 96 and Check Cashing Unlimited were sold to **MORGENSTERN** in approximately August of 1999.

A. Florida corporate records show that **MORGENSTERN** was listed as the customer who filed the articles of incorporation for

28

Gold Coast Checking on April 28, 1998. Gold Coast Checking is now the owner of the check cashing business being operated at 5701 Margate Boulevard, Margate, Florida. This is the location of the business formerly run by MAMONE and called Check Cashing Unlimited, from which CS-4 received the extortionate loan as discussed above.

58. CS-4 reported that in approximately September of 1999, MAMONE told CS-4 that MAMONE had twenty-one checks which MAMONE wanted CS-4 to have cashed at Akel's Market, 502 N.W. 6th Street, Pompano Beach, Florida. MAMONE told CS-4 that the checks had all come from MORGENSTERN, that MORGENSTERN has people to invest and that they receive 4-5% return a year. MAMONE stated that he (MAMONE) wanted to receive back approximately $100,000 in cash, and the rest in money orders and/or cashier checks. MAMONE initially provided CS-4 with copies of the twenty-one checks, which CS-4 in turn provided to Akel Kaiser. On or about September 22, 1999, MAMONE and CS-4 took the twenty-one checks drawn on various accounts, payable to the order of Chemical Trust, Alliance Trust and various individuals, totaling approximately $1,046,000.00, to Akel's Market. MAMONE said the checks should be good and asked Kaiser to only charge him (MAMONE) one and one-half points rather than two points. MAMONE said that he (MAMONE) would have more checks to come. Kaiser was concerned because of the circumstances of the out-of-state checks. Kaiser ended up taking all twenty-one checks from MAMONE. Within a day, Kaiser called CS-4 and told CS-4

29

that Kaiser could not cash the twenty-one checks because it was too large an amount. **MAMONE** got the checks back from Kaiser and **MAMONE** later told CS-4 that he (**MAMONE**) had gotten rid of the checks.

A.    Based upon the investigation, it appears that Kaiser is aware that the checks had come from **MORGENSTERN**, but is not aware of the investment fraud scheme. The investigation was unable to determine how or where **MAMONE** finally cashed these twenty-one checks after Kaiser refused to handle them.

B.    The FBI in Greenville, South Carolina, has been conducting an ongoing   investigation regarding mail fraud activities engaged in by various targets, including **MORGENSTERN**, and, **VIRGIL** and **CHARLOTTE WOMACK**. The investigation has disclosed that the above-referenced checks were the proceeds of mail fraud activity and were sent to South Florida in order to promote the illegal activity. A more detailed explanation of the scheme and artifice to defraud is set forth below.

59.    In September of 1998, the Securities and Exchange Commission (SEC) filed a complaint for injunctive and other relief in federal court, Southern District of Florida, Case Number 98-7044-Civ-Dimitrouleas, against **MORGENSTERN**, Amquest International, Ltd., and others. That complaint alleges the following information. During 1996, Amquest did a private placement offering in order to supposedly raise money to create a mortgage company. Registration form N1-A was filed with the SEC, as well as form D

30

regarding the private placement memorandums issued by Amquest. The private placement memorandums were issued to approximately 100 investors. Approximately 5,000 shares of common stock were sold and approximately $3.4 million was raised. The proceeds of the private placement were laundered by MORGENSTERN through Kinsman Merchant & Associates, Inc. Checks were made payable to Kinsman, which were signed by MORGENSTERN and deposited in Kinsman's bank accounts. Kinsman then issued checks made payable to approximately fifteen different companies; these companies opened brokerage accounts in which the monies were deposited. Some of the money was as well deposited into MORGENSTERN's personal bank account and the personal account of the secretary of Amquest. MORGENSTERN was also involved in a second offering, Sleep Source, in which they raised money in an attempt to acquire Sleep-O-Rama. MORGENSTERN raised approximately $800,000 from fifteen different investors. The proceeds from this offering were again laundered through Kinsman and again through the fifteen company accounts. The complaint charges that MORGENSTERN and others engaged in a scheme to defraud investors in connection with Amquest International, LTD., described by the defendants as a financial services business. That civil case is still pending.

60.    In November of 1996, VIRGIL WOMACK, Principal for Western Continental Holdings, Inc., Tifton, Georgia, began to offer and sell unregistered securities in the form of Commercial

31

Promissory Notes. By January of 1997, **VIRGIL WOMACK** and his wife, **CHARLOTTE WOMACK**, formed a corporation known as Global Financial, Inc. (GFI), which continued to sell the notes nationwide to hundreds of investors. GFI falsely claimed that its corporate promissory note was an approved exempt security under the Securities Act of 1933. GFI further falsely claimed that the Notes were doubly insured and backed by a financial guarantee policy issued by Keyes International Insurance Company (KIIC), Ltd of St. Kitts, West Indies.

A. According to the Georgia Secretary of States Office, these notes are not deemed exempt securities in accordance with state statutes, and neither are the transactions deemed exempt. **VIRGIL WOMACK** was not registered by the State of Georgia or any other state to sell securities.

B. The National Association of Insurance Commissioners advised that KIIC was an offshore insurance company located on the island of St. Kitts, West Indies, and was not licensed to conduct business in the United States.

61. From November of 1996 until mid-1999, **VIRGIL** and **CHARLOTTE WOMACK**, through their organization, defrauded investors of approximately $8 million. In fact, during one year the organization defrauded over one hundred investors of $6.4 million. According to public records, the State of Georgia placed GFI under receivership in 1999 and shortly thereafter, **VIRGIL WOMACK** left the State of Georgia.

62.  Information from FBI, Macon, Georgia, on July 30, 1999, indicated that VIRGIL WOMACK had relocated to South Carolina from Georgia and was perpetuating a new investment fraud scheme, soliciting investors for an offering named Alliance Trust.

63.  Confidential Source Number Five (CS-5) has been providing information to the FBI since October 29, 1999, and is being paid for this information.  CS-5 is an employee of VIRGIL WOMACK and is in a unique position to provide information.  The information provided by CS-5 has been corroborated through independent investigation, including other sources of information, physical surveillances, and pen register information, and, has been determined to be reliable.

64.  On October 29, 1999, CS-5 advised a special agent of the Federal Bureau of Investigation (FBI) that VIRGIL WOMACK, his wife, CHARLOTTE WOMACK, her sister-in-law, Crystal Wilkinson, and others, are operating a securities investment business known as Chemical Trust and/or Alliance Trust, based in two condominiums in Seneca, South Carolina, one of which is WOMACKs' residence.  CS-5 advised the FBI that VIRGIL WOMACK had recruited a cadre of salespeople (agents) throughout the United States who were actually marketing and selling these  investment instruments, known as Chemical Trust and Alliance Trust, to investors nationwide.   Investors are promised a guaranteed contract which returns varying amounts of interest on their investment. Salespersons, however, are advised by VIRGIL WOMACK that they are guaranteed up to 25% commission on

33

their client's investment.

65.   CS-5 advised this operation is receiving from $250,000 to $600,000 in investor checks on a daily basis. CS-5 stated that approximately 25% of the investor funds are processed through the First National Bank of Onaga, Onaga, Kansas, and Fidelity Bank of Atlanta, Georgia, through the use of Self-Directed Individual Retirement Accounts (IRAs). CS-5 indicated these IRA funds are wire transferred directly from these banks to a Chemical Trust account at Admiralty Bank, Palm Beach Gardens, Florida.

66.   CS-5 advised that VIRGIL WOMACK has signatory authority on the Chemical Trust account at Admiralty Bank and he (VIRGIL WOMACK) recently wire transferred funds from that account to London, England.

A.    A review of subpoenaed bank records by agents of the FBI for Admiralty Bank, Palm Beach Gardens, Florida, reflect that on October 20, 1999, $3,000,000.00 was wire transferred from Chemical Trust account #300137931, Seneca, South Carolina, to Falcon Trust Company, Ltd., account #63772677, at Barclays Bank, PLC, London, England. Bank records reflect authority to make this transaction were received by fax from VIRGIL WOMACK.

B.    A review of subpoenaed bank records for Admiralty Bank reflect that on November 1, 1999, $1,250,000.00 was wire transferred from Chemical Trust account #300137931, to Falcon Trust Company, Ltd., account #63772677, Barclays Bank, PLC, London, England. VIRGIL WOMACK's signature and date, "11-1-99," appear on

34

the facsimile sheet authorizing the transaction.

67. On October 29, 1999, CS-5 advised that **VIRGIL WOMACK** has another account at the Admiralty Bank, Palm Beach Gardens, Florida, in the name of Prestige Accounting Services, Inc., which is used to pay agents (salesmen) and clients (investors) their commissions and interest earnings when demanded by the investor. CS-5 indicated that **VIRGIL WOMACK** uses the signature stamp of George H. Williamson, Sr. on this account. CS-5 told the FBI that these checks are also prepared from the Seneca, South Carolina location.

A.    A review of subpoenaed bank records for Admiralty Bank, Palm Beach Gardens, Florida, for Prestige Accounting Services, Inc., Seneca, South Carolina 29678, account #300137842, reflects signatory authority as VIRGIL WOMACK and also shows checks signed by George H. Williamson, Sr., with a West Palm Beach address.

B.    I understand that WOMACK's organization further the investor/victims by convincing them to forego annual interest payments on their investments with the promise of an additional 5% interest return.

68. On October 29, 1999, CS-5 told the FBI that **VIRGIL WOMACK** does not use his true name, but rather uses the name of Clifton Wilkinson, which is his brother-in law's name, when dealing with salespersons who market his trust instruments. CS-5 indicated **VIRGIL WOMACK** signs all documents as Wilkinson and utilizes a signature stamp in Wilkinson's name. CS-5 stated that **VIRGIL**

WOMACK also has a signature stamp with the names Lewey L. Catoe, III, and George H. Williamson, which he uses on documents and checks. CS-5 stated that VIRGIL WOMACK told CS-5 that he is to be referred to as Clifton Wilkinson when responding to telephonic inquiries by salespeople. VIRGIL WOMACK refers salespersons who would like to meet personally, to United Marketing Trust, which source believes is an office located at 4126 Pleasantdale Road, Suite B-207, Atlanta, Georgia 30340. CS-5 advised that all salespersons refer to VIRGIL WOMACK as Cliff (Wilkinson), and uses his cellular telephone, (770) 331-4079, extensively to conduct business operations.

A.    I am aware that area code 770 is an Atlanta, Georgia telephone exchange.

69.    On October 29, 1999, CS-5 advised that when VIRGIL WOMACK receives a new contract for an investor, the source prepares a payment surety bond, then facsimiles these bonds to U.S. Guarantee Corporation, in Scottsdale, Arizona. U.S. Guarantee Corporation sends back to VIRGIL WOMACK, via overnight mail, a new payment surety bond with an "official" logo of a blue eagle, signed by Alvin Tang, its Chief Operating Officer, and Kenneth Turner, its Vice-President. CS-5 advised that VIRGIL WOMACK stamps the name Lewey L. Cato, III on the bottom of the bond and it is sent to the investor. U.S. Guarantee Corporation represents that they are backed by $2.6 billion in assets.

A.    Your affiant has determined through a review of

36

investigative records that Alvin Albert Tang was convicted by the State of Arizona in 1988 for defrauding investors of $1 million in a stock scheme.

      B.   Your affiant has been advised by the SEC that the claim that U.S. Guarantee Corporation is backed by $2.6 billion in assets is false.

    70.  On October 29, 1999, CS-5 told the FBI that the actual business address for the above-described Trusts, which is reflected on all business correspondence and the destination points for incoming mail from salespersons and investors, is Applewood Center Place, 290G Applewood Center, Suite 301, Seneca, South Carolina 29678-0930, which is a Mail Boxes, Etc. location. Unendorsed investor checks are packaged daily and mailed via Federal Express to **FRED MORGENSTERN** in South Florida.

      A.   CS-5 stated that until November 29, 1999, at the direction of **VIRGIL WOMACK**, CS-5 mailed the investor checks to **MORGENSTERN** at The Merrit Advisors Group, Inc., 4901 N.W. 17th Way, Suite 407, Fort Lauderdale, Florida. Since November 29, 1999, the checks are now being mailed on a daily basis to **MORGENSTERN** at Gold Coast Checking, Margate, Florida.

      B.   Based upon the investigation being conducted in South Carolina as well as in South Florida, your affiant has been unable to find any other reason for contact between **WOMACK** and **MORGENSTERN** other than the ongoing investment fraud described in this affidavit.

71.    On November 1, 1999, CS-5 advised that MORGENSTERN is the
individual who assists VIRGIL WOMACK in cashing investor checks
through several banks, including one in the Bahamas, and possibly
two check cashing operations in Florida, one known as Gold Coast
Check Cashing, Inc.  On November 12, 1999, CS-5 advised that PEGGY
PRESTON works with MORGENSTERN in the Fort Lauderdale, Florida
office of The Merrit Advisors Group. According to CS-5, PRESTON is
involved in moving money from the Admiralty Bank in Palm Beach
Gardens, Florida.

A.    MORGENSTERN is associated with both Kinsman Merchant
& Associates as well as The Merrit Advisors Group.    Both these
companies have the same office space located at 4901 N. W. 17th Way,
Suite 407, Fort Lauderdale, Florida.

72.    CS-5 has indicated that the daily receipts which are then
forwarded to MORGENSTERN average from $250,000 to $600,000 in
investments, however, on several days the total has been in excess
of $1 million.  For example, CS-5 stated that on October 28, 1999,
at VIRGIL WOMACK's direction, CS-5 forwarded by DHL Express,
unendorsed investor checks made payable to Chemical Trust totaling
$626,574.66 to MORGENSTERN. On October 29, 1999, CS-5 forwarded an
additional  $256,206.00  in  unendorsed  investor  checks  to
MORGENSTERN.  On November 1, 1999, CS-5 mailed, at VIRGIL WOMACK's
direction, unendorsed investors checks made payable to Chemical
Trust totaling $193,718.43 to MORGENSTERN.  On December 17, 1999,

CS-5 mailed to MORGENSTERN in Florida, at VIRGIL WOMACK's direction, unendorsed investors checks totaling $1,350,557.00; on December 21, 1999, the total of unendorsed investors checks mailed to MORGENSTERN in Florida was $1,234,535.06.

73. Based upon the information being provided on a daily basis by CS-5, from October 28, 1999, through December 30, 1999, a total of over 15 million dollars in investors checks have been received at WOMACK's office and in turn forwarded to MORGENSTERN in Florida. These monies represent the proceeds from the fraudulent investment scheme, commonly referred to as a Ponzi scheme, which is being operated by WOMACK and his associates out of South Carolina. As indicated by CS-5, the majority of the investors' checks are being forwarded on a daily basis to MORGENSTERN in South Florida. MORGENSTERN is the individual who handles the cashing of these checks, at least some of which are handled by MAMONE.

74. On November 12, 1999, CS-5 stated that PRESTON facsimilied a document regarding Chemical Trust, which had a return address of 5701 Margate Boulevard, Margate, Florida 33063. CS-5 advised that PRESTON acknowledged receipt of two packages, one containing $676,747.72, the other $98,891.00. CS-5 stated PRESTON can be reached at (954) 969-8606.

A. Telephone number (954) 969-8606 is subscribed to by Gold Coast Check Cashing, Margate, Florida.

75. On November 1, 1999, CS-5 advised that VIRGIL WOMACK said

39

to the source that once he (VIRGIL WOMACK) moved to the Bahamas and, "got the money out of the United States, it could not be touched by the United States Government," and added that "people that had money in the United States could put their money in his investment opportunity."

76. Your affiant has determined through investigation that the Secretaries of State or Superior Courts of eight (8) states have issued these Cease and Desist orders directing that VIRGIL WOMACK or Clifton Wilkinson, d.b.a. Chemical Trust, Allliance Trust, and Global Financial Incorporated, or his salesmen, immediately cease selling unregistered securities. These states are South Dakota, Kansas, Michigan, Georgia, Kentucky, Pennsylvania, Arkansas, and Oklahoma.

77. On November 23, 1999, CS-5 advised that VIRGIL WOMACK told CS-5 the reason that the Chemical Trust funds are now being placed into many different bank accounts is to not draw unwanted attention from the banks by having large sums of money in one account. VIRGIL WOMACK told the source that this is the reason the First National Bank of Onaga, Kansas, closed the Chemical Trust account.

A. A review of subpoenaed bank records has disclosed that VIRGIL WOMACK has recently opened and then closed several new accounts, i.e., Continental Trust, Seneca, South Carolina - opened August 20, 1999; closed November 30, 1999; Three Rivers Trust, Seneca, South Carolina - opened June 9, 1999, closed November 30,

40

1999; and, New Millennium Management, Longwood, Florida - opened July 9, 1999, closed October 14, 1999. **VIRGIL WOMACK** had signatory authority on all these accounts.

78. CS-5 provided copies of two different letters which were prepared on March 19, 1999, to be sent to various insurance companies with the stamped names of George H. Williamson and Lewey L. Cato, III, respectively, which were prepared by **CHARLOTTE WOMACK**. The letters represented these two individuals as trustees of Chemical Trust.

79. CS-5 has advised the FBI that **VIRGIL WOMACK** travels to Florida routinely to consult with **MORGENSTERN** concerning the business. **VIRGIL WOMACK** also travels to the Bahamas routinely and recently returned from a trip on November 16, 1999. CS-5 indicated **VIRGIL WOMACK** plans to relocate his business to the Bahamas in the near future.

A. Records of the United States Customs Service, Department of Treasury reflect that **VIRGIL WOMACK** entered the United States from Nassau, the Bahamas, on August 3, 1999, November 12, 1999, and November 16, 1999.

B. Records of the United States Customs Service, Department of Treasury reflect that **FRED MORGENSTERN** entered the United States from Nassau, the Bahamas, on October 15, 23, and 26 1998, November 3, 1998, December 2, 1998, January 3, 4, and 12, 1999, February 2, 1999, April 4, 1999, May 3, 1999, October 13, 22,

and 27, 1999, November 5 and 17, 1999, December 1, 8, 14, and 17, 1999.

C.    Recent pen register information from MORGENSTERN's cellular telephone, (954) 557-3651, shows that on two occasions, the day after MORGENSTERN returned from the Bahamas, he (MORGENSTERN), utilized the target cellular telephone, (954) 537-3651 and placed calls to MAMONE's cellular telephone, (954) 614-1821. Specifically on December 8, 1999, Customs' records indicate that MORGENSTERN returned from the Bahamas; on December 9, 1999, MORGENSTERN's cellular was then used to place a call to MAMONE. On December 17, 1999, MORGENSTERN again returned from the Bahamas; on December 18, 1999, MORGENSTERN's cellular was again used to call MAMONE's cellular.

D.    Based upon the investigation to date, the financial records reviewed, and the source information set forth above, your affiant believe that the travels by VIRGIL WOMACK and MORGENSTERN to and from the Bahamas and the follow-up telephone calls from MORGENSTERN's cellular to MAMONE's cellular as described above are in furtherance of the fraud being committed against numerous investors throughout the United States and the unlawful deposit of those funds in the Bahamas for the purpose of concealing the illegal profits from law enforcement detection and seizure.

PEN REGISTER ANALYSIS

42

79.   As described, above, in the preceding section, MAMONE uses his cellular telephone, target telephone number (954) 614-1821, to discuss the extortionate loans and other criminal activity undertaken by the RAFFA organization.   The pen register analysis set forth below demonstrates that MAMONE's cellular telephone, target telephone number (954) 614-1821, is in regular contact with telephone number associated with other members of the criminal conspiracy set forth herein.     Based   on   the   intercepted conversations, and the pattern of contact revealed by the pen register, your Affiant concludes that these contacts are in furtherance of the criminal activities of the conspiracy.

80.   On November 2, 1999, Chief United States Magistrate Barry S. Seltzer, United States District Court, Southern District of Florida, signed an Order authorizing the FBI to initiate a pen register device, a trap and trace device, and Basic/Enhanced Caller Identification on target telephone number (954) 614-1821 for a period of sixty (60) days.

81.   Pen register records for cellular telephone number (954) 614-1821 reflect that 55 calls were placed to telephone number (954) 969-8606 between November 8, 1999 and December 27, 1999, with the last call being placed on December 22, 1999.   Pen register records for telephone number (954) 969-8606 reflect that 10 calls were place to telephone number (954) 614-1821 between November 17, 1999, and December 27, 1999, the last call being place on December

43

11, 1999. Telephone company records reflect that telephone number (954) 969-8606 is subscribed to by Gold Coast Check Cashing, 5701 Margate Boulevard, Margate, Florida, 33063.

82. Pen register records for cellular telephone number (954) 614-1821 reflect that 26 calls were placed to telephone number (954) 969-9691 between November 10, 1999 and December 27, 1999, with the last call being placed on December 22, 1999. Pen register records for telephone number (954) 969-9691 reflect that 17 calls were place to telephone number (954) 614-1821 between November 15, 1999, and December 27, 1999, the last call being place on December 11, 1999. Telephone company records reflect that telephone number (954) 969-9691 is subscribed to by Gold Coast Check Cashing, 5701 Margate Boulevard, Margate, Florida, 33063.

83. Pen register records for cellular telephone number (954) 614-1821 reflect that 21 calls were placed to telephone number (954) 969-8638 between November 6, 1999 and December 27, 1999, with the last call being placed on December 23, 1999. Pen register records for telephone number (954) 969-8638 reflect that 5 calls were place to telephone number (954) 614-1821 between November 20, 1999, and December 27, 1999, the last call being place on December 11, 1999. Telephone company records reflect that telephone number (954) 969-8638 is subscribed to by Gold Coast Check Cashing, 5701 Margate Boulevard, Margate, Florida, 33063.

84. Pen register records for cellular telephone number (954)

614-1821 reflect that 39 calls were placed to telephone number (954) 829-4142 between November 15, 1999 and December 27, 1999, with the last call being placed on December 25, 1999. Telephone company records reflect that telephone number (954) 829-4142 is subscribed to Ralph Lento, 1550 N. W. 80th Avenue, Margate, Florida.

A.    As described above in the affidavit, Lento presently has an outstanding extortionate loan which Lento received from **MAMONE**.

85.    Pen register records for cellular telephone number (954) 614-1821 reflect that 43 calls were placed to telephone number (954) 802-4510 between November 10, 1999 and December 27, 1999, with the last call being placed on December 24, 1999. Telephone company records reflect that telephone number (954) 802-4510 is subscribed to Freddy Scarola 1550 N. W. 80th Avenue, Margate, Florida.

A.    Scarola presently has an outstanding extortionate loan which Scarola had received from **MAMONE**, as described above in the affidavit.

86.    Pen register records for cellular telephone number (954) 614-1821 reflect that 34 calls were placed to telephone number (954) 270-0061 between November 10, 1999 and December 27, 1999, with the last call being placed on December 25, 1999. Telephone company records reflect that telephone number (954) 270-0061 is subscribed to **MICHAEL BUCCINNA**, 6363 N. W. 39th Street, Coral

45

Springs, Florida.

87.    Pen register records for cellular telephone number (954) 614-1821 reflect that 9 calls were placed to telephone number (954) 557-3651 between November 9, 1999 and December 27, 1999, with the last call being placed on December 21, 1999.    Telephone company records reflect that telephone number (954) 557-3651 is subscribed to Kinsman Merchant and Associates, 4901 N. W. 17th Way, Fort Lauderdale, Florida, a business associated with MORGENSTERN.

88.    Pen register records for cellular telephone number (954) 614-1821 reflect that 3 calls were placed to telephone number (954) 557-3648 between November 17, 1999 and December 27, 1999, with the last call being placed on December 6, 1999.    Telephone company records reflect that telephone number (954) 557-3648 is subscribed to Kinsman Merchant and Associates, 4901 N. W. 17th Way, Fort Lauderdale, Florida, a business associated with MORGENSTERN.

89.    Pen register records for cellular telephone number (954) 614-1821 reflect that 1 call was placed to telephone number (954) 557-6252 on November 8, 1999.    Telephone company records reflect that telephone number (954) 557-6252 is subscribed to Kinsman Merchant and Associates, 4901 N. W. 17th Way, Fort Lauderdale, Florida, a business associated with MORGENSTERN.

90.    Pen register records for cellular telephone number (954) 614-1821 reflect that 1 call was placed to telephone number (954)

46

681-3545 on November 24, 1999. Telephone company records reflect that telephone number (954) 557-6252 is subscribed to T.M.C., Commercial Center Inc, 4137 N. W. 135th Court, Opa-locka, Florida, **RAFFA's** business.

91. On December 22, 1999, Chief United States Magistrate Barry S. Seltzer, United States District Court, Southern District of Florida, signed an Order authorizing the FBI to initiate a pen register device, a trap and trace device, and Basic/Enhanced Caller Identification on target telephone number (954) 557-3651 and (954) 927-7113 for a period of sixty (60) days.

A.    Since the inception of this pen register, there was limited use of target cellular telephone (954) 557-3651 reflected on the pens. Your affiant believes that this may have been due to the end of the year holidays.

B.    However there have been some recent calls of significance reflected on the pen register since the holidays have ended. Specifically, from January 3 to 4, 2000, there have been a total of 6 calls placed from *MORGENSTERN's* cellular telephone, (954) 557-3651 to the Bahamas. Thus far your affiant has only been able to identify one of the numbers called, that is, (242) 326-3981, which is the American International Bank in the Bahamas; three of the calls on January 4, 2000 were placed to this telephone number.

C.    Pen register records for cellular telephone number (954) 557-3651 reflect 1 call was placed to telephone number (954)

47

557-3648, Kinsman Merchant & Associates, on January 4, 2000.

92. Pen registers have also been utilized in the South Carolina investigation. As it relates to this investigation, the following information has been received.

A. A review of court authorized dialed number recorder information by the FBI for telephone number (864) 882-9021, the Chemical Trust office, reflects that from the period November 22, 1999 through December 27, 1999, 23 calls were made to (954) 557-3651, MORGENSTERN's cellular, with the last call being placed on December 21, 1999. These calls were place on the following dates: November 22, 1999 (2 calls); November 23, 1999 (3 calls); November 29, 1999 (2 calls); December 2, 1999 ( 1 call); December 3, 1999 (4 calls); December 6, 1999 (3 calls); December 14, 1999 (1 call); December 15, 1999 (1 call); December 16, 1999 (1 call); December 20, 1999 (3 calls); and, December 21, 1999 (2 calls).

B. A review of court authorized dialed number recorder information by the FBI for telephone number (864) 882-5471, another number for the Chemical Trust office, reflects that from the period November 22, 1999 through January 2, 2000, 12 calls were made to (954) 557-3651, MORGENSTERN's cellular, with the last call being placed on January 2, 2000. These calls took place on the following dates: November 21, 1999 (2 calls); November 28, 1999 (1 call); December 2, 1999 (1 call); December 2, 1999 (1 call); December 9, 1999 (1 call); December 15, 1999 (1 call); December 20, 1999 (2 calls); December 22, 1999 (1 call); December 31, 1999 (1 call);

48

January 1, 2000; and, January 2, 2000.

C.   A   review   of   court   ordered   records   concerning telephone number (770) 331-4079, a cellular telephone subscribed to by **VIRGIL WOMACK**, revealed that from October 5, 1999, through December 16, 1999, 5 calls were made to (954) 557-3651, **MORGENSTERN's** cellular, with the last call being placed on October 22, 1999.

D.   A   review   of   court   ordered   records   concerning telephone number (864) 882-5471, **WOMACK's** residence, revealed that from November 22, 1999, through December 21, 1999, 8 calls were made to (954) 557-3651, with the last call being placed on December 21, 1999.

## NORMAL INVESTIGATIVE TECHNIQUES

93.  Your   affiant   submits   this   application   seeking authorization for the interception of wire communications because alternative investigative techniques to further this investigation (a) have been tried with only limited success and appear reasonably unlikely to reach greater success if continued, or, (b) are too dangerous to attempt and reasonably appear unlikely to succeed if tried, as more specifically set forth below.

94.  Your affiant is aware that **JOHN MAMONE** is a member of a criminal organization in South Florida headed by **STEVEN BRUNO RAFFA**.  Your affiant is also aware from prior investigations that members of LCN Crime families, such as **RAFFA**, typically use others

49

to insulate themselves from the commission of certain criminal acts. The relationship between members and associates of the **RAFFA** organization, and, **FRED MORGENSTERN** and **PEGGY PRESTON** is consistent with this type of insulation. This buffer serves to protect the "made" member from direct dealings with undercover agents or confidential sources.

95. The FBI in 1994 attempted to introduce two undercover agents into the **RAFFA** criminal organization. These efforts proved to be unsuccessful, and **RAFFA** later became aware of this failed operation. At present, your affiant is unaware of any undercover agents or cooperating witnesses who can infiltrate the conspiracy at a level high enough to identify all members of the conspiracy or otherwise satisfy all the goals of this investigation.

96. The use of confidential sources has been very valuable in developing information pertaining to the named interceptees and their criminal activities. However CS-1, CS-2, and CS-3 are unwilling to testify against the targets of this investigation out of fear for their own safety and that of their families. Although CS-4 and CS-5 are willing to testify, they do not know all or sufficient detail concerning their co-conspirators' criminal conduct, which is needed to ensure a successful prosecution. This is, in part, because the targets of this investigation have been unwilling to discuss with them all of the details of their criminal activity. For example, none of them are in the inner circle of the Trafficante LCN family and thus are not privy to the many

50

activities and businesses in which they are not personally involved.

A.    CS-4 has met MORGENSTERN and although CS-4 was asked to assist MAMONE in cashing twenty-one checks in September, 1999 which MAMONE had identified as having come from MORGENSTERN, CS-4 was unable to gain any more information concerning those particular checks. In addition, CS-4 has not been asked to assist MAMONE in the cashing of any other checks which MAMONE is apparently receiving from MORGENSTERN. Nor has the investigation in South Florida or South Carolina been able to determine where or how MORGENSTERN is cashing the enormous amount of investors' checks that he (MORGENSTERN) is receiving on a daily basis from VIRGIL WOMACK.

B.    Although CS-5 is working in VIRGIL WOMACK's office in South Carolina, CS-5 is not privy to a vast amount of information concerning the investment fraud. CS-5 is not aware of the substance of the conversations between VIRGIL WOMACK and the various salespeople throughout the country. Further, because of VIRGIL WOMACK's recent concern over law enforcement scrutiny, VIRGIL WOMACK relocated his business records to a storage facility on December 21, 1999. CS-5 also has no information concerning the manner in which MORGENSTERN handles the laundering of the investors' checks once they reach South Florida. Therefore,

although the information from CS-5 provides some direct evidence against **VIRGIL WOMACK** and his immediate associates in South Carolina, CS-5's information is insufficient to identity the entire scope of this conspiracy and all the participants.

97. Maione and CS-3 are no longer available to work in an undercover capacity for the FBI and are not known to have any current association with the listed interceptees. As noted above, CS-4 still has direct and regular contact with **MAMONE**. At the FBI's direction, CS-4 has engaged in limited criminal transactions with **MAMONE**. These transactions have included the purchase of jewelry purportedly stolen from interstate commerce and negotiations concerning the laundering of proceeds from illegal gambling. However CS-4 is still not in a position to determine the full nature and extent of the criminal activity of all the named interceptees. None of the confidential sources possess complete access to all the listed interceptees. In addition, although there is one other source not specifically mentioned in this affidavit, who has had contact with some of the named interceptees, the source does not have access to all of the named interceptees nor is the source in a position to determine the full extent of the ongoing criminal activity. Specifically, in February and March of 1999, another source of the FBI cashed checks for **PRESTON** and another associate, and, during that time period met **MORGENSTERN**, who **PRESTON** indicated she worked for. However the investigation has not shown those checks to be related to the South Carolina fraud

52

being spearheaded by VIRGIL WOMACK nor has the investigation as yet been able to even determine the source of those checks or if it relates to any criminal activity. Since that time, this particular source has not been approached by MORGENSTERN, PRESTON, or their associates to handle the cashing of any further checks. Therefore this source is not in a position at this time to be able to gather any information which would further the goals of this investigation. Moreover, the source is not in contact with the other named interceptees or their associates and, consequently, is not in a position to reveal the full scope and nature of the criminal activity. In summary, the confidential sources are not in a position to provide complete information regarding the criminal activities of those persons who comprise the enterprise under investigation herein. Moreover, many sources have expressed fear of being killed or seriously injured by members of the conspiracy if they were to testify. Indeed, as noted in this affidavit, the members of RAFFA organization use violence to further their criminal acts.

98. Conducting physical surveillance of participants is a commonly used investigative technique. Surveillance has been conducted in this investigation and has assisted in disclosing some of the associations and places of meetings by the participants. For example, surveillance has established that on September 29, 1999, RAFFA, MAMONE and Bellitto all met at Gold Coast Check Cashing, Oakland Park, Florida. However, this technique has failed to

53

reveal the identity of all the participants and has failed to provide sufficient admissible evidence of specific criminal activities. Without knowledge of the content of these meetings, surveillance alone is of limited value. While surveillance can confirm the fact that a meeting took place, under most circumstances it cannot provide the content of the discussions which facilitate the organization's illegal activities. Moreover, your affiant knows that the subjects herein are particularly sensitive to efforts to observe their activities. In addition, it is not possible to conduct physical surveillance within either Gold Coast Check Cashing Store now owned by MORGENSTERN because the facilities are small and the presence of anyone but customers would arouse suspicion. The location of MORGENSTERN's other companies, The Merrit Advisors Group, Inc., and Kinsman Merchant & Associates, is upstairs in a secured building; law enforcement has been unable to gain access to the building itself.

A.    Physical surveillance on September 29, 1999, identified STEVE RAFFA, Giuseppe Bellitto and JOHN MAMONE at Gold Coast Check Cashing, 3591 North Andrews Avenue in Oakland Park, Florida. Specifically, from approximately 12:00 p.m. to 12:11 p.m. all three persons were inside Gold Coast Check Cashing. At approximately 12:12 p.m., Bellitto and MAMONE stepped outside of the store and briefly talked with each other. MAMONE then drove away in his vehicle while Bellitto reentered the store. Thereafter, at approximately 12:17 p.m., Bellitto stepped outside

54

the store, talked on cellular telephone, and then re-entered the store. At approximately 12:19 p.m., RAFFA and Bellitto left the store together and drove away in a vehicle.

B. On November 29, 1999, physical surveillance was conducted at Gold Coast Check Cashing, Margate, which was able to confirm the meeting between CS-4 and MAMONE described above during which CS-4 provided MAMONE with the "stolen" jewelry. However because this meeting took place within the store, the agents could not observe the actual exchange nor was physical surveillance able to determine where MAMONE took the jewelry subsequent to the meeting in order to fence or sell the "stolen" property.

C. On January 5, 2000, physical surveillance was conducted at MORGENSTERN's business location at 4901 N.W. 17th Way, Fort Lauderdale. However no observation of MORGENSTERN could be made and law enforcement was unable to gain access to the buailding without arousing suspicion.

99. Your affiant knows that any extensive surveillance risks exposure, and can compromise the covert nature of this investigation causing STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, and their associates to alter and/or temporarily cease their criminal operations. Continued surveillance of the residences and businesses of the principals would jeopardize the covert nature of the ongoing

investigation, causing the participants to be more cautious and secretive about their ongoing criminal activity. However, surveillance, in conjunction with the interception of relevant conversations, will provide valuable evidence regarding the activities of those involved in this criminal enterprise. Your affiant has caused a covert video surveillance camera to be installed in the vicinity of the exterior of Gold Coast Check Cashing store in Oakland Park, Florida (formerly RAFFA's Cash 96). Initially the images from this camera were generally not sufficiently clear to identify the persons entering and leaving the location. However, this condition has improved somewhat with the addition of new equipment. Yet even with the improved clarity, the camera can merely identify the individuals at the location, but cannot provide sufficient evidence because the substance of any conversations between those individuals remains unknown. Moreover, because of the physical location of Gold Coast Check Cashing, extensive physical surveillance is difficult. Physical surveillance has proved useful in confirming the presence of persons at meetings, e.g., the meeting of RAFFA, Bellitto and MAMONE on September 29, 1999. However, as noted above, in and of itself this technique does not disclose the substance of the criminal conversations.

100. The possibility of initiating a Federal Grand Jury investigation at this time into the illegal activities of the principals of this investigation has been considered. However,

many of the possible witnesses are conspirators themselves, and there are presently not sufficient facts to determine which of the alleged conspirators, if any, should be or could be compelled to testify under a grant of immunity. Individuals who are members and associates of organized crime families often invoke their Fifth Amendment testimonial privilege, and even under a grant of immunity have been known to risk and accept contempt charges rather than testify. From your affiant's experience, as well as that of other Agents of the FBI experienced in organized crime matters, extensive overt investigations would only result in the targets further camouflaging their activities, making detection even more difficult.

101. Consideration has been given to interviewing co-conspirators and associates of the principal subjects. However, the individuals who are knowledgeable of the criminal activities are generally participants in the crimes, and are therefore unwilling to provide information and testify. Even with the testimony of a co-conspirator, there would likely be insufficient evidence to successfully prosecute all co-conspirators or to develop usable information relating to the full scope of the federal violations set forth in this affidavit. The co-conspirators, in addition to being afraid of physical retaliation, are often themselves prior participants or currently involved in illegal activity, and as such refuse to cooperate with law enforcement to any significant degree. Even with the benefit of several key conspirators willing to testify, electronic

surveillance, in this case, is still necessary to accomplish successful prosecution because the recorded testimony of a cooperating witness will not reveal the full nature and extent of the criminal organization.

102. From prior investigations and reports of other Agents, your affiant knows that LCN Crime families and the Sicilian Mafia are extremely sophisticated in detecting and avoiding investigations by law enforcement agencies. This has made conventional investigative techniques, such as interviews, of very limited value.

103. Based upon your affiant's experience and the experience of fellow agents who have investigated organized crime activity, your affiant believes that interviews of additional co-conspirators or victims in this matter would be communicated to the principals, their subordinates, or others, who would take even more precautionary measures to avoid the further collection of evidence by law enforcement. Moreover, it is your affiant's belief that interviews with co-conspirators at this stage of the investigation could jeopardize the safety of the confidential sources.

104. Telephone toll call records of telephones used by some of the known participants have been obtained. These records have been useful in revealing some of the associations and frequency of contact of the known participants with each other. However, these records, standing alone, do not provide proof of illegal activities because the records do not reveal the content of conversations. Pursuant to lawful court orders, pen registers and trap and trace

techniques have been used in this investigation. As previously outlined in greater detail, the pen register information has revealed the existence of telephonic contact between the principals of this investigation, but like toll record information these records, standing alone, do not provide sufficient proof of illegal activities. The associations and frequency of contacts in themselves, do not provide evidence of criminal activity and do not identify the actual participants in the telephone contacts.

105. Although many bank records have been subpoenaed and reviewed in relationship to the investment fraud portion of this investigation, those records alone are insufficient to meet the goals of this investigation. The bank records have disclosed where some, but certainly not all, of the investors' funds are being funneled by WOMACK and his associates. WOMACK and his group are constantly opening and closing bank accounts, thereby making it difficult to continue to locate the accounts and acquire the bank records. Further, WOMACK and his associates have moved large amounts of the cash overseas to the Bahamas and England; those bank records are not readily available to U.S. law enforcement.

106. Based upon my experience, and the experiences of other law enforcement agents as related to me, it is my belief that the use of search warrants at this time would not provide sufficient evidence necessary to determine the full scope of the criminal conspiracies, the identity of all of the co-conspirators and the various methods used to run this criminal enterprise. Most such records are typically kept in a coded format, which is difficult to

decipher absent the interception of relevant communications. On January 7, 2000, South Carolina arrested **VIRGIL WOMACK, CHARLOTTE WOMACK**, and two associates and are in the process of executing search warrants at the **WOMACKs'** residence and the offices of Chemical/Alliance Trust in South Carolina, U.S. Guarantee Corporation in Arizona, as well as Merrit Advisors Group, Inc, and Gold Coast Check Cashing/Prestige Accounting Services, Margate. These latter two locations are where the investors' checks have been forwarded to **MORGENSTERN** and his associates. Even with the arrests of **VIRGIL** and **CHARLOTTE WOMACK**, these individuals would still have access to telephones and therefore remain named interceptees. Further, even if some records and evidence is found at these locations, it is not expected that they will fully disclose the manner and means by which **MORGENSTERN** and his associates have been laundering the vast amounts of investors' checks that they have been receiving on a daily basis at least since October of 1999. It is presently unknown where **MORGENSTERN** and his associates have been cashing these checks. Further, since **MAMONE** has divested himself of the check cashing store, it is not reasonable to expect that any evidence will be found which would reveal the agreement that **MORGENSTERN** and **MAMONE** have concerning the cashing of at least some of these investors' checks nor the specifics of where **MAMONE** has, in fact, cashed those checks. Nor can these search warrants be expected to uncover any evidence

concerning RAFFA's participation in this fraudulent investment scheme or his receipt, on behalf of the Trafficante LCN family, of his portion of the earnings of MAMONE for all of his (MAMONE's) criminal activities.

107. As set forth above, FRED MORGENSTERN was also the subject of a separate criminal investigation concerning suspected money laundering and fraud activities. Although initially, it appeared that this investigation was unrelated to the criminal activities of RAFFA, it now seems that the fraudulent activity and money laundering activity undertaken by MORGENSTERN is related to the RAFFA organization. As noted above, CS-4 stated that MORGENSTERN is a significant earner and MAMONE receives a portion of those earnings. In any event, the court authorized interceptions sought herein are necessary in order to disclose the full nature and extent of the on going criminal relationship between the RAFFA organization and MORGENSTERN.

A. Although VIRGIL and CHARLOTTE WOMACK and their associates in South Carolina, Georgia and Arizona may be arrested during the course of this electronic surveillance, it is not anticipated that MORGENSTERN, MAMONE, RAFFA or their associates in South Florida will be arrested. Therefore the criminal activity between MORGENSTERN and MAMONE is expected to continue in relationship to the investment fraud. Based upon the the pen register information described above, it is clear that WOMACK and

his offices are not the only locations or individuals that **MORGENSTERN** is in telephonic contact with concerning the investment fraud. In addition, it is reasonable to expect that the arrests will cause **MORGENSTERN** and **MAMONE** to be even more circumspect in their dealings and therefore electronic surveillance will be the only means of obtaining the evidence of their criminal activities. Further, because **MAMONE**, **RAFFA**, and their associates are involved in a number of unrelated criminal activities, the arrest of **VIRGIL** and **CHARLOTTE WOMACK** and their associates should have no effect on the continuation of those activities.

108. Finally, it should be observed that **MAMONE** and **TORRES** are also the subject of an ongoing investigation concerning his criminal activities with members and associates of the Bonanno LCN family. Indeed, the United States has recently obtained a court authorized electronic surveillance order in connection with that investigation (November 12, 1999, which was continued by Court Order on December 28, 1999). However the ongoing electronic surveillance of the cellular telephones being utilized by **TORRES** and Anthony Graziano do not appear to have developed any evidence concerning the criminal activity described in this affidavit. The pertinent interceptions of **TORRES** and **MAMONE** in that electronic surveillance thus far has disclosed that **TORRES** is currently involved in a bookmaking office, loansharking, and possibly telemarketing fraud. The interceptions thus far of **MAMONE** in that

62

electronic surveillance have been minimal.

109. Based on the foregoing, your affiant believes there is a need for electronic surveillance in this matter to fully reveal the manner and scope in which STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, the named interceptees, and others as yet unknown, are involved in the violations of federal statutes as set forth in paragraph 4 of this affidavit.

## MINIMIZATION

110. All interceptions will be minimized pursuant to Chapter 119 of Title 18, United States Code. Interceptions will be suspended when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined that the conversation is relevant to those matters under investigation. Even if one or more of the named interceptees or their confederates, when identified, is a participant in the conversation, monitoring will be suspended if the conversation is non-pertinent to those matters under investigation. Intermittent spot monitoring will be conducted to ensure that a minimized conversation has not become relevant.

111. It is anticipated that interceptions will occur involving Italian and possibly other foreign languages. In the event such

conversations occur, and an expert in that language is not reasonably available, it is requested that the Court authorize that the minimization may be conducted as soon as practicable after such interception.

## PERIOD OF INTERCEPTION

112. It is believed that the communications to be intercepted will reflect a continuing criminal conspiracy and continuing course of criminal activity, thereby necessitating the interception of communications on a continuing basis, following the first interception of communications that are the subject of this request. Therefore, it is requested that the interception not automatically terminate when incriminating communications are initially intercepted, but continue until communications are intercepted that reveal the full nature and manner in which STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, and others as yet unknown, participate in the illegal conduct referenced herein, the identifies of the participants, co-conspirators, and victims, the precise nature and scope of the criminal enterprise and illegal activity, the individual acts committed by aiders, abettors, and co-conspirators, the extent of their participation in these offenses, their places of operation, the full nature of the criminal conspiracies involved therein, and the acquisition and disbursement of proceeds derived from criminal activity, or for a period not to exceed thirty (30)

64

days, such thirty-day period to begin on the day on which the investigative or law enforcement officer first begins to conduct an interception under the Order, or, ten (10) days after Order is entered, whichever is earlier.

Patrick G. Brodsky, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this ___ day of January, 2000.

WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

Certified to be a true and correct copy of the document on file
Clarence Maddox, Clerk,
U.S. District Court
Southern District of Florida

By _____ Deputy Clerk

Date _____

65

DLWF:df

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

NO._____

IN THE MATTER OF THE APPLICATION    )
OF THE UNITED STATES OF AMERICA     )    UNDER SEAL
FOR AN ORDER AUTHORIZING THE CONTINUED )
INTERCEPTION OF WIRE COMMUNICATIONS )

### AFFIDAVIT IN SUPPORT OF APPLICATION

I, Patrick G. Brodsky, Special Agent, Federal Bureau of Investigation, Miami, Florida, being duly sworn, depose and say:

1.    I am a Special Agent of the Federal Bureau of Investigation (FBI). As such, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.    I have been employed as a Special Agent of the FBI for over four years. For the past four years, I have been assigned primarily to investigations of organized crime, including investigations of an organized criminal enterprise known as the La Cosa Nostra (LCN). As a result of my participation in these investigations, conversations with other FBI agents familiar with the criminal activities of the LCN, reviews of reports concerning LCN, reviews of reports concerning LCN activities, members and associates, and reliable informant information, I know that the

**EXHIBIT B**

criminal activities of the LCN include, but are not limited to, gambling, trafficking in narcotics, loansharking, money laundering, extortion, labor racketeering, and murder. I have also become familiar with many of the methods used by the LCN in the commission of these offenses.

3. On January 7, 2000, the Honorable William P. Dimitrouleas, United States District Judge, Southern District of Florida, Fort Lauderdale, Florida, signed a Court Order authorizing the interception of wire communications of STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, and others yet unknown, occurring over the following telephone numbers: cellular telephone number (954) 614-1821, electronic serial number (ESN) E36391C2, subscribed to by Gateway Transportation, 7770 West Oakland Park Boulevard, Apartment 450, Fort Lauderdale, Florida, and utilized by JOHN MAMONE; and, cellular telephone number (954) 557-3651, ESN 25314057896, subscribed to by Kinsman Merchant & Associates, 4901 N.W. 17th Way, #407, Fort Lauderdale, Florida (mailing address), and utilized by FRED MORGENSTERN, for a period of thirty days.

4. This Affidavit is being submitted in support of an application which seeks an Order authorizing the continued interception of wire communications of STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, ISRAEL "BUDDY" TORRES,

MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, JOSEPH SILVESTRI, ANSON KLINGER, BRUCE CHIUSANO, JOSEPH SPITALERI, MARK CARATTINI, GIUSEPPE BELLITTO, DAVID MORGENSTERN, GEORGE WILLIAMSON, ORMANDO GOMEZ, JEFF LNU, JOE LNU, HUEY LNU, and others yet unknown, occurring over the following telephone numbers for a period of thirty (30) days:

A.    Cellular telephone number (954) 614-1821, electronic serial number (ESN) EB6391C2, subscribed to by Gateway Transportation, 7770 West Oakland Park Boulevard, Apartment 450, Fort Lauderdale, Florida, and utilized by JOHN MAMONE; and,

B.    Cellular telephone number (954) 557-3651, ESN 25314057896, subscribed to by Kinsman Merchant & Associates, 4901 N.W. 17th Way, #407, Fort Lauderdale, Florida (mailing address), and utilized by FRED MORGENSTERN.

C.    Authorization is also sought to intercept communications from any telephone numbers subsequently assigned to or used by the instruments bearing the same ESN as the target cellular telephones and notwithstanding any changes in the ESN of the target cellular telephones so long as its assigned telephone number remains the same.

D.    Authorization is also sought so that, in the event that the target cellular telephone is transferred outside the territorial jurisdiction of the Court, interceptions may take place in any other jurisdiction within the United States.

3

5.    The wire interceptions sought herein will be conducted pursuant to Title 18, United States Code, Section 2518, concerning the following offenses enumerated in Title 18, United States Code, Section 2516:

A.    Conspiracy to conduct and participate, and conducting and participating, directly and indirectly in the affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4), i.e., a group of individuals associated in fact, that is, the named interceptees and others, the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity which includes the offenses set forth in paragraphs 4(B) through 4(K) below, and through the collection of unlawful debt, in violation of Title 18, United States Code, Sections 1962(c) and (d);

B.    Making extortionate extensions of credit, financing extortionate extensions of credit, collecting extensions of credit by extortionate means and conspiracy to do so, in violation of Title 18, United States Code, Sections 892, 893 and 894;

C.    Wire fraud and mail fraud in violation of Title 18, United States Code, Sections 1341 and 1343;

D.    Interference with commerce by threats or violence, in violation of Title 18, United States Code, Section 1951;

E.    Interstate Gambling Business, in violation of Title 18, United States Code, Section 1955;

F.    Money laundering, in violation of Title 18, United States Code, Section 1956 and 1957;

4

G.    Transportation of stolen goods, securities, moneys, in violation of Title 18, United States Code, Section 2314;

H.    Bank Fraud, in violation of Title 18, United States Code, Section 1344;

I.    Interstate and Foreign Travel in Aid of Racketeering, in violation of Title 18, United States Code, Section 1952;

J.    Transmission of wagering information, in violation of Title 18, United States Code, Section 1084;

K.    Obstruction of Justice, in violation of Title 18, United States Code, Section 1503; and,

L.    Conspiracy, in violation of Title 18, United States Code, Section 371.

6.    I have personally participated in this investigation of the offenses referred to in paragraph 5 of this affidavit. From that personal participation in this investigation, and through oral and written reports made to me by agents and analysts of the FBI and other state and local law enforcement agencies, I am familiar with the facts and circumstances of the investigation.

7.    Since this affidavit is being submitted for the limited purpose of securing authorization for the continued interception of wire communications, I have not included each and every fact known to me concerning this investigation. I have only set forth those facts believed to be necessary to establish the requisite foundation for the issuance of the order requested herein.

8.    The facts and circumstances of this affidavit as set

5

forth below demonstrate that:

A.    There is probable cause to believe that STEVE BRUNO

RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, ISRAEL "BUDDY"

TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, JOSEPH

SILVESTRI, ANSON KLINGER, BRUCE CHIUSANO, JOSEPH SPITALERI, MARK

CARATTINI, DAVID MORGENSTERN, GIUSEPPE BELLITTO, GEORGE WILLIAMSON,

ORMANDO GOMEZ, JEFF LNU, JOE LNU, HUEY LNU, and others as yet

unknown, have committed, are committing and will continue to commit

the offenses enumerated herein above in paragraphs 5(A) through

5(L).

B.    There is probable cause to believe that STEVE BRUNO

RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, ISRAEL "BUDDY"

TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, JOSEPH

SILVESTRI, ANSON KLINGER, BRUCE CHIUSANO, JOSEPH SPITALERI, MARK

CARATTINI, DAVID MORGENSTERN, GIUSEPPE BELLITTO, GEORGE WILLIAMSON,

ORMANDO GOMEZ, JEFF LNU, JOE LNU, HUEY LNU, and others as yet

unknown, have used, are using, and will continue to use cellular

telephone number (954) 614-1821, ESN EB6391C2, subscribed to by

Gateway Transportation, 7770 West Oakland Park, Apartment 450, Fort

Lauderdale, Florida, and utilized by JOHN MAMONE, and, cellular

telephone number (954) 557-3651, ESN 25314057896, subscribed to by

Kinsman Merchant & Associates, 4901 N.W. 17th Way, #407, Fort

Lauderdale, Florida (mailing address), and utilized by FRED

6

MORGENSTERN, for the purpose of facilitating the offenses enumerated in paragraph 5.

C.    The continued interception of wire communications of STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, JOSEPH SILVESTRI, ANSON KLINGER, BRUCE CHIUSANO, JOSEPH SPITALERI, MARK CARATTINI, DAVID MORGENSTERN, GIUSEPPE BELLITTO, GEORGE WILLIAMSON, ORMANDO GOMEZ, JEFF LNU, JOE LNU, HUEY LNU, and others yet unknown, will yield relevant information and admissible evidence of those offenses, including communications concerning:

(i)    the precise nature and scope of the illegal activities;

(ii)    the identities and roles of the coconspirators and other participants in these illegal activities;

(iii)    the locations and means used in furtherance of these illegal activities;

(iv)    the location of records maintained by or in relation to these illegal activities;

(v)    the location of assets derived as a result of these criminal activities and the distribution of money received through these illegal activities, including the methods used to transport and transfer money between and among conspirators and the current location of money and other assets derived from or used to promote these illegal activities; and,

(vi)    the location of resources and

7

operations leading to the discovery of the identities of other co-
conspirators, aiders and abettors, and victims, and the role of
each participant in the conspiracies and in the substantive
violations set forth above in paragraph 5.

D.    In addition, the wire communications are expected to
constitute admissible evidence of the commission of the above-
enumerated offenses.

9.    Normal investigative procedures have been tried and have
not fully succeeded in achieving the objectives of the
investigation, or reasonably appear to be unlikely to succeed if
tried, or are too dangerous to employ.    These investigative
procedures are discussed more fully below.

## DESCRIPTION OF FACILITIES
## TO BE INTERCEPTED

10.    AT&T Wireless records reveal that cellular telephone
number (954) 614-1821, ESN E36391C2, is subscribed to by Gateway
Transportation, 7770 West Oakland Park Boulevard, Apartment 450,
Fort Lauderdale, Florida.

11.    Sprint telephone records reveal that cellular telephone
number (954) 557-3651, ESN 25314057896, is subscribed to by Kinsman
Merchant & Associates, 4901 N.W. 17th Way, #407, Fort Lauderdale,
Florida (mailing address).

## BACKGROUND OF THE INTERCEPTEES

12.    STEVE BRUNO RAFFA, a/k/a "Uncle Steve", was born on
October 2, 1941, in the city of Ciancianna, in the province of

Agrigento, Sicily, Italy. RAFFA currently resides at 15641 SW 16th
Street in Pembroke Pines, Florida. According to the Italian law
enforcement authorities, RAFFA's brother, Pietro Raffa (now thought
to be deceased), was documented as being a member of the Sicilian
Cosa Nostra (Sicilian Mafia) based in the Agrigento Province of
Sicily. RAFFA is now the Boss of the Trafficante LCN family in
South Florida. The Trafficante LCN family exercises considerable
power and influence in South Florida. No arrest record for RAFFA
could be located.

13. JOHN MAMONE was born on June 12, 1951, in New Jersey.
MAMONE currently resides at 1960 Augusta Terrace in Coral Springs,
Florida. MAMONE is a made member in the Trafficante LCN family and
is considered to be one of RAFFA's closest confidantes. MAMONE has
the following criminal record: He was arrested on December 16,
1991, in New Jersey for Intimidation and the case was dismissed.
MAMONE was arrested on August 16, 1993, for mail fraud; he was
subsequently convicted and was sentenced on March 31, 1995, to 48
months probation and restitution in the amount of $94,444. On
October 3, 1994, MAMONE was arrested by the New Jersey State Police
and charged with one count of terrorist threats, one count of theft
by extortion, one count of commercial bribery, one count of
tampering with a witness/informant, one count of racketeering and
one count of racketeering conspiracy; MAMONE was sentenced on
September 9, 1998, to four years probation and a fine of $7,500.

9

Until approximately August of 1999, MAMONE operated Check Cashing Unlimited, a check cashing store, located at 5701 Margate Boulevard, Margate, Florida (hereinafter referred to as Check Cashing Unlimited). In August of 1999, Check Cashing Unlimited was purchased by FRED MORGENSTERN and is now called Gold Coast Check Cashing.

14. FRED MORGENSTERN, who will be referred to throughout this affidavit as "MORGENSTERN" was born on October 28, 1948, and resides at 23170 Floral Wood Lane in Boca Raton, Florida. MORGENSTERN incorporated Gold Coast Check Cashing, Inc., in April of 1998. In approximately August of 1999, MORGENSTERN took over the operation of Cash 96, 3591 North Andrews Avenue, Oakland Park, Florida, and Check Cashing Unlimited and is presently operating both under the name of Gold Coast Check Cashing. MORGENSTERN has a criminal record which includes the following: MORGENSTERN was arrested on June 5, 1976, for theft and was convicted and sentenced to five years probation. MORGENSTERN was arrested on December 22, 1976, in Cincinnati, Ohio, for passing bad checks and the case was dismissed. On January 30, 1989, MORGENSTERN began serving a three year sentence for transportation of stolen securities. On October 18, 1994, MORGENSTERN was arrested for grand larceny and the charges were later dropped. As described below, MORGENSTERN is also associated with VIRGIL WOMACK in a scheme to defraud

10

investors, which the Trafficante LCN family is also involved with at least to the extent of laundering the investors' funds.

15.  PEGGY PRESTON was born on August 17, 1964, and resides at 4717 N. W. 82nd Avenue, Fort Lauderdale, Florida. Based on electronic surveillance information, PRESTON is an associate of both MORGENSTERN and CROSSEN and assists MORGENSTERN with financial transactions.  PRESTON is employed at Gold Coast Check Cashing, Inc., 5701 Margate Boulevard, Margate, Florida, and has no criminal record.

16.  ISRAEL TORRES, also known as "Buddy", was born on July 10, 1950, in Manhattan, New York, and has a registered address of 5100 Las Verde Circle, #318, Delray Beach, Florida.  Anthony Graziano is a Capo in the Bonanno LCN Family and is TORRES' principal contact for the criminal crew operating in South Florida. On October 6, 1994, TORRES was arrested by Broward County Sheriff's Office, Florida, for two counts of Grand Larceny and Tampering With/Destroying Evidence.  On December 2, 1994, TORRES was arrested by Palm Beach County Sheriff's Office, Florida, for Fraud, Illegal Use of Credit Cards and Forgery of Credit Card.  On December 23, 1994, TORRES plead nolo contendre to the October 6, 1994 charges and plead guilty to the December 2, 1994 charges; TORRES was sentenced to four years probation, suspension of his driver's license, and restitution of $8,460. On March 31, 1998, TORRES was arrested by Palm Beach County Sheriff's Office, Florida, for Grand

11

Theft; those charges were subsequently dismissed.

17. MICHAEL BUCCINNA was born on April 30, 1959, and resides at 6363 N.W. 39th Street, Coral Springs, Florida. BUCCINNA works at Gold Coast Check Cashing, Inc., 5701 Margate Boulevard, Margate, Florida. BUCCINNA has no criminal record, but as described in the original affidavit, BUCCINNA helps to collect extortionate loans for MAMONE.

18. VIRGIL WOMACK, also known as Lewey L. Catoe, III, George H. Williamson, and Clifton Wilkinson, was born on July 24, 1941, in Georgia. WOMACK has a residence at 11052 Watson Drive, Suite C in Seneca, South Carolina. WOMACK has a criminal record which includes the following: WOMACK was arrested on March 10, 1986, for battery and the case was dismissed; WOMACK was arrested on April 17, 1990, for battery, criminal damage to property second degree, aggravated assault and terrorist threats and acts. WOMACK received a suspended sentence upon payment of a fine of $120.00 and restitution. WOMACK was arrested on January 7, 2000, pursuant to a criminal complaint issued in South Carolina, charging him and others with Conspiracy, Mail Fraud, Wire Fraud, and Money Laundering; that matter is still pending.

19. CHARLOTTE WOMACK, the spouse of VIRGIL WOMACK, was born on November 23, 1948. CHARLOTTE WOMACK has a residence at 11052 Watson Drive, Suite C, Seneca, South Carolina. CHARLOTTE WOMACK

12

was arrested on January 7, 2000, pursuant to a criminal complaint issued in South Carolina, charging him and others with Conspiracy, Mail Fraud, Wire Fraud, and Money Laundering; that matter is still pending.

20. JOSEPH RAMON SILVESTRI a/k/a Joe Silvestri, was born on August 12, 1931, and resides at 1870 Mediterranean Road in West Palm Beach, Florida. SILVESTRI is an associate of the Bonanno LCN Family. SILVESTRI has a criminal record which includes the following: SILVESTRI was arrested in New Jersey on March 3, 1984, on charges of conspiracy to commit bribery, bribery of a public official, and racketeering enterprise. SILVESTRI was convicted on March 17, 1986, to three years imprisonment and received a $15,000 fine. SILVESTRI was arrested in New Jersey on March 28, 1968, for larceny and burglary; both counts were subsequently dismissed. SILVESTRI was arrested in New Jersey on September 3, 1968, for larceny and burglary; SILVESTRI pleaded guilty to both charges and was fined fifty dollars. SILVESTRI was arrested in New Jersey on October 8, 1970, for extortion; SILVESTRI pleaded not guilty and was acquitted.

21. ANSON PETER KLINGER was born on February 8, 1940, and resides at 5334 Sapphire Valley, Boca Raton, Florida. KLINGER has a criminal record as follows: he was arrested on April 10, 1958, for public lewdness and was received a sentence of $50 or 25 days in jail; on February 16, 1965, he was arrested for failure to

13

comply with a court order; on November 26, 1966, he was arrested for sale of football tickets and was directed to forfeit a $18 profit; on March 22, 1967, he was charged with worthless check; on February 2, 1968, he was charged with three counts of worthless check and failure to answer summons and was placed on 18 months probation; on January 19, 1972, he was arrested for one count of worthless check; on March 21, 1972, he was arrested for fraud and insufficient funds/check; on January 23, 1984, he was arrested in relationship to a retail theft and had adjudication withheld with the payment of $100 in costs; on November 18, 1994, he was charged with aggravated battery and the matter was nolle prossed; on February 6, 1999, he was arrested in Las Vegas for insufficient funds/checks;

22.  JULIUS BRUCE CHIUSANO, also known as "Bruce Chiusano,", was born on June 29, 1948, and resides at 2801 N.E. 183rd Street, Apartment 213, Miami, Florida.     CHIUSANO does not have any criminal history.

23.  JOSEPH SPITALERI was born on May 28, 1954, and resides at 1501 East Hallandale Beach Boulevard, Apartment 213, Hallandale, Florida.  SPITALERI's criminal record is as follows: On October 30, 1971, he was arrested for marijuana; on December 12, 1979, he was arrested for marijuana possession, two counts of possession of narcotics' equipment, cocaine possession, and no valid drivers' license; on April 30, 1980, he was arrested for possession of valium and marijuana, obstruction of justice by disorderly person,

14

and driving with a suspended license and this matter was eventually dismissed; on July 27, 1980, he was charged with passing forged bills, cocaine, quaaludes, and marijuana possession, as well as narcotics' equipment with residue; on September 20, 1984, he was arrested for a probation violation and possession of cocaine and received a sentence of 61 days confinement and probation; and, on September 26, 1988, he was arrested for stolen property/firearm, possession of a weapon by a convicted felon, possession of a switchblade, and a traffic offense for which he was found guilty.

24. **MARK CARATTINI** was born on September 15, 1959, and resides at 1355 Camellia Circle, Weston, Florida. CARATTINI has no criminal record.

25. **GIUSEPPE BELLITTO**, also known as "Joe Bellitto," was born on April 10, 1949 and resides at 1290 NW 16th Avenue, Boca Raton, Florida. BELLITTO is associated with the Trafficante Family and works for RAFFA. BELLITTO has a criminal record which includes the following: BELLITTO was arrested on March 31, 1971 for violations concerning immigration laws and was ordered deported. BELLITTO was arrested on March 20, 1979 for involuntary sexual battery and the case was dismissed. BELLITTO was arrested on January 9, 1989 for trafficking in cocaine in excess of 28 grams, and this case was dismissed. BELLITTO was arrested on January 17, 1992 for violations involving drugs and firearms. On October 7, 1992, BELLITTO was charged with making extortionate extensions of credit.

15

He was subsequently convicted, sentenced to 7 months incarceration and 3 years supervised release. Until approximately August of 1999, BELLITTO operated, along with RAFFA, Cash 96.

26. DAVID MORGENSTERN was born on October 28, 1948, and resides at 2332 N.E. 28th Court, Pompano Beach, Florida. DAVID MORGENSTERN's criminal record is as follows: On June 5, 1976, he was arrested for larceny/theft; on February 2, 1981, he was arrested for DUI; on January 30, 1989, he was charged with conspiracy to misappropriate funds and transportation of stolen securities and received a sentence of three years incarceration; and, on January 23, 1998, he was charged with cruelty toward a child;

27. GEORGE WILLIAMSON was born on August 16, 1934, and resides at 1005 N. Southlake Drive, Hollywood, Florida. WILLIAMSON has no criminal record.

28. ORMANDO GOMEZ was born on July 30, 1961, and resides at 3000 N.W. 36th Street, Miami, Florida. GOMEZ' criminal record is as follows: On June 19, 1982, he was arrested for aggravated assault with an automobile, resisting an officer, loitering and prowling and the disposition has been sealed; on October 17, 1986, he was arrested for disorderly conduct; on August 2, 1989, he was arrested for conspiracy to traffic in cocaine and received a sentence of five years incarceration; on September 5, 1997, he was arrested for DUI; on April 30, 1998, he was arrested for

16

trespassing; and, on June 13, 1999, he was arrested for battery/domestic violence and adjudication was withheld.

29. **JEFF LNU** has not yet been fully identified, but he appears to be an individual involved in an illegal gambling business with **MAMONE** and has been reached at telephone numbers (954) 478-1392 and (954) 683-0566, both subscribed to by Josehine Saxon, 2437 N.W. 4th Court, Pompano Beach, Florida

30. **JOE LNU** has not been fully identified, however **MAMONE** reached **JOE LNU** at telephone number (954) 275-9155, which is subscribed to by Delta Recycling, 2075 North Powerline Road, Pompano Beach, Florida. It appears that **JOE LNU** and **MAMONE** are involved in some, as yet, undetermined money laundering.

31. **HUEY LNU** has not yet been fully identified. **HUEY LNU** is an individual who has called **MAMONE** from telephone number (954) 410-6211. Although requested, the subscriber information has not been received for this telephone number. **HUEY LNU** appears to be involved in illegal gambling, specifically bookmaking, however the exact relationship to **MAMONE** has not yet been determined.

## PREVIOUS APPLICATIONS

32. I caused a search to be made of the electronic Surveillance Indices of the Federal Bureau of Investigation and the Drug Enforcement Administration during the weeks of December 27, 1999 and February 7, 2000, in order to determine whether previous applications have been made to intercept wire, oral or electronic

17

communications of STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, JOSEPH SILVESTRI, ANSON KLINGER, BRUCE CHIUSANO, JOSEPH SPITALERI, MARK CARATTINI, GIUSEPPE BELLITTO, DAVID MORGENSTERN, GEORGE WILLIAMSON, ORMANDO GOMEZ, JEFF LNU, JOE LNU, HUEY LNU, or of any of the communication facilities named in this Affidavit. These searches did not reveal any previous applications to intercept wire, oral or electronic communications of any of those persons, or for any of the communication facilities for which authorization is herein sought, other than the following:

33. On April 26, 1988, the Honorable Thomas E. Scott, United States District Judge, Southern District of Florida, signed a Court Order which authorized the interception of wire communications of GIUSEPPE BELLITTO and others occurring over telephone numbers (305) 785-1480, (305) 785-1494, (305) 785-4140, and the oral communications of GIUSEPPE BELLITTO and others occurring at Frank's Restaurant, 3428 East Atlantic Boulevard, Pompano Beach, Florida, for a period of thirty (30) days.

34. On October 23, 1988, the Honorable Edward Korman, United States District Judge, Eastern District of New York, signed a Court Order which authorized the interception of oral and wire communications of JOSEPH SPITALERI and others occurring within Room 435, LaGuardia Holiday Inn, 100-15 Ditmars Boulevard, Elmhurst, New York, and over telephone number (718) 898-1225, for a period of

thirty (30) days.

35.   On October 23, 1988, the Honorable John Bissell, United States District Judge, District of New Jersey, signed a Court Order which authorized the interception of oral communications of **JOSEPH SPITALERI** and others occurring within Room 152 of the Franklin Inn, 50 Port Street, Newark, New Jersey, for a period of thirty (30) days.

36.   On January 16, 1991, the Honorable Robert J. Ward, United States District Judge, Southern District of New York, signed a Court Order which authorized the interception of oral communications of **JOHN MAMONE** and others for a period of thirty (30) days. Extension Orders authorizing the continued interception of oral communications of **JOHN MAMONE** and others each for periods of thirty days, were issued on February 16, 1991, March 13, 1991, April 17, 1991, and May 16, 1991.

37.   On September 12, 1991, the Honorable Nicholas H. Politan, United States District Judge, District of New Jersey, entered an Order authorizing the interception of wire communications of **JOHN FRANCIS MAMONE** and others occurring over telephone number (908) 469-1657 and (908) 469-8424, for a period of thirty (30) days.   On October 16 and November 15, 1991, the Honorable Nicholas H. Politan, United States District Judge, District of New Jersey, entered Orders authorizing extensions of time for the above described interception of wire communications for additional thirty (30) day periods.

19

38. On September 4, 1992, the Honorable Ralph W. Nimmonf, United States District Judge, Middle District of Florida, entered an Order authorizing the interception of the wire communications of **STEVE BRUNO RAFFA** and others occurring over telephone numbers (813) 286-8882 and (813) 286-8883, for a thirty (30) day period. On October 6, 1992, an Order was entered authorizing an extension of time for the above-described interception of wire communications for additional thirty (30) day period.

39. On December 19, 1994, the Honorable Norman C. Roettger, United States District Judge, Southern District of Florida, entered an Order authorizing the interception of the wire communications of **MICHAEL BUCCINA (BUCCINNA), ANSEN PETER KLINGER (ANSON PETER KLINGER)** and others occurring over telephone numbers (305) 981-4506, (305) 981-8916, (305) 981-8949, and (305) 962-0706, for a thirty (30) day period.

40. On October 13, 1998, the Honorable Wilkie D. Ferguson, Jr., United States District Judge, Southern District of Florida, entered an Order authorizing the continued interception of the wire communications of **MARK CARATTINI** and others occurring over telephone numbers (954) 782-3172 and 562-0082, for a thirty (30) day period.

41. On November 16, 1998, the Honorable William P. Dimitrouleas, United States District Judge, Southern District of Florida, entered an Order authorizing the interception of **MARK CARATTINI** and others occurring over telephone number (914) 523-

20

4166, for a thirty (30) day period.

42. On November 19, 1998, the Honorable Wilkie D. Ferguson, Jr., United States District Judge, Southern District of Florida, entered an Order authorizing the interception of the wire communications of **JOHN MAMONE** and others occurring over telephone number (954) 295-6672, 1700 N. State Road 7, Hollywood, Florida, for a thirty (30) day period.

43. On March 18, 1999, the Honorable William P. Dimitrouleas, United States District Judge, Southern District of Florida, entered an Order authorizing the interception of the wire communications of **JULIUS BRUCE CHIUSANO, JOSEPH SPITALERI**, and others occurring over cellular telephone numbers (954) 224-7512 and (954) 224-7513, as well as telephone numbers (954) 456-3020 and (954) 944-2929, for a period of thirty (30) days. This authorization was continued by Court Orders dated April 20, 1999, and May 20, 1999, each for thirty day periods.

44. On September 23, 1999, the Honorable William P. Dimitrouleas, United States District Judge, Southern District of Florida, entered an Order authorizing the interception of the wire communications of **STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, GIUSEPPE BELLITTO** and others occurring over telephone number (954) 564-5599, for a period of thirty (30) days.

45. On November 12, 1999, the Honorable Wilkie D. Ferguson, Jr., United States District Judge, Southern District of Florida, entered an Order authorizing the interception of the wire

21

communications of ISRAEL "BUDDY" TORRES, JOHN MAMONE, and others occurring over cellular telephone numbers (561) 350-5824 and (917) 414-7111, for a period of thirty (30) days.

46. On December 28, 1999, the Honorable Wilkie D. Ferguson, Jr., United States District Judge, Southern District of Florida, entered an Order authorizing the continued interception of the wire communications of ISRAEL "BUDDY" TORRES, JOHN MAMONE, and others occurring over cellular telephone numbers (561) 350-5824 and (917) 414-7111, for a period of thirty (30) days.

47. On January 7, 2000, the Honorable William P. Dimitrouleas, United States District Judge, Southern District of Florida, Fort Lauderdale, Florida, signed a Court Order authorizing the interception of wire communications of STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, and others yet unknown, occurring over cellular telephone numbers (954) 614-1821 and (954) 557-3651, for a period of thirty days.

48. On February 4, 2000, the Honorable Wilkie D. Ferguson, Jr., United States District Judge, Southern District of Florida, entered an Order authorizing the continued interception of the wire communications of ISRAEL "BUDDY" TORRES, JOHN MAMONE, and others occurring over cellular telephone numbers (561) 350-5824 and (917) 414-7111, for a period of thirty (30) days, which is ongoing at this time.

## FACTS AND CIRCUMSTANCES
## ESTABLISHING PROBABLE CAUSE

49.  The criminal organization which is the subject of this affidavit, the Trafficante LCN Family, and its associates, is fully described in the original affidavit, attached as Exhibit A, and incorporated herein by reference.

50.  Based upon the facts and circumstances showing probable cause contained in the attached original Affidavit (Exhibit A) and the review of court authorized wire interceptions, your affiant is aware that the named interceptees and others as yet unknown, are currently involved in ongoing criminal activity.

51.  As the attached original affidavit reflects, the named interceptees and other coconspirators are currently participating in a criminal enterprise, the activities of which involve the operation of illegal gambling businesses, the collection of unlawful debt, extortionate credit transactions, mail fraud, wire fraud, the laundering of monetary instruments, and other crimes. On January 7, 2000, law enforcement in South Carolina arrested VIRGIL AND CHARLOTTE WOMACK, and, Clifton and Crystal Wilkinson pursuant to criminal complaints, for mail and wire fraud, money laundering, and conspiracy, as well as having a number of search warrants executed in South Carolina, Florida, Georgia, and Arizona. Since that time, temporary restraining orders have also been issued concerning a number of bank accounts, freezing assets which are believed to have come from the investment fraud scheme described in the original affidavit.  As described in the original affidavit,

23

VIRGIL WOMACK's organization was sending, on a daily basis, the investors' checks to MORGENSTERN in Florida. MORGENSTERN, in turn, was cashing the checks, which totaled anywhere from $200,000 to over one million dollars daily, through a number of different avenues. On at least one occasion, as described in the original affidavit, MAMONE attempted to have CS-4 cash twenty-one checks totaling over 1.6 million dollars; this transaction was never completed by CS-4. In addition, the investigation has discovered some checks apparently from this investment fraud through a search of another check cashing store, which is described below. The below-recited court authorized wire interceptions reflect that these actions by South Carolina has caused there to be a number of calls between MAMONE and MORGENSTERN, as well as other as yet unidentified individuals concerning the previous cashing of checks for VIRGIL WOMACK and the location of various funds. The court authorized wire interceptions also reflect that MAMONE is involved with SILVESTRI, CARATTINI, and JEFF LNU in an illegal gambling business, and, that CARATTINI is involved in collecting at least one loan, believed to be extortionate. for MAMONE.

52. On January 7, 2000, at approximately 10:03 p.m., a Court authorized interception was made over telephone number (954) 614-1821. MAMONE placed an outgoing call to (954) 255-1565 and reached an unknown male (U/M). MAMONE and the U/M discussed the search

going on at the store (Gold Coast Check Cashing). MAMONE then received an incoming call from BUCCINNA, who said that the search was being conducted by the FBI, that they are looking for Chemical Trust, and that they were taking everything. BUCCINNA had not called PEGGY (PRESTON) or FRED (MORGENSTERN) yet; MAMONE said that he (MAMONE) would call them right now. MAMONE stated that he (MAMONE) would make FRED (MORGENSTERN) pay for an attorney in order to get all the paperwork back. BUCCINNA stated that the FBI had asked him where all the money goes for Chemical Trust; MAMONE responded that the money just goes into "their account." MAMONE stated that he (MAMONE) was going to see Joe LNU at that time and would let Joe LNU know what was happening.

    A.    On January 7, 2000, at approximately 7:30 p.m., the FBI executed search warrants at Gold Coast Check Cashing Store located in Margate as well as at The Merrit Advisors Group, MORGENSTERN's business in Fort Lauderdale, in relationship to the ongoing South Carolina investment fraud investigation described in the original affidavit. Because MORGENSTERN had been receiving the investors' checks from WOMACK's group and then cashing them through a number of as yet unidentified locations, which would constitute money laundering, the execution of the search warrants appears to have greatly concerned MORGENSTERN, MAMONE, and their associates because of the possible uncovering of their criminal activities.

B. . Telephone records disclose that telephone number (954) 255-1565 is subscribed to by Leasing Ventures Manager, 1750 N.W. 124th Way, Coral Springs, Florida.

53. On January 7, 2000, at approximately 10:12 p.m., a Court authorized interception was made over both telephone numbers (954) 614-1821 and (954) 557-3651. MAMONE called MORGENSTERN and told him that the FBI were at the store (Gold Coast Check Cashing), that they have search warrants, and that they are taking everything out of the store. MORGENSTERN was incredulous that the FBI was taking everything out of "our" store. MAMONE stated that the FBI was looking for MORGENSTERN, PEGGY (PRESTON), and Jason (Crossen). MAMONE further stated that the FBI took the $55,000 and that they were seizing all the bank accounts. MAMONE also said that one of the agents said that someone was going to jail for a long time. MAMONE suggested that MORGENSTERN call his (MORGENSTERN's) brother, who should know more about what was going on, and contact whoever else MORGENSTERN thought that he (MORGENSTERN) should contact. MAMONE surmised that they (the FBI) may have gotten "the guy" in Atlanta. MAMONE recommended that MORGENSTERN get a good criminal attorney. MORGENSTERN complained that "they" were just cashing the checks. MORGENSTERN stated that his (MORGENSTERN's) brother was in Europe; MAMONE responded that that was probably a good place to be. MAMONE explained that he (MAMONE) did not know if the FBI was

looking for MORGENSTERN, PEGGY (PRESTON), and Jason (Crossen) to question them or to arrest them. MAMONE said that if MORGENSTERN was taken tonight, that MORGENSTERN would be in until Monday. MAMONE then recommended that MORGENSTERN get a hotel room somewhere for that night. MAMONE discussed the "money laundering laws" with MORGENSTERN and said that he (MAMONE) had asked from day one if MORGENSTERN knew what Chemical Trust was doing and MORGENSTERN had assured MAMONE that he (MORGENSTERN) did. MAMONE stated that MORGENSTERN could be held liable as a coconspirator because MORGENSTERN was laundering the money through the check cashing store, since MORGENSTERN was using the check cashing store to hide where the money was coming from. MAMONE said that MORGENSTERN has a problem and should not take this lightly because what MORGENSTERN was doing was structuring. MAMONE then told MORGENSTERN that he (MAMONE) would call MORGENSTERN back in five minutes.

    A.   Based upon the investigation thus far, it appears in this conversation that MAMONE is berating MORGENSTERN for having gotten MAMONE involved in a money laundering operation which would, because of the law enforcement scrutiny, bring unwanted attention to MAMONE and his activities. It also appears that this money laundering involves MORGENSTERN's brother, DAVID MORGENSTERN, and as yet unidentified locations in Europe.

B.    In addition to the execution of search warrants in Miami, there were search warrants executed in Georgia, South Carolina, and Arizona, on January 7, 2000.  The FBI in South Carolina also arrested VIRGIL WOMACK, CHARLOTTE WOMACK, Clifton and Crystal Wilkinson on the same date for their criminal activities in furtherance of the investment fraud scheme, a Ponzi scheme, described in the original affidavit.

C.    Based upon the investigation to date, your affiant believes that the reference by MAMONE in this conversation to "the guy in Atlanta" is a reference to VIRGIL WOMACK.

54.  On January 7, 2000, at approximately 10:29 p.m., a Court authorized interception was made over telephone number (954) 557-3651.  MORGENSTERN called and left a message for VIRGIL WOMACK at (877) 706-8030.  MORGENSTERN asked to call MORGENSTERN on his mobile, (954) 557-3651.

55.  On January 7, 2000, at approximately 10:38 p.m., a Court authorized interception was made over telephone number (954) 614-1821.  MAMONE called Grace Mamone at telephone number (954) 346-4128.  MAMONE explained that "they" (the FBI) had come for FRED (MORGENSTERN) and his company, and the checks from Chemical Trust, the company that MORGENSTERN is cashing the checks for.

A.    Based upon the investigation thus far, this conversation appears to be direct evidence of MAMONE's knowledge of

28

MORGENSTERN's money laundering activity.

B.    Telephone records disclose that telephone number (954) 346-4128 is subscribed to by David Mamone, 3307 N.W. 108th Drive. Apartment 7, Coral Springs, Florida.

56.    On January 7, 2000, at approximately 10:51 p.m., a Court authorized interception was made over telephone number (954) 557-3651. MORGENSTERN called PEGGY PRESTON at telephone number (954) 577-3648. MORGENSTERN said that JOHN (MAMONE) had called and told MORGENSTERN that agents were at the store picking up Chemical Trust records. MORGENSTERN stated that he (MORGENSTERN) didn't know what MORGENSTERN had gotten them into, that what they had done was legitimate, that they didn't have anything to do with "this person" except to set up his little accounting shop in our place.

A.    Although MORGENSTERN is claiming to be innocent in this conversation, information received from both CS-4 and CS-5, as described in the original affidavit, makes it clear that MORGENSTERN received large amounts daily of investors' checks and was cashing them in a manner which would disguise the source of those funds, thus constituting money laundering. Therefore in this conversation, MORGENSTERN is obviously lying when he said that all he did was set up a small accounting shop.

B.    Based upon the investigation to date, your affiant believes that MORGENSTERN's mention of "this person" in the conversation is a reference to VIRGIL WOMACK.

29

C.   Telephone records disclose that cellular telephone number (954) 557-3648 is subscribed to by Kinsman Merchant & Associates, 4901 N.W. 17th Way, #407, Fort Lauderdale, Florida.

57. On January 7, 2000, at approximately 10:55 p.m., a Court authorized interception was made over both telephone numbers (954) 614-1821 and (954) 557-3651. MAMONE called MORGENSTERN and said that he (MAMONE) was waiting for MIKE (believed to be a reference to BUCCINNA) to come by and would call MORGENSTERN when he (MAMONE) had more information. MAMONE said that he (MAMONE) was sure that "the guy" in Atlanta got picked up. MORGENSTERN stated that he (MORGENSTERN) had not yet been able to get a hold of his brother in Europe. MORGENSTERN said that they had followed all the procedures. MAMONE confirmed that he (MAMONE) remembered all the paperwork but advised MORGENSTERN that the paperwork does not put MORGENSTERN above the law. MAMONE said that he (MAMONE) believes that this started a long time ago, that the federal agents must have been at the bank before and that was why the bank had given Irv LNU and BRUCE (CHIUSANO) a hard time. MAMONE said that he (MAMONE) does not know what the company is or what it does, but that MORGENSTERN's brother has been dealing with them for some time and must know that they are legitimate or he (MORGENSTERN's brother) would not have gotten MORGENSTERN involved. MAMONE and MORGENSTERN agreed that CTR's had been filed on every transaction

30

and they discussed how to open the check cashing store the next day.

A.    Based upon the investigation to date, your affiant believes that in this conversation, "Irv" refers to Irving Weiss and "BRUCE" refers to BRUCE CHIUSANO.  On September 2, 1999, the FBI executed search warrants at Check Cashing Unlimited II, 2603 North Dixie Highway, Wilton Manors, Florida, a check cashing store which was operated at that time by Irving Weiss.  Within some of the documents seized from that search, the FBI has discovered checks made out to and/or endorsed by Chemical Trust.    The investigation has also disclosed that MORGENSTERN has two brothers, Jim and DAVID MORGENSTERN.  It is unclear which brother is being referred to in this conversation.

B.    Although both MAMONE and MORGENSTERN are disclaiming any knowledge of the WOMACK's investment fraud and their role in it, their previous conversation on January 7, 2000, at 10:21 p.m., described above, make it clear that they were both aware that the cashing of the investors' checks was money laundering.  Further, as described in the original affidavit, MAMONE requested that CS-4 attempt to cash twenty-one of these investors' checks at a different check cashing store in September of 1999.

58.  On January 7, 2000, at approximately 11:26 p.m., a Court authorized interception was made over telephone number (954) 557-3651.    An U/M called MORGENSTERN from an unknown number and

MORGENSTERN explained that the FBI had come to the Margate store and seized money and records. MORGENSTERN stated that he (MORGENSTERN) could not reach "him" or Joe LNU, that there must be something wrong somewhere. MORGENSTERN further stated that this would disrupt a lot of things because everything was intertwined.

A. This conversation appears to relate to other activities of MORGENSTERN which are somehow related to MORGENSTERN's work for VIRGIL WOMACK, which MORGENSTERN believes will now be interfered with by law enforcement scrutiny.

59. On January 8, 2000, at approximately 12:13 a.m., a Court authorized interception was made over telephone number (954) 557-3651. MORGENSTERN called an U/M, believed to be JOSEPH SILVESTRI, at telephone number (561) 236-4113. MORGENSTERN commented that missing from the list on the search warrant was the Arizona company; SILVESTRI responded that the Arizona company had been served by the FCC. SILVESTRI surmised that this must have begun with the marked checks at Admiralty and was surprised that they (the FBI) had found out about GEORGE (believed to be a reference to GEORGE WILLIAMSON). SILVESTRI and MORGENSTERN agreed to tackle the problem in the morning.

A. Based upon the investigation to date, your affiant is aware that GEORGE WILLIAMSON and JOSEPH SILVESTRI have knowledge of some of the activities of MORGENSTERN in relationship to the

32

South Carolina investment fraud.

B.    Telephone records disclose that telephone number (561) 236-4113 is subscribed to by McMow Art Glass, Inc., 1870 Mediterranean Road, West Palm Beach, Florida.

60.    On January 8, 2000, at approximately 12:41 a.m., a Court authorized interception was made over telephone number (954) 557-3651.    MORGENSTERN called PRESTON at telephone number (954) 557-3648 (Kinsman & Associates) and they discussed opening the check cashing store the next day.  MORGENSTERN stated that they (the FBI) did not go to all the stores, and that once they (the FBI) look at the paperwork, they would see that we (MORGENSTERN and others) were not conspiring with him (believed to be a reference to VIRGIL WOMACK), that "we" were just sending the money where he (VIRGIL WOMACK) would direct.  MORGENSTERN further stated that "we" did not know how he (VIRGIL WOMACK) was getting the money.

A.    Based upon the investigation to date, your affiant believes that this conversation confirms that MORGENSTERN laundered the money for the WOMACK organization and is apparently trying to convince PRESTON that what they did was legitimate.  However, based on other conversations described in this affidavit and the original affidavit, mainly with MAMONE  it is clear that MORGENSTERN actually knew that the cashing of the checks for the WOMACKs constituted money laundering.

33

61. On January 8, 2000, at approximately 9:31 a.m., a Court authorized interception was made over telephone number (954) 557-3651. MORGENSTERN called PRESTON at telephone number (561) 734-2122 and jokingly asked PRESTON if she (PRESTON) was hiding out. PRESTON asked if they should take all the money out and put it somewhere else; MORGENSTERN responded that they should get what they could. PRESTON said that the bank stated that there was a little less than $15,000 in the account. PRESTON explained that they (the FBI) took everything and PRESTON had had $350,000 in the Chemical Trust checks at the store.

A. Based upon the investigation to date, your affiant believes that the reference to "the store" in this conversation relates to Gold Coast Check Cashing Store.

B. Telephone records disclose that telephone number (561) 734-2122 is subscribed to by Mona Hodus, 10672 Ranchipur Street, Boynton Beach, Florida.

62. On January 8, 2000, at approximately 12:17 p.m., a Court authorized interception was made over telephone number (954) 557-3651. MORGENSTERN called GEORGE (believed to be GEORGE WILLIAMSON) at telephone number (954) 927-7113. WILLIAMSON stated that he (WILLIAMSON) had heard all the news; MORGENSTERN replied that he (MORGENSTERN) had spoken with DAVID (MORGENSTERN), JOE (SILVESTRI), and VIRGIL (VIRGIL WOMACK), who was in jail, and that

34

they had them for mail fraud. WILLIAMSON asked if MORGENSTERN had

put any money through the store; MORGENSTERN responded that they

had put a lot of money through the store. MORGENSTERN stated that

although WOMACK's is not the only thing that they are doing, that

it is an important part of their business.

A.    This conversation confirms that WILLIAMSON has

knowledge of the WOMACK's operation and MORGENSTERN role in

laundering of the investors' checks.

B.    Telephone records disclose that telephone number

(954) 927-7113 is subscribed to by Lynn Diaz, 1005 North South Lake

Drive, Hollywood, Florida.

63.    On January 9, 2000, at approximately 11:07 a.m., a Court

authorized interception was made over telephone number (954) 614-

1821. MAMONE called MARK CARATTINI at telephone number (954) 868-

9440 and they discussed a debt owed to MAMONE by an U/M which

CARATTINI was attempting to collect. MAMONE complained that the

U/M had a check for 90,000 the previous week so the U/M should be

able to pay his (the U/M's) debt. CARATTINI described a

conversation that he (CARATTINI) had had with the U/M, in which the

U/M, who is in the mail box business, had apologized for putting

CARATTINI in the middle. MAMONE stated that he (MAMONE) needs the

money to take care of his own business and that MAMONE would do

whatever he (MAMONE) has to, that MAMONE would not put him (the

U/M) against the wall but that MAMONE needs the U/M to communicate about the debt. CARATTINI said that the U/M told CARATTINI that the U/M would have all the money for CARATTINI on Monday. CARATTINI indicated that the U/M owes CARATTINI $12,000 plus the bet on Monday. MAMONE also told CARATTINI that MAMONE was interested in the Dolphin game; CARATTINI responded that it was down to "three". MAMONE stated that he (MAMONE) was not interested in "three", but that MAMONE might call back before the game began and that CARATTINI should call MAMONE if "it" goes to "four".

A. Based upon the investigation to date, your affiant believes that MAMONE and CARATTINI are discussing gambling debts owed to CARATTINI by an as yet unidentified individual. Further, their mention of the Dolphins game and the numbers "three" and "four" are references to the point spread.

B. Telephone records disclose that telephone number (954) 868-9440 is subscribed to by MARK CARATTINI, 10347 N.W. 53rd Court, Coral Springs, Florida.

64. On January 9, 2000, at approximately 3:01 p.m., a Court authorized interception was made over telephone number (954) 557-3651. MORGENSTERN called ORMANDO GOMEZ at an unknown telephone number. MORGENSTERN stated that it (the investigation) looks like it was just limited to "that one friend of ours", but they were both concerned about the FBI going through all the files. GOMEZ

36

informed MORGENSTERN that he (GOMEZ) had movers coming in and asked

if MORGENSTERN wanted his (MORGENSTERN's) stuff moved too;

MORGENSTERN agreed that would be a good idea.

A.    Based upon the investigation to date, your affiant

believes that the mention of "that one friend of ours" in this

conversation refers to VIRGIL WOMACK and that MORGENSTERN and GOMEZ

are engaging in obstruction of justice.

65.    On January 9, 2000, at approximately 4:38 p.m., a Court

authorized interception was made over telephone number (954) 557-

3651.   ORMANDO GOMEZ called MORGENSTERN from an unknown telephone

number and they discussed why the FBI would go after Merrit.

MORGENSTERN said that he (MORGENSTERN) does not have any of the

packages because they all went to Gold Coast.   MORGENSTERN stated

that it could have been worse if "the other situation" had been

included; GOMEZ responded that it was included because the FBI got

the other server, which is an exact duplicate of what is next door.

GOMEZ suggested that they look for someone to put MORGENSTERN's

stock or corporation in some other name.   MORGENSTERN acknowledged

that some of the money from VIRGIL WOMACK went through Gold Coast.

A.    The investigation to date has not yet been able to

determine what "the other situation" is that GOMEZ and MORGENSTERN

discuss during this conversation.   However, your affiant believes

that the mention of "the other server" refers to the computer

37

records which were seized during the execution of the search warrant on January 7, 2000. Further, your affiant believes that the mention of "the packages" which went to Gold Coast is a reference to the investors' checks which had been forwarded to MORGENSTERN from VIRGIL WOMACK.

66. On January 9, 2000, at approximately 7:48 p.m., a Court authorized interception was made over both telephone numbers (954) 614-1821 and (954) 557-3651. MAMONE called MORGENSTERN. MORGENSTERN was in conversation with an unknown individual in the background and MAMONE told MORGENSTERN not to use his telephone, that they could be tapped. MAMONE and MORGENSTERN discussed meeting the following day at 8:30 a.m. at the Park Place Diner. MAMONE stated that bad news had come already, that the office was bugged and that the phones were tapped.

- 67. On January 10, 2000, at approximately 2:32 p.m., a Court authorized interception was made over telephone number (954) 614-1821. MAMONE called JOE LNU at (954) 275-9155. JOE LNU was concerned that "the kid" would let it out of the bag that "we" had a meeting the day before; MAMONE reassured JOE LNU that "the kid" would act like he ("the kid") had never met JOE LNU before in his life. MAMONE and JOE LNU agreed that they do not want to be put in the middle. JOE LNU said that with the magnitude of the business that "we" (MAMONE and JOE LNU) could help "the kid", but that "the

kid" could not help MAMONE and JOE LNU.  MAMONE stated that "the
kid" can come through Delta to "smurf it" and that "the kid" knows
he ("the kid") is going to go back and forth.

A.    Based upon the investigation to date, your affiant
believes that in this conversation, MAMONE and Joe LNU are
discussing money laundering, which they refer to as "smurfing".

B.    Telephone records disclose that telephone number
'954) 275-9155 is subscribed to by Delta Recycling, 2075 North
Powerline Road, Pompano Beach, Florida.

oo.  On January 10, 2000, at approximately 6:12 p.m., a Court
authorized interception was made over telephone number (954) 614-
1821.  MAMONE placed an outgoing call to JEFF LNU at telephone
number (954) 478-1392. MAMONE complained that JEFF LNU had not
called MAMONE and instructed JEFF LNU that "201" could not do
anything because "201" had to come see MAMONE first.  MAMONE
further advised that "202" and "204" were okay.  JEFF LNU then gave
MAMONE the following figures: "201" at -13,650; "202 at +12,535;
and "204" at +10,490.  MAMONE and JEFF LNU discussed the late
placement of a bet on the horses placed by "202".  JEFF LNU also
complained that everyone had picked the Dolphins that week and it
was "a crusher" for JEFF LNU.  MAMONE asked if JEFF LNU needed to
come see MAMONE; JEFF LNU responded that it was not necessary.

A.    Based upon the investigation to date, your affiant

39

believes that JEFF LNU is a bookmaker with whom MAMONE has particular bettors, who are identified in this conversation by the numbers "201", "202", and "204". Further, JEFF LNU provides MAMONE with the current balances of these three bettors. Your affiant also believes that MAMONE's question as to whether JEFF LNU needs to see MAMONE after his payoffs for the Dolphins game is a coded offer by MAMONE to loan JEFF LNU money at an extortionate rate of interest.

69.  On January 11, 2000, at approximately 7:54 a.m., a Court authorized interception was made over telephone number (954) 614-1821. MAMONE was called by MORGENSTERN, who was calling from an unknown telephone number. MORGENSTERN asked MAMONE what he (MAMONE) thought about creating a "whole overlay operation" about "this situation," with the understanding that MORGENSTERN is an investor; MAMONE responded that the attorneys would know best. MORGENSTERN informed MAMONE that he (MORGENSTERN) was on his way to briefly meet with an attorney in Miami and would meet with MAMONE later in the morning.

70.  On January 11, 2000, at approximately 9:51 a.m., a Court authorized interception was made over telephone number (954) 557-3651. MORGENSTERN received an incoming call from SILVESTRI, who was calling from telephone number (305) 467-9852. SILVESTRI stated that he (SILVESTRI) was at the airport and that his (SILVESTRI's)

40

plane was boarding.  SILVESTRI asked MORGENSTERN how MORGENSTERN
did on the 400,000 that MORGENSTERN tried to move; MORGENSTERN
stated that he didn't know yet and that MORGENSTERN had not yet
heard from his (MORGENSTERN's) brother.

A.    Based upon the investigation to date, your affiant
believes that the moving of 400,000 relates to money laundering.

71.  On January 11, 2000, at approximately 11:57 a.m., a Court
authorized interception was made over telephone number (954) 614-
1821.  MAMONE was called by BRUCE CHIUSANO, who was at telephone
number (954) 567-9898.  CHIUSANO asked MAMONE to reach out for "our
fat friend" and ask him ("our fat friend") to call CHIUSANO on the
portable.  CHIUSANO stated that he (CHIUSANO) had not yet spoken
with Irving LNU.  MAMONE suggested that they should be able to
shake up Irving LNU with the subpoena and everything because they
(the FBI) do not know that Irving LNU owes them (CHIUSANO and
MAMONE) money and if "they" did, "they" might investigate Irving
LNU's books and then Irving LNU could have a problem.  CHIUSANO
responded that he (CHIUSANO) would put the "heat" on Irving LNU.

A.    Telephone records disclose that telephone number
(954) 567-9898 is subscribed to by I.H. Weiss, d/b/a Check Cashing
Unlimited II, 2601 North Dixie Highway, Fort Lauderdale, Florida.

B.    In this conversation, it appears that MAMONE and
CHIUSANO are discussing an illegal debt that Irving LNU owes to

41

MAMONE and CHIUSANO. It is unclear whether this debt arises from gambling or an extortionate extension of credit.

72. On January 11, 2000, at approximately 5:59 p.m., a Court authorized interception was made over telephone number (954) 557-3651. An U/M, apparently calling from Nassau, Bahamas, called MORGENSTERN and said that he (the U/M) believed this was more serious because it was a search warrant rather than the grand jury. The U/M said that some unidentified person had called the U/M and wanted to come to Nassau on Thursday and then meet on Friday in order to review matters; this unidentified person had also told the U/M that this could be navigated because some other unidentified person did not have a significant relationship with the bank. The U/M said that the unidentified person would be protective so that it would not be an embarrassment to Cleo LNU and her (Cleo LNU's) relationship with the people on that side of the world.

A. Based upon the investigation to date, your affiant believes that in this conversation, MORGENSTERN and the U/M are discussing the ramifications of the FBI's investigation, including the execution of search warrants, upon other aspects of the money laundering operation in other parts of the world.

73. On January 13, 2000, at approximately 9:32 a.m., a Court authorized interception was made over telephone number (954) 614-1821. MAMONE called an U/M at telephone number (954) 520-3606 and they discussed the accounting at the check cashing store. The U/M

stated that they were going to need about $75,000 that day. MAMONE told the U/M to have Scott LNU wire the money because where it is now, is not the safest place. MAMONE stated that he (MAMONE) did not want to leave a trail, that it would be a problem getting it from the Merril Lynch account, and that MAMONE did not want to do a CTR. MAMONE said that he (MAMONE) did not want the money to touch his (MAMONE's) personal accounts at all.

A. In this conversation, MAMONE describes his (MAMONE's) attempts to acquire substantial cash without it appearing in MAMONE's account and without having the required CTRs filed. Scott LNU, who is going to be used to wire the money, has not yet been identified and the investigation has not been able to determine where this money is coming from.

B. Telephone records disclose that telephone number (954) 520-3606 is subscribed to by John Manning, 5615 Travelers Palm Lane, Tamarac, Florida

74. On January 13, 2000, at approximately 10:15 a.m., a Court authorized interception was made over telephone number (954) 614-1821. MAMONE called STEVE RAFFA at telephone number (305) 439-7986 and said that he (MAMONE) would stop by the Café in five minutes to meet with RAFFA.

A. Because of the shortness of time of the proposed meeting, physical surveillance could not be conducted.

B. Based upon the investigation to date, your affiant

43

believes that the mention of "the Café" in this conversation refers to Café Sportiva, located in Pompano Beach, Florida, a location often frequented by RAFFA, MAMONE and their associates.

75.    On January 14, 2000, at approximately 11:23 a.m., a Court authorized interception was made over telephone number (954) 614-1821.    MAMONE received an incoming call from an U/M, who was calling from an unknown telephone number.    MAMONE stated that he (MAMONE) was going to cash checks. The U/M told MAMONE to cash the 6,000 somewhere else and give "him" cash.

A.    Based upon the investigation to date, your affiant believes that this conversation relates to a money laundering transaction.

76.    On January 14, 2000, at approximately 12:51 p.m., a Court authorized interception was made over telephone number (954) 614-1821.    MAMONE called MIKE BUCCINNA at telephone number (954) 270-0061 and they discussed the papers that had been served.    MAMONE complained that MORGENSTERN is in the Bahamas, that MORGENSTERN must have taken the money and run. MAMONE further complained that all they did was cash checks for those people.

A.    Telephone records disclose that telephone number (954) 270-0061 is subscribed to by MICHAEL BUCCINNA, 6363 N.W. 39th Street, Pompano Beach, Florida.

B.    As evidenced by the earlier conversation between MAMONE and MORGENSTERN on January 7, 2000, at 10:12 p.m. described

44

above, MAMONE was aware that the cashing of the checks for WOMACK's organization constituted money laundering because it was an attempt to hide the source of the monies. Therefore MAMONE's acknowledgment in this conversation of cashing the checks is direct evidence of MAMONE's participation in the money laundering.

77. On January 15, 2000, at approximately 6:03 p.m., a Court authorized interception was made over telephone number (954) 614-1821. MAMONE called ANSON KLINGER at telephone number (561) 417-2442. MAMONE directed KLINGER not to speak with MAMONE on his (MAMONE's) home telephone. KLINGER requested that MAMONE raise a bettor, BBB T204, to 2,000 a game, and, bettor T201 to 10,000 a game, from 20 to 30. MAMONE stated that he (MAMONE) is not carrying one dollar; KLINGER responded that all four bettors lost this week. KLINGER stated that he (KLINGER) owes $7,700 personally; MAMONE stated that he (MAMONE) does not want to be carrying this money.

A. Based upon the investigation to date, your affiant believes that this conversation relates to bookmaking, an illegal gambling operation.

B. Telephone records disclose that telephone number (561) 417-2442 is subscribed to by PETER KLINGER, 5334 Sapphire Valley, Boca Raton, Florida.

78. On January 16, 2000, at approximately 11:08 a.m., a Court

45

authorized interception was made over telephone number (954) 557-3651. MORGENSTERN called SILVESTRI at telephone number (561) 965-2093 and they discussed the case in South Carolina. They talked about some unidentified person who is not a U.S. citizen; SILVESTRI stated that "they" transferred $3,000 a month to "him" from the "other guy's" account. SILVESTRI believed that Admiralty Bank gave up SILVESTRI's name because the Association, ACC, transferred one million dollars to Admiralty Bank and that it included Gold Coast. SILVESTRI stated that the banker at Admiralty Bank warned SILVESTRI that he (the banker) could not do anything about it even though he is the president and major stockholder.

A.   Based upon the investigation to date, it appears that SILVESTRI is the individual who introduced MORGENSTERN to VIRGIL WOMACK to assist the WOMACKs in the laundering of all the investors' checks.

B.   Telephone records disclose that telephone number (561) 965-2093 is subscribed to by JOSEPH SILVESTRI, 1870 Mediterranean Road, West Palm Beach, Florida.

79.   On January 17, 2000, at approximately 9:20 a.m., a Court authorized interception was made over telephone number (954) 557-3651. MORGENSTERN called PRESTON at telephone number (954) 746-9340 and they discussed the checks that had come in and the checks that had been seized. MORGENSTERN stated that he (MORGENSTERN) had a package sent in on the 3rd, Monday and Tuesday for "205".

46

MORGENSTERN asked if something had come in after that; PRESTON responded that something came in on Friday, that it seemed that something was coming in every day.

A.   Based upon the investigation to date, your affiant believes that the discussion about the checks and the packages which were coming in every day refers to the investors' checks which were being forwarded from VIRGIL WOMACK's operation in South Carolina to MORGENSTERN in Florida.   It appears that MORGENSTERN and PRESTON are attempting to determine if there are any investors' checks which the government had not seized.

B.   Telephone records disclose that telephone number (954) 746-9340 is subscribed to by PEGGY PRESTON, 4717 N.W. 82nd Avenue, Lauderhill, Florida.

8C.   On January 19, 2000, at approximately 10:07 a.m., a Court authorized interception was made over telephone number (954) 614-1821.   While MAMONE was speaking to CS-4 on the telephone, MAMONE took a call waiting from Dave LNU, who called from telephone number (954) 928-6305, and they discussed their schedule for the day. MAMONE and Dave LNU talked about how to get the stores out of Gold Coast, that "they" would have to sell the stores (the Check Cashing stores) or have a buy-out to avoid seizure of the assets by the federal government. MAMONE stated that he (MAMONE) still has the original lease on the building and that there is no paper trail of him (MAMONE) selling the store to Gold Coast.   MAMONE suggested

47

that they should arrange a management contract or a simple buy-out for Dave LNU because the ultimate goal was to roll all the stores into "that public shell." MAMONE and Dave LNU agreed to meet at 1:00 off of Griffin Road at the Sheraton Hotel. MAMONE commented that he (MAMONE) does not know what MORGENSTERN is free to do or not to do, but said that MORGENSTERN had met with attorneys all week so now it was worth another meeting. If need be, MAMONE said that he (MAMONE) could still take the store back for nonpayment, that there was a balance due of $13,000.

A. Based upon the investigation to date, your affiant believes that MAMONE and Dave LNU are discussing various means to avoid the seizure of their assets by the federal government, in particular the check cashing stores which were being operated by MORGENSTERN but one of which apparently is still owned by MAMONE.

81. On January 19, 2000, at approximately 4:06 p.m., a Court authorized interception was made over telephone number (954) 614-1821. MAMONE called SPITALERI at telephone number (954) 895-5008. MAMONE asked SPITALERI if he (SPITALERI) still has one guy working; SPITALERI responded yes. MAMONE stated that he (MAMONE) has guys with good potential and that it could be one million if "we" could get some. SPITALERI said that he (SPITALERI) would talk to BRUCE (believed to be a reference to BRUCE CHIUSANO) and give CHIUSANO half.

48

A._  Telephone records disclose that telephone number (954) 895-5008 is subscribed to by JOSEPH SPITALERI, 1749 East Hallandale Beach Boulevard, Apartment 199, Hallandale, Florida.

82.  On January 21, 2000, at approximately 11:02 a.m., a Court authorized interception was made over telephone number (954) 614-1821.  MAMONE placed a call to GIUSEPPE BELLITTO at telephone number (954) 205-8534.  MAMONE explained that he (MAMONE) dropped the papers off to Paul (believed to be a reference to Paul DiFilippi), that BELLITTO had taken everything "out there" the other day, and that MORGENSTERN might close all the stores. BELLITTO responded that if he (MORGENSTERN) leaves everything there, that "we" could have Paul (DiFilippi) reopen it under "our" license.

A.  Based upon the investigation to date, your affiant believes that this conversation relates to obstruction of justice.

B.  Telephone records disclose that telephone number (954) 205-8534 is subscribed to by GIUSEPPE BELLITTO, 1290 N.W. 16th Avenue, Boca Raton, Florida.

83.  On January 21, 2000, at approximately 3:28 p.m., a Court authorized interception was made over telephone number (954) 614-1821.  MAMONE received an incoming call from HUEY LNU, who was calling from telephone number (954) 410-6211.  MAMONE stated that "the guy" (referring to Adam LNU) was in Las Vegas doing his sports book, that Budin (phonetic) used to own SPG Global, that Carl LNU

49

was in Charlotte, North Carolina, and that Adam LNU handles him (Carl LNU) like a puppet on a string. MAMONE stated that he (MAMONE) has "a kid" with a touting service that pays 80%. HUEY LNU recounted that Adam LNU got 3 million out of the 9 million in winnings, that "they" were getting kickbacks on every deal, and that Adam LNU is the number one player in America.

A. Based upon the investigation to date, your affiant believes that this conversation relates to an illegal gambling business.

84. On January 22, 2000, at approximately 6:12 p.m., a Court authorized interception was made over telephone number (954) 614-1821. MAMONE placed a call to BELLITTO at telephone number (954) 205-8534 (BELLITTO's cellular telephone). BELLITTO said that STEVE (believed to be a reference to RAFFA) wanted to know what was happening with the stores (check cashing stores); MAMONE responded that "the guy from Miami" was supposed to take them all over from FRED (MORGENSTERN).

A. Based upon the investigation to date, your affiant believes that in this conversation, BELLITTO was informing MAMONE about RAFFA's concern about the FBI's ongoing investigation of RAFFA's organization.

85. On January 23, 2000, at approximately 11:20 a.m., a Court authorized interception was made over telephone number (954) 614-

1821. MAMONE placed a call to JEFF LNU at telephone number (954) 478-1392. MAMONE instructed JEFF LNU not to allow an unidentified male to bet on the horses until Monday.

     A.   Based upon the investigation to date, your affiant believes that this conversation relates to the illegal gambling business.

    86.  On January 26, 2000, at approximately 9:42 a.m., a Court authorized interception was made over telephone number (954) 614-1821. MAMONE placed a call to RAFFA at telephone number (305) 439-7986, who asked MAMONE if he (MAMONE) had spoken to JOE (BELLITTO). RAFFA said that he (RAFFA) would meet at the same place, the diner, as before.

     A.   As mentioned in the original affidavit, attached as Exhibit A, MAMONE routinely reports to RAFFA, the boss of the Trafficante Crime Family, on all criminal matters undertaken on behalf of the Family. Based upon this, I understand that during this conversation, RAFFA ordered MAMONE to meet with him for the purpose of providing information about the status of the recent FBI investigation in South Carolina that resulted in search warrants being executed at Gold Coast Check Cashing and the Merrit Advisor Group in South Florida.

    87.  On January 26, 2000, at approximately 9:45 a.m., a Court authorized interception was made over telephone number (954) 614-1821. MAMONE received an incoming call from BELLITTO, who was

calling from telephone number (954) 205-8534. **BELLITTO** said that
he (**RAFFA**) had just called him (**BELLITTO**) and that **BELLITTO** would
also be at the meeting.

88. On January 30, 2000, at approximately 1:11 p.m., a Court
authorized interception was made over telephone number (954) 557-
3651. MORGENSTERN received an incoming call from ORMANDO GOMEZ,
who was calling from an unknown telephone number. MORGENSTERN and
GOMEZ argued about how they were going to distribute the one
million shares because of the ongoing investigations by the FBI and
the SEC as well as their backgrounds. GOMEZ said that it is very
serious because "they" are grouping them (GOMEZ, MORGENSTERN, and
Bernadette Stevens). MORGENSTERN stated that he (MORGENSTERN) did
it just to pay his (MORGENSTERN's) bills. GOMEZ said that
MORGENSTERN should not have been running with the Bahamian
business, that MORGENSTERN should have been running with "our"
(MORGENSTERN's and GOMEZ') business.

89. On January 31, 2000, at approximately 7:50 p.m., a Court
authorized interception was made over telephone number (954) 557-
3651. MORGENSTERN received an incoming call from an U/M, who was
at an unknown telephone number. The U/M indicated that he (the
U/M) was in Nassau, Bahamas, and that the U/M was going to be
seeing "Jude" and "G.W.". The U/M stated that he (the U/M) would
be traveling into Fort Lauderdale and asked MORGENSTERN to meet him

(the U/M) at the airport. The U/M said that he (the U/M) wanted to take all the "inventory, in the preferred form, because nothing carries like the "real stuff".

A.    Based upon the investigation to date, your affiant believes that in this conversation "G.W." refers to George Williamson and the term "inventory, in the preferred form" refers to cash.

90.    On February 2, 2000, at approximately 11:33 a.m., a Court authorized interception was made over telephone number (954) 557-3651. MORGENSTERN placed a call to PRESTON at telephone number (954) 557-3648. MORGENSTERN stated that he (MORGENSTERN) was still en route to the airport, that he (MORGENSTERN) was still "five" short, that MORGENSTERN had been only able to connect with "five." PRESTON responded that she would find out where Mark LNU was at that time.    MORGENSTERN said he (MORGENSTERN) would go to the airport area, SouthWest, upper deck. PRESTON stated that she would have Mark LNU run by and give MORGENSTERN "that."

A.    Based upon the investigation to date, your affiant believes that this coded conversation concerns the transportation of money for the purpose of laundering it.

91.    On February 6, 2000, at approximately 12:18 p.m., a Court authorized interception was made over telephone number (954) 614-1821. MAMONE placed a call to Philip Medico at telephone number (954) 683-3417. MAMONE complained that Medico shorted him (MAMONE)

53

three (thousand) and that Medico is killing MAMONE.   MAMONE and Medico agreed to meet at Atlantic Boulevard at 1 p.m.

     A.   Based upon the investigation to date, which includes this and previous court authorized interceptions, I believe that Medico is a bettor who owes MAMONE an undetermined amount of money for gambling losses.

<u>NORMAL INVESTIGATIVE TECHNIQUES</u>

     92.  Your affiant submits this application seeking authorization for the interception of wire communications because alternative investigative techniques to further this investigation (a) have been tried with only limited success and appear reasonably unlikely to reach greater success if continued, or, (b) are too dangerous to attempt and reasonably appear unlikely to succeed if tried, as more specifically set forth below.

     93.  Your affiant is aware that JOHN MAMONE is a member of a criminal organization in South Florida headed by STEVEN BRUNO RAFFA.  Your affiant is also aware from prior investigations that members of LCN Crime families, such as RAFFA, typically use others to insulate themselves from the commission of certain criminal acts.  The relationship between members and associates of the RAFFA organization, and, FRED MORGENSTERN and PEGGY PRESTON is consistent with this type of insulation.  This buffer serves to protect the "made" member from direct dealings with undercover agents or confidential sources.

94. The FBI in 1994 attempted to introduce two undercover agents into the RAFFA criminal organization. These efforts proved to be unsuccessful, and RAFFA later became aware of this failed operation. At present, your affiant is unaware of any undercover agents or cooperating witnesses who can infiltrate the conspiracy at a level high enough to identify all members of the conspiracy or otherwise satisfy all the goals of this investigation.

95. The use of confidential sources has been very valuable in developing information pertaining to the named interceptees and their criminal activities. However CS-1, CS-2, and CS-3 are unwilling to testify against the targets of this investigation out of fear for their own safety and that of their families. Although CS-4 and CS-5 are willing to testify, they do not know all or sufficient detail concerning their coconspirators' criminal conduct, which is needed to ensure a successful prosecution. This is, in part, because the targets of this investigation have been unwilling to discuss with them all of the details of their criminal activity. For example, none of them are in the inner circle of the Trafficante LCN family and thus are not privy to the many activities and businesses in which they are not personally involved.

A. CS-4 has met MORGENSTERN and although CS-4 was asked to assist MAMONE in cashing twenty-one checks in September, 1999 which MAMONE had identified as having come from MORGENSTERN, CS-4 was unable to gain any more information concerning those particular

checks. In addition, CS-4 has not been asked to assist MAMONE in the cashing of any other checks which MAMONE had been receiving from MORGENSTERN. The investigation in South Florida or South Carolina has not been able to determine where or how MORGENSTERN was cashing the enormous amount of investors' checks that he (MORGENSTERN) received on a daily basis from VIRGIL WOMACK except those checks that were deposited in the bank accounts maintained by Gold Coast Check Cashing and Check Cashing Unlimited II. Nor has the investigation in South Florida or South Carolina been able to determine how the proceeds deposited into the accounts of Gold Coast Check Cashing and Check Cashing Unlimited are ultimately divided among the members of the enterprise.

      B.   Since the January 7, 2000, arrest of VIRGIL WOMACK, CS-5 has terminated her relationship with the WOMACK organization. However, prior to that, even though CS-5 worked in WOMACK's office in South Carolina, CS-5 was not privy to a vast amount of information concerning the investment fraud. CS-5 was not aware of the substance of the conversations among VIRGIL WOMACK and the various salespeople throughout the country. CS-5 also has no information concerning the manner in which MORGENSTERN handles the laundering of the investors' checks once they reach South Florida. Therefore, although the information from CS-5 provided some direct evidence against VIRGIL WOMACK and his immediate associates in South Carolina, CS-5's information is insufficient to identity the

entire scope of this conspiracy and all the participants.

96. Maione and CS-3 are no longer available to work in an undercover capacity for the FBI and are not known to have any current association with the listed interceptees. As noted above, CS-4 still has direct and regular contact with MAMONE. At the FBI's direction, CS-4 has engaged in limited criminal transactions with MAMONE. These transactions have included the purchase by MAMONE of jewelry purportedly stolen from interstate commerce and negotiations concerning the laundering of proceeds from illegal gambling. However CS-4 is still not in a position to determine the full nature and extent of the criminal activity of all the named interceptees. None of the confidential sources possess complete access to all the listed interceptees. In addition, although there is one other source not specifically mentioned in this affidavit, who has had contact with some of the named interceptees, the source does not have access to all of the named interceptees nor is the source in a position to determine the full extent of the ongoing criminal activity. Specifically, in February and March of 1999, another source of the FBI cashed checks for PRESTON and another associate, and, during that time period met MORGENSTERN, who PRESTON indicated she worked for. However the investigation has not shown those checks to be related to the South Carolina fraud being spearheaded by VIRGIL WOMACK nor has the investigation as yet been able to even determine the source of those checks or if it relates to any criminal activity. Since that time, this particular

57

source has not been approached by MORGENSTERN, PRESTON, or their associates to handle the cashing of any further checks. Therefore this source is not in a position at this time to be able to gather any information which would further the goals of this investigation. Moreover, the source is not in contact with the other named interceptees or their associates and, consequently, is not in a position to reveal the full scope and nature of the criminal activity. In summary, the confidential sources are not in a position to provide complete information regarding the criminal activities of those persons who comprise the enterprise under investigation herein. Moreover, many sources have expressed fear of being killed or seriously injured by members of the conspiracy if they were to testify. Indeed, as noted in the original affidavit, the members of RAFFA organization use violence to further their criminal acts.

97. Conducting physical surveillance of participants is a commonly used investigative technique. Surveillance has been conducted in this investigation and has assisted in disclosing some of the associations and places of meetings by the participants. However, this technique has failed to reveal the identity of all the participants and has failed to provide sufficient admissible evidence of specific criminal activities. Without knowledge of the content of these meetings, surveillance alone is of limited value. While surveillance can confirm the fact that a meeting took place, under most circumstances it cannot provide the content of the discussions which facilitate the organization's illegal activities.

58

Moreover, your affiant knows that the subjects herein are particularly sensitive to efforts to observe their activities. In addition, it is not possible to conduct physical surveillance within Gold Coast Check Cashing Store, now owned by MORGENSTERN, because the facilities are small and the presence of anyone but customers would arouse suspicion. The location of MORGENSTERN's other companies, The Merrit Advisors Group, Inc.,and Kinsman Merchant & Associates, is upstairs in a secured building; law enforcement has been unable to gain access to the building itself for surveillance purposes. Moreover, in this investigation, the FBI has continued to conduct surveillance where practicable however because of the limited period between the information provided by electronic surveillance and a meeting, often times a surveillance unit cannot cover these meetings. Moreover, the exact locations of these meetings are often not described during the telephone conversations that are intercepted.

98. Your affiant knows that any extensive surveillance risks exposure, and can compromise the covert nature of this investigation causing STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, JOSEPH SILVESTRI, ANSON KLINGER, BRUCE CHIUSANO, JOSEPH SPITALERI, MARK CARATTINI, DAVID MORGENSTERN, GIUSEPPE BELLITTO, GEORGE WILLIAMSON, ORMANDO GOMEZ, JEFF LNU, JOE LNU, HUEY LNU, and their associates to alter and/or

59

temporarily cease their criminal operations. Continued surveillance of the residences and businesses of the principals would jeopardize the covert nature of the ongoing investigation, causing the participants to be more cautious and secretive about their ongoing criminal activity. However, surveillance, in conjunction with the interception of relevant conversations, will provide valuable evidence regarding the activities of those involved in this criminal enterprise. Moreover, because of the physical location of Gold Coast Check Cashing, extensive physical surveillance is difficult. Physical surveillance has proved useful in confirming the presence of persons at meetings, for example, MAMONE and MORGENSTERN were observed meeting at the Sheraton Hotel in Dania, Florida, on January 19, 2000. However, in and of itself this technique does not disclose the substance of the criminal conversations.

99. The possibility of initiating a Federal Grand Jury investigation at this time into the illegal activities of the principals of this investigation has been considered. However, many of the possible witnesses are conspirators themselves, and there are presently not sufficient facts to determine which of the alleged conspirators, if any, should be or could be compelled to testify under a grant of immunity. Individuals who are members and associates of organized crime families often invoke their Fifth Amendment testimonial privilege, and even under a grant of immunity have been known to risk and accept contempt charges rather than testify. From your affiant's experience, as well as that of other

agents of the FBI experienced in organized crime matters, extensive
overt investigations would only result in the targets further
camouflaging their activities, making detection even more
difficult.

100. Consideration has been given to interviewing
coconspirators and associates of the principal subjects. However,
the individuals who are knowledgeable of the criminal activities
are generally participants in the crimes, and are therefore
unwilling to provide information and testify or provide false
information about the investigation.

A.   On January 25, 2000, your affiant did attempt to
interview RAFFA at his place of business in Opalocka, Florida.
During that interview, RAFFA provided false information to the FBI
when he denied that he knew MORGENSTERN. RAFFA further indicated
that he had sold his check cashing store, Cash 96, located on N.
Andrews Avenue, Oakland Park, Florida, to a company called Gold
Coast Check Cashing and provided no further information. Also, in
mid-January, 2000, SILVESTRI was telephonically interviewed by an
FBI agent from South Carolina. During this interview, SILVESTRI
admitted receiving approximately $1.5 million for his services as
a broker/underwriter between VIRGIL WOMACK and U.S. Guarantee
Corporation. He further claimed to have no knowledge about any
fraud committed by anyone relating to the WOMACK organization.

B.   After the arrests in South Carolina of VIRGIL

61

WOMACK, CHARLOTTE WOMACK, Clifton Wilkinson and Crystal Wilkinson
by the FBI, Crystal Wilkinson agreed to cooperate with the
government. During her interview, Wilkinson indicated she was the
bookkeeper for WOMACK's operation and the she suspected criminal
activity, but did not investigate it. Ms. Wilkinson advised that
she did not know any of the participants of the organization from
South Florida, but she was responsible for sending investors'
checks to MORGENSTERN on a daily basis in South Florida. She was
unable to provide further details of the scope of the money
laundering organization in South Florida. In fact on January 17,
2000, she had a telephone conversation with MORGENSTERN, under the
direction of the FBI, which was intercepted over cellular telephone
number (954) 557-3651. During the conversation, Wilkinson
attempted to obtain additional information about the scope of the
enterprise. Wilkinson asked about the location of investor
proceeds that were sent to MORGENSTERN from WOMACK, among other
questions about the fraud. MORGENSTERN was very guarded in his
responses and provided no information. In a later intercepted
conversation, with SILVESTRI, MORGENSTERN implied that he was aware
that Wilkinson was cooperating with the FBI. Thus far, the
remaining defendants in the South Carolina case have not agreed to
cooperate with the FBI. In late January, 2000, Crystal Wilkinson
pled guilty in the District of South Carolina to conspiracy to
commit mail fraud and is awaiting sentencing.

C.   On February 7, 2000, Alvin A. Tang pled guilty to an information charging him with conspiracy to commit mail and wire fraud in the District of South Carolina. Tang, a coconspirator of WOMACK, has agreed to cooperate with the FBI in the South Carolina investigation and was debriefed on February 8, 2000. Tang has acknowledged that as president of U.S. Guarantee in Arizona, he was approached by SILVESTRI, who offered Tang a number of assets which SILVESTRI would allow Tang to use to back U.S. Guarantee in turn for issuing guarantee bonds for WOMACK investors. U.S. Guarantee was paid approximately 4 million dollars by the WOMACKs for the issuance of the guarantee bonds; out of that, SILVESTRI was paid between 1.5 to 2 million. Tang has stated that eventually he determined that the SILVESTRI assets were actually of minimal value or completely valueless, but remained because of the amounts of money he was being paid. Although Tang has heard of MORGENSTERN, Tang has never met MORGENSTERN nor does Tang know the specifics of the relationship between the WOMACKs and MORGENSTERN. And Tang knows nothing of the Trafficante crime families' involvement in the investment fraud.

D.   In January 2000, in a separate and unrelated investigation in the Southern District of Florida, ANSON KLINGER was called as a grand jury witness under letter immunity granting him only direct use immunity and not full immunity. KLINGER informed the FBI that even though he appeared in the grand jury, he

63

would refuse to testify in any public trial. During the interviews and testimony, KLINGER did not provide any information concerning this investigation.

E. Furthermore, even with the testimony of a coconspirator, such as Wilkinson, there would likely be insufficient evidence to successfully prosecute all coconspirators or to develop usable information relating to the full scope of the federal violations set forth in this affidavit. The coconspirators, in addition to being afraid of physical retaliation, are often themselves prior participants or currently involved in illegal activity, and as such refuse to cooperate with law enforcement to any significant degree. Even with the benefit of several key conspirators willing to testify, electronic surveillance, in this case, is still necessary to accomplish successful prosecution because the recorded testimony of a cooperating witness will not reveal the full nature and extent of the criminal organization.

101. From prior investigations and reports of other agents, your affiant knows that LCN Crime families and the Sicilian Mafia are extremely sophisticated in detecting and avoiding investigations by law enforcement agencies. This has made conventional investigative techniques, such as interviews, of very limited value.

102. Based upon your affiant's experience and the experience of fellow agents who have investigated organized crime activity, your affiant believes that interviews of additional coconspirators or victims in this matter would be communicated to the principals,

their subordinates, or others, who would take even more precautionary measures to avoid the further collection of evidence by law enforcement. Moreover, it is your affiant's belief that interviews with coconspirators at this stage of the investigation could jeopardize the safety of the confidential sources.

103. Telephone toll call records of telephones used by some of the known participants have been obtained. These records have been useful in revealing some of the associations and frequency of contact of the known participants with each other. However, these records, standing alone, do not provide proof of illegal activities because the records do not reveal the content of conversations. Pursuant to lawful court orders, pen registers and trap and trace techniques have been used in this investigation. As previously outlined in greater detail, the pen register information has revealed the existence of telephonic contact between the principals of this investigation, but like toll record information these records, standing alone, do not provide sufficient proof of illegal activities. The associations and frequency of contacts in themselves, do not provide evidence of criminal activity and do not identify the actual participants in the telephone contacts.

104. Although many bank records have been subpoenaed and reviewed in relationship to the investment fraud portion of this investigation, those records alone are insufficient to meet the goals of this investigation. The bank records have disclosed where some, but certainly not all, of the investors' funds were funneled by WOMACK and his associates. WOMACK and his group were constantly

65

opening and closing bank accounts, thereby making it difficult to continue to locate the accounts and acquire the bank records. Further, WOMACK and his associates have moved large amounts of the cash overseas to the Bahamas and England; those bank records are not readily available to U.S. law enforcement.

105. Based upon my experience, and the experiences of other law enforcement agents as related to me, it is my belief that the use of search warrants at this time would not provide sufficient evidence necessary to determine the full scope of the criminal conspiracies, the identity of all of the coconspirators and the various methods used to run this criminal enterprise. Most such records are typically kept in a coded format, which is difficult to decipher absent the interception of relevant communications. Moreover, on January 7, 2000, the FBI did execute search warrants at several locations in Georgia, South Carolina, Arizona, and South Florida. The locations and entities subject to searches were: Chemical/Alliance Trust in South Carolina, U.S. Guarantee Corporation in Arizona, as well as Merrit Advisors Group, Inc, and Gold Coast Check Cashing/Prestige Accounting Services, Margate. These latter two locations are where the investors' checks had been forwarded to MORGENSTERN and his associates. Some of the documents and records seized pursuant to the warrants has evidentiary value concerning the investment fraud operation conducted in South Carolina and Florida, but these records do not provide evidence of the full scope of the financial fraud

66

organization or the manner and means by which MORGENSTERN and his coconspirators have been laundering the vast amounts of investors' money that they have been receiving on a daily basis since at least October 1999. Morever, the evidence seized from the various locations do not provide proof of other criminal transactions being conducted by other coconspirators. Specifically, these searches did not uncover any evidence concerning RAFFA's participation in this fraudulent investment scheme or his receipt, on behalf of the Trafficante LCN family, of his portion of the earnings of MAMONE for all of his (MAMONE's) criminal activities.

106. As set forth above, FRED MORGENSTERN was also the subject of a separate criminal investigation concerning suspected money laundering and fraud activities. Although initially it appeared that this investigation was unrelated to the criminal activities of RAFFA, it now seems that the fraudulent activity and money laundering activity undertaken by MORGENSTERN is related to the RAFFA organization. As noted above, CS-4 stated that MORGENSTERN is a significant earner and MAMONE receives a portion of those earnings. In any event, the court authorized interceptions sought herein are necessary in order to disclose the full nature and extent of the ongoing criminal relationship between the RAFFA organization and MORGENSTERN.

A. Even though VIRGIL and CHARLOTTE WOMACK and their associates in South Carolina, Georgia and Arizona were arrested on

January 7, 2000, it is not anticipated that MORGENSTERN, MAMONE,
RAFFA or their associates in South Florida will be arrested.
Therefore the criminal activity between MORGENSTERN and MAMONE is
expected to continue in relationship to the investment fraud.
Based upon the pen register information described in the original
affidavit, it is clear that WOMACK and his offices are not the only
locations or individuals that MORGENSTERN is in telephonic contact
with concerning investment frauds.   In addition, based upon
electronic surveillance, it is clear that  MORGENSTERN and MAMONE
are very circumspect in their dealings and therefore electronic
surveillance will be the only means of obtaining the evidence of
their criminal activities.   Further, because MAMONE, RAFFA, and
their associates are involved in a number of unrelated criminal
activities, the arrest of VIRGIL and CHARLOTTE WOMACK and their
associates should have no effect on the continuation of those
activities.

107. Finally, it should be observed that MAMONE and TORRES are
also the subject of an ongoing investigation concerning his
criminal activities  with  members and associates of the Bonanno
LCN family.   Indeed, the United States has recently obtained a
court authorized electronic surveillance order in connection with
that investigation (November 12, 1999, which was continued by Court
Order on December 28, 1999, and February 4, 2000).   However the
ongoing electronic surveillance of the cellular telephones being

utilized by TORRES and Anthony Graziano do not appear to have developed any evidence concerning the criminal activity described in this affidavit. The pertinent interceptions of TORRES and MAMONE in that electronic surveillance thus far has disclosed that TORRES is currently involved in a bookmaking office, loansharking, and possibly telemarketing fraud. The interceptions thus far of MAMONE in that electronic surveillance have been minimal.

108. The court authorized interceptions contained in this and the attached Affidavit reflect that the named coconspirators continue to participate in a criminal enterprise, the activities of which include, among other crimes, the operation of illegal gambling businesses, wire and mail fraud activities, money laundering, and extortionate collections. The intercepted conversations reflect that unidentified coconspirators participate with the named interceptees in these activities. Although the prior court authorized interceptions have been useful in identifying coconspirators and violations of criminal laws, to date, the investigation has not disclosed the identities of all enterprise members nor the extent of their criminal activities. The goals of the investigation have not been achieved and the necessity of continued court authorized electronic surveillance remains essential.

109. Based on the foregoing, your affiant believes there is a need for electronic surveillance in this matter to fully reveal the manner and scope in which STEVE BRUNO RAFFA, JOHN MAMONE, FRED

69

MORGENSTERN, PEGGY PRESTON, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, JOSEPH SILVESTRI, ANSON KLINGER, BRUCE CHIUSANO, JOSEPH SPITALERI, MARK CARATTINI, DAVID MORGENSTERN, GIUSEPPE BELLITTO, GEORGE WILLIAMSON, ORMANDO GOMEZ, JEFF LNU, JOE LNU, HUEY LNU, the named interceptees, and others as yet unknown, are involved in the violations of federal statutes as set forth in paragraph 5 of this affidavit.

## MINIMIZATION

110. All interceptions will be minimized pursuant to Chapter 119 of Title 18, United States Code. Interceptions will be suspended when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined that the conversation is relevant to those matters under investigation. Even if one or more of the named interceptees or their confederates, when identified, is a participant in the conversation, monitoring will be suspended if the conversation is non-pertinent to those matters under investigation. Intermittent spot monitoring will be conducted to ensure that a minimized conversation has not become relevant. Further, during the course of the last thirty days, it appears that a number of the named interceptees have retained attorneys. Other than VIRGIL and CHARLOTTE WOMACK, the other named interceptees do not appear to

have any pending criminal charges. Minimization has been and will continue to be conducted in such a manner so as to avoid, as much as possible, the interception of privileged communications.

111. It is anticipated that interceptions will occur involving Italian and possibly other foreign languages. In the event such conversations occur, and an expert in that language is not reasonably available, it is requested that the Court authorize that the minimization may be conducted as soon as practicable after such interception.

### PERIOD OF INTERCEPTION

112. It is believed that the communications to be intercepted will reflect a continuing criminal conspiracy and continuing course of criminal activity, thereby necessitating the interception of communications on a continuing basis, following the first interception of communications that are the subject of this request. Therefore, it is requested that the interception not automatically terminate when incriminating communications are initially intercepted, but continue until communications are intercepted that reveal the full nature and manner in which STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, JOSEPH SILVESTRI, ANSON KLINGER, BRUCE CHIUSANO, JOSEPH SPITALERI, MARK CARATTINI, DAVID MORGENSTERN, GIUSEPPE BELLITTO, GEORGE WILLIAMSON, ORMANDO GOMEZ, JEFF LNU, JOE LNU, HUEY LNU, and others as yet unknown, participate in the illegal conduct referenced

71

herein, the identifies of the participants, co-conspirators, and victims, the precise nature and scope of the criminal enterprise and illegal activity, the individual acts committed by aiders, abettors, and coconspirators, the extent of their participation in these offenses, their places of operation, the full nature of the criminal conspiracies involved therein, and the acquisition and disbursement of proceeds derived from criminal activity, or for a period not to exceed thirty (30) days, such thirty-day period to begin on the day on which the Order is entered.

Patrick G. Brodsky, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this ____ day of February, 2000.

WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

Certified to be a true and
correct copy of the document on file
Clarence Maddox  Clerk,
U.S. District Court
Southern District of Florida

By _____
Deputy Clerk

Date _____

72

MJD:pab

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION
NO. 99-6

IN THE MATTER OF THE APPLICATION    )
OF THE UNITED STATES OF AMERICA     )    **UNDER SEAL**
FOR AN ORDER AUTHORIZING THE        )
INTERCEPTION OF WIRE COMMUNICATIONS)

**AFFIDAVIT IN SUPPORT OF APPLICATION**

I, Patrick G. Brodsky, Special Agent, Federal Bureau of Investigation, Miami, Florida, being duly sworn, depose and say:

1.    I am a Special Agent of the Federal Bureau of Investigation (FBI). As such, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States code (U.S.C.), Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, U.S.C., Section 2516.

2.    I have been employed as a Special Agent of the FBI for over four years. For the past four years, I have been assigned primarily to investigations of organized crime, including investigations of an organized criminal enterprise known as the La Cosa Nostra (LCN). As a result of my participation in these investigations, conversations with other FBI agents familiar with

**EXHIBIT C**

the criminal activities of the LCN, reviews of reports concerning LCN, reviews of reports concerning LCN activities, members and associates, and reliable informant information, I know that the criminal activities of the LCN include, but are not limited to, gambling, trafficking in narcotics, loansharking, money laundering, extortion, labor racketeering, and murder.  I have also become familiar with many of the methods used by the LCN in the commission of these offenses.

3.   This Affidavit is being submitted in support of an application which seeks an order authorizing the interception of wire communications of **STEVE BRUNO RAFFA, GIUSEPPE BELLITTO, JOHN MAMONE, FRANK TOBIA, FRANK FIORE, FRED MORGENSTERN,** (hereinafter referred to as the named interceptees) and others yet unknown occurring over telephone number **(954) 564-5599** the target telephone number being subscribed to and located at Gold Coast Check Cashing, Inc., 3591 North Andrews Avenue, Oakland Park, Florida and billed to Gold Coast Check Cashing, 5701 Margate Blvd., Margate, FL.

4.   The wire interceptions sought herein will be conducted pursuant to Title 18, United States Code, Section 2518, concerning the following offenses enumerated in Title 18, United States Code, Section 2516:

A.   Conspiracy to conduct and participate, and conducting and participating, directly and indirectly in the

2

affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4), i.e., a group of individuals associated in fact, the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity which includes the offenses set forth in paragraphs 4(B) through 4(F) below, and through the collection of an unlawful debt, in violation of Title 18, United States Code, Sections 1962(c) and (d);

B. Making extortionate extensions of credit, financing extortionate extensions of credit, collecting extensions of credit by extortionate means and conspiracy to do so, in violation of Title 18, United States Code, Sections 892, 893 and 894;

C. Wire fraud in violation of Title 18, United States Code, Section 1343;

D. Interference with commerce by threats or violence, in violation of Title 18, United States Code, Section 1951;

E. Interstate Gambling Business, in violation of Title 18, United States Code, Section 1955.

F. Money laundering, in violation of Title 18, United States Code, Section 1956 and 1957.

5. I base this affidavit upon information I have discovered through my personal participation in this investigation, from oral and written reports made to me by other agents of the FBI and other federal, state, and local law enforcement agencies, I am familiar

3

with the facts and circumstances of the investigation. In addition, I have reviewed numerous FBI reports concerning information provided by confidential informants, cooperating witnesses, and surveillances.

6. Since this affidavit is being submitted for the limited purpose of securing authorization for the interception of wire communications, I have not included each and every fact known to me concerning this investigation. I have only set forth those facts believed to be necessary to establish the requisite foundation for the issuance of the order requested herein.

7. The facts and circumstances of this affidavit as set forth below demonstrate that:

A. There is probable cause to believe that **STEVE BRUNO RAFFA, GIUSEPPE BELLITTO, JOHN MAMONE, FRANK TOBIA, FRANK FIORE FRED MORGENSTERN,** and others as yet unknown, have committed, are committing and will continue to commit the offenses enumerated herein above in paragraphs 4(A) through 4(F).

B. There is probable cause to believe that **STEVE BRUNO RAFFA, GIUSEPPE BELLITTO, JOHN MAMONE, FRANK TOBIA, FRANK FIORE, FRED MORGENSTERN,** and others as yet unknown, have used, are using, and will continue to use telephone number **(954) 564-5599** for the purpose of facilitating the offenses enumerated herein above in

4

paragraphs 4(A) through 4(F).

8. In particular, I believe that wire communications will occur over the target telephone **(954) 564-5599** which will disclose:

A. The precise nature and scope of the illegal activities.

B. The disposition of proceeds of these illegal activities; and

C. The location of resources and operations leading to the discovery of the identities of other co-conspirators, aiders and abettors, and victims, and the role of each participant in the conspiracies and in the substantive violations set forth herein above in paragraph 4.

D. In addition, the wire communications are expected to constitute admissible evidence of the commission of the above-enumerated offenses.

9. Normal investigative procedures have been tried and have not fully succeeded in achieving the objectives of the investigation, or reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ. These investigative procedures are discussed more fully below.

<u>DESCRIPTION OF FACILITIES</u>
<u>TO BE INTERCEPTED</u>

10. Bell South telephone records reveal that telephone number

5

**(954) 564-5599** to Gold Coast Check Cashing, Inc., 3591 North Andrews Avenue, Oakland Park, Florida and billed to Gold Coast Check Cashing, 5701 Margate Blvd., Margate, FL.

11.    There is probable cause to believe that particular wire communications of **STEVE BRUNO RAFFA, GIUSEPPE BELLITTO, JOHN MAMONE, FRANK TOBIA, FRANK FIORE, FRED MORGENSTERN,** and others yet unknown, who are engaged in the offenses enumerated in paragraphs 4(A) through 4(F) will be obtained through the interception of wire communications occurring over telephone number **(954) 564-5599.**

BACKGROUND OF THE PRINCIPALS

12.    **STEVE BRUNO RAFFA**, a/k/a "Uncle Steve," was born on October 2, 1941 in the city of Ciancianna, in the province of Agrigento, Sicily, Italy. **STEVE RAFFA** currently resides at 15641 SW 16th Street in Pembroke Pines, Florida. According to the Italian law enforcement authorities, **RAFFA**'s brother, Pietro Raffa, is documented as being a member of the Sicilian Cosa Nostra (Sicilian Mafia) based in the Agrigento Province of Sicily. **RAFFA** is now the Boss of the Trafficante LCN family in South Florida. The Trafficante LCN family exercises considerable power and influence in South Florida. No arrest record for **RAFFA** could be located.

13.    **GIUSEPPE BELLITTO**, a/k/a "Joe Bellitto," was born on April 10, 1949 and resides at 1290 NW 16th Avenue, Boca Raton,

6

Florida. **BELLITTO** is associated with the Trafficante Family and works for **RAFFA**. **BELLITTO** is operating a check cashing store in or association with **RAFFA** formerly called **CASH 96 CORPORATION** and now called Gold Coast Check Cashing Inc., out of which extortionate loans are made. **BELLITTO** has a criminal record which includes the following: **BELLITTO** was arrested on March 31, 1971 for violations concerning immigration laws and was ordered deported. **BELLITTO** was arrested on March 20, 1979 for involuntary sexual battery and the case was dismissed. **BELLITTO** was arrested on January 9, 1989 for trafficking in cocaine in excess of 28 grams, and this case was dismissed. **BELLITTO** was arrested on January 17, 1992 for violations involving drugs and firearms. On October 7, 1992, **BELLITTO** was charged with making extortionate extensions of credit. He was subsequently convicted, sentenced to 7 months incarceration and 3 years supervised release.

14. **JOHN MAMONE**, was born on June 12, 1951 in New Jersey. **MAMONE** currently resides at 1960 Augusta Terrace in Coral Springs, Florida. **MAMONE** is a made member in the Trafficante LCN family and is considered to be one of **RAFFA**'s closest confidants. **MAMONE** has the following criminal record: He was arrested on December 16, 1991 in New Jersey for Intimidation and the case was dismissed. **MAMONE** was arrested on August 16, 1993 for mail fraud, he was subsequently

7

convicted and was sentenced on March 31, 1995 to 48 months probation and restitution in the amount of $94,444.

15. **FRANK TOBIA**, a/k/a "The Architect," was born on June 5, 1955, and resides at 1067 SW 92nd Avenue in Plantation, Florida. **TOBIA** is associated with the Trafficante LCN Organized Crime Family and is considered one of **RAFFA**'s close confidants. No criminal arrest record could be located for **TOBIA**.

16. **FRANK FIORE**, was born on November 13, 1954, and resides at 5138 Chardonnay Drive, Coral Springs, Florida. **FIORE** is an associate of **RAFFA**. **FIORE** was arrested on February 2, 1996 by the Broward County Sheriff's Office for fraud, for which **FIORE** entered a plea of nolo contendere on March 18, 1997 to fraud, however, adjudication of guilt was withheld.

16.1 **FRED MORGENSTERN** was born on October 28, 1948, and resides at 23170 Floral Wood Lane in Boca Raton, Florida. Based on corporate records, **MORGENSTERN** is associated with both Gold Coast Check Cashing and Check Cashing Unlimited. **MORGENSTERN** has a criminal record which includes the following: **MORGENSTERN** was arrested on June 5, 1976 for theft and was convicted and sentenced to five years probation. **MORGENSTERN** was arrested on December 22, 1976 for passing bad checks and the case was dismissed. On January 30, 1989, **MORGENSTERN** began serving a three year sentence for

8

transportation of stolen securities. On October 18, 1994, **MORGENSTERN** was arrested by for grand larceny and the charges were later dropped.

### PREVIOUS APPLICATIONS

17. I caused a search to be made of the electronic Surveillance Indices of the Federal Bureau of Investigation and the Drug Enforcement Administration during the week of August 16, 1999 in order to determine whether previous applications have been made to intercept wire, oral or electronic communications of **STEVE BRUNO RAFFA, GIUSEPPE BELLITTO, JOHN MAMONE, FRANK TOBIA, FRANK FIORE FRED MORGENSTERN**, or of any of the communication facilities named in this Affidavit. These searches did not reveal any previous applications to intercept wire, oral or electronic communications of any of those persons, or for any of the communication facilities for which authorization is herein sought, other than the following:

18. On April 26, 1988, the Honorable Thomas E. Scott, United States District Judge, Southern District of Florida, executed an order authorizing the interception of the wire communications of **GIUSEPPE BELLITTO** and others occurring over telephone numbers 305-785-1480, 305-785-1494, 305-785-4140 and the oral communications of **GIUSEPPE BELLITTO** and others occurring at Frank's Restaurant, 3428 East Atlantic Blvd., Pompano Beach, FL for a period of 30 days.

9

18.1 On February 25, 1991, the Honorable Mary Ann Trump, United States District Judge, District of New Jersey, executed an order authorizing the interceptions of the wire communications of **FRANK FIORE** and others occurring over telephone number 210-327-5427 for a period of 30 days.

19.  On September 12, 1991 the Honorable Nicholas H. Politan, United States District Judge, District of New Jersey, executed an order authorizing the interception of wire communications of **JOHN FRANCIS MAMONE** and others occurring over telephone number (908) 469-1657 and (908) 469-8424, for a period of thirty days.  On October 16, 1991, the Honorable Nicholas H. Politan, United States District Judge, District of New Jersey, executed an order authorizing extension of time for the above described interception of wire communications for an additional thirty (30) day period. On November 15, 1991, the Honorable Nicholas H. Politan, United States District Judge, District of New Jersey, executed an order authorizing extension of time for the above described interception of wire communications for an additional thirty (30) day period.

20.  On October 16, 1998, the Honorable Wilkie D. Ferguson, Jr., United States District Judge, Southern District of Florida, executed an order authorizing the interception of the wire communications of **JOHN MAMONE** and others occurring over telephone number (954) 295-6672, 1700 N. St. Rd. 7, Hollywood, Florida.  On

10

November 19, 1998, the Honorable Wilkie D. Ferguson, Jr. executed an order authorizing an extension of time for the above described interception of wire and oral communications for an additional thirty (30) day period.

**FACTS AND CIRCUMSTANCES**
**ESTABLISHING PROBABLE CAUSE**

**STRUCTURE OF THE LCN**

21.    Based on my investigative training and experience, coupled with information provided by various sources including other agents of the FBI, I have learned the following information about the La Cosa Nostra (LCN), a nationwide secret criminal association crime group in the United States.

A.    The LCN is the most powerful and sophisticated organized crime group in the United States.

B.    The LCN consists of approximately twenty-four separate organizational units, known as "families," functioning in different cities throughout the United States.

C.    The hierarchy of each LCN family is very rigidly structured in the form of a pyramid.  At the top of the pyramid for each LCN family is the Boss. The second-in-command is known as the Underboss.  Beneath the Underboss is the Consigliere, or counselor. The fourth highest rank in each LCN family's hierarchy is the position of Caporegime, often referred to simply as "Capo,"

11

"Captain," or "Skipper." Caporegime are supervisors over "crews," i.e., groups of Soldiers, the lowest ranking members of the LCN family. Finally, LCN members frequently have nonmember associates who operate under their direction.

        D.    There are five LCN families operating in the New York metropolitan area. They are the Bonanno, Colombo, Gambino, Genovese, and Lucchese LCN families. Each of these families is involved in a wide variety of criminal activities including murder, arson, gambling, loansharking, extortion, labor racketeering, robbery, money laundering, and narcotics trafficking. The Miami/Fort Lauderdale area is considered an "open city" in which any LCN family may operate without paying tribute to any other LCN family. Each of the five New York families has representatives in South Florida. In addition to the five New York LCN families, the Trafficante and DeCavalcante Families, along with representatives of the Sicilian mafia, operate in the South Florida area. Often members of these families will operate and invest together in business and/or illegal operations.

### THE TRAFFICANTE FAMILY

        22.    The Trafficante LCN Family, with approximately nine documented members and a multitude of unconfirmed members and associates, is one of the more powerful LCN families in the Tampa and South Florida areas. Source information reveals that the

12

Trafficante LCN family and its associates engage in drug trafficking and money laundering, and additionally are involved in traditional racketeering activities, such as murder, gambling, loansharking, public corruption and obstruction of justice, among other racketeering offenses.  Trafficante LCN Family operations extend from Tampa through South Florida.

### THE STRUCTURE OF THE TRAFFICANTE FAMILY AND ITS CONTINUING CRIMINAL ACTIVITY

23.  As described in more detail below, **RAFFA** is the Boss of the Trafficante Organized Crime Family in South Florida.  **RAFFA** eventually assumed his present position following the death of Santo Trafficante who died in 1987.

### CONFIDENTIAL SOURCE NUMBER ONE

24.  Confidential Source Number One (CS-1) has been associated with members of all five of the New York LCN and the Trafficante LCN family for over 15 years.  The information provided by CS-1 has been corroborated by independent investigation, e.g., information supplied by other sources of information, physical surveillances, Pen Register information, and has been determined to be reliable. Information supplied by CS-1 has been used to obtain over 30 orders for electronic surveillance and over 45 search warrants. Information supplied by CS-1 has resulted in more than twenty five persons charged with criminal offenses.

13

25. On January 25, 1996, CS-1 advised that **RAFFA** and **MAMONE** were members of the Trafficante Organized Crime Family. **RAFFA** is a captain in the Trafficante crime family and is involved in narcotics trafficking and extortionate extensions of credit to legitimate businesses and persons. CS-1 further stated that **MAMONE** works for **RAFFA** and is involved in narcotics trafficking with **RAFFA**. CS-1 learned this information based on his conversations and association with members and associates of the five New York LCN families and the Trafficante family. CS-1 is not willing to testify and is fearful that he/she will be harmed or killed if he/she were to testify.

A. Although it is possible that conversations concerning narcotics trafficking will be intercepted, your affiant does not believe that there is sufficient evidence at this time to list narcotics trafficking as a predicate offense.

26. On August 16, 1999, CS-1 advised that he is still in regular contact with members and associates of the five LCN families and the Trafficante family. CS-1 advised that **RAFFA,** **MAMONE,** and **TOBIA** are made members of the Trafficante Organized Crime Family. CS-1 stated that **RAFFA** continues to be involved in making extortionate extensions of credit.

**CONFIDENTIAL SOURCE NUMBER TWO**

14

27.  Confidential Source Number Two (CS-2) has been associated with a New York LCN family for approximately 20 years.  CS-2 has known **RAFFA** since approximately 1990.  The information provided by CS-2 has been corroborated by independent investigation, e.g., information supplied by other sources of information, physical surveillances, Pen Register information, and has been determined to be reliable.  CS-2 is not willing to testify and is fearful that he/she will be harmed or killed if he/she were to testify.

28.  On August 16, 1999, CS-2 advised that **RAFFA** has previously admitted to him that he (**RAFFA**) is a member of the Trafficante LCN family.  CS-2 advised that **RAFFA** and Vincent Loscalzo divide the territory of the Trafficante family, with **RAFFA** being located in South Florida and Loscalzo being located in Tampa. **RAFFA** operates a crew of members and associates of the Trafficante family in South Florida.  CS-2 advised that the following persons are members of **RAFFA**'s crew and engage in the following crimes: **JOHN MAMONE** (illegal gambling), **FRANK TOBIA** (extortionate credit transactions), **GIUSEPPE BELLITTO** (extortionate credit transactions and illegal gambling).

29.  CS-2 stated that in April 1996, **BELLITTO** repeatedly shot out the windows of Café Roma in Pompano Beach while the restaurant was closed.  **BELLITTO** did this because the owner of the restaurant

15

had refused **RAFFA**'s request to use the restaurant for illegal gambling activities that **RAFFA**'s group was conducting on behalf of the Trafficante Crime family. CS-2 learned this information from the owner of the Café, who told CS-2 that **BELLITTO** informed the owner that he (**BELLITTO**) had shot up the owner's restaurant.

30. CS-2 has verified to agents of the FBI that for the past several years, **RAFFA** has been the true owner of Café Sportiva, located at 2219 E. Atlantic Blvd., Pompano Beach. This establishment is a local coffee house where members of **RAFFA**'s organization routinely meet.

### PRIOR FBI INVESTIGATION RELATING TO THE TRAFFICANTE LCN FAMILY

#### COOPERATING WITNESS LOUIS MAIONE

31. From approximately 1994 to approximately 1995, Cooperating Witness Louis Maione, an associate of the Gambino Crime Family, pretended to act on behalf of the Gambino Family while he, in fact, was cooperating with the FBI. Maione has provided information to the FBI for approximately ten years. Maione had been associated with the Gambino Family for approximately forty years. The information provided by Maione has been corroborated by independent investigation, e.g., information supplied by other sources of information, physical surveillances, Pen Register

information, and has been determined to be reliable.  Information supplied by Maione has been used to obtain three orders for electronic surveillance.

32.  Information supplied by Maione has resulted in the indictment of Nicholas Corozzo, the acting head of the Gambino crime family and eight other persons.  Maione has stated on numerous occasions that Nicholas Corozzo was the acting Boss of the Gambino Organized Crime Family.  The Gambino Crime Family is one of the Five LCN families that are headquartered in New York City.  On August 22, 1997, Corozzo and others entered a guilty plea in the Southern District of Florida to violations of the Racketeering Influenced and Corrupt Organizations statute (RICO).

33.  On June 13, 1996 Maione recorded a meeting attended by **RAFFA**, **MAMONE**, and Augustus Corrao (a soldier in the Gambino organized crime family) concerning a financial debt owed to **MAMONE** by Louis last name unknown (LNU), an associate of the Gambino Organized Crime family.  This meeting occurred at Corrao's residence in Miami, Florida.  In that meeting, Corrao, the Gambino Crime Family soldier, referred to **RAFFA** as the Boss of the Santo Trafficante crew.  **RAFFA** stated to Maione that he (**RAFFA**) did not interfere in shakedowns, or extortions, undertaken by Nicholas Corozzo (then the Acting Boss of the Gambino Family) and in return he (**RAFFA**) expected that Corrozo would not involved himself in the

shakedowns conducted by **RAFFA**. Maione informed **RAFFA** that he would communicate this position to Corozzo.

34. On June 26, 1996, Maione met with Corozzo, the acting head of the Gambino Crime Family, at the Arch Diner in Brooklyn, New York. During this meeting, Maione asked Corozzo if **RAFFA** was, in fact the Boss of the Trafficante family and if **RAFFA** had power in Florida. Corozzo replied that **RAFFA** was now the leader of the Trafficante family and that he had a crew of six or eight persons.

### EVIDENCE OF LOANSHARKING & GAMBLING BUSINESS

### CONFIDENTIAL SOURCE NUMBER THREE

35. Confidential Source Number Three (CS-3) has been associated with **MAMONE** for approximately four years. Although, CS-3 is no longer an open source, the information provided by CS-3 has been corroborated by independent investigation, e.g., information supplied by other sources of information, physical surveillances, Pen Register information, and has been determined to be reliable. In the fall or winter of 1995 CS-3 approached Joseph Russo (**MAMONE**'s associate) and **JOHN MAMONE** and took out an extortionate loan for approximately $40,000. CS-3 described the loan a wholesale type loan that would usually run about a point to a point and a half per week. (Based on my training and experience, it is my understanding that this refers to one to one and one half percent

18

per week or over fifty two percent per year). This loan was later forgiven when **MAMONE** became CS-3's silent partner in CS-3's business.

36. CS-3 stated that in May 1997, **MAMONE** and Joseph Russo physically assaulted him/her in connection with a debt owed by a third party to **MAMONE** and Russo. CS-3 further stated that **MAMONE** and Russo also assaulted the third party with a baseball bat. Agents from the FBI interviewed the third party who confirmed that he/she had been assaulted by **MAMONE** and Russo. **MAMONE** and Russo blamed CS-3 for the failure of the third party to pay approximately $150,000 to **MAMONE** and Russo that **MAMONE** and Russo thought they were owed as a result of a business dispute.

**CONFIDENTIAL SOURCE NUMBER FOUR**

37. Confidential Source Number Four (CS-4) has been in regular contact with **MAMONE** for the past several months. The information supplied by CS-4 has been corroborated by independent investigation, including, information supplied by other confidential sources, pen register information as well as physical surveillances, and has been determined to be reliable.

38. CS-4 stated that **MAMONE** extended an extortionate loan to him/her. CS-4 stated that **MAMONE** charged an interest rate of two percent per week on the loan, for a total interest rate of

19

approximately 104 percent per year. CS-4 said that this loan was made through Check Cashing Unlimited, 5701 Margate Blvd, Margate Fl. (now called Gold Coast Check Cashing, Inc.). CS-4 stated that Check Cashing Unlimited was controlled by **MAMONE**. CS-4 learned through a close associate of **MAMONE**'s that **RAFFA** and **MAMONE** are members of the Trafficante LCN family and that **MAMONE** reports to **RAFFA**.

39. CS-4 further stated that **MAMONE** regularly makes extortionate extensions of credit in South Florida to several individuals associated with illegal gambling businesses.

40. In late August 1999, CS-4 stated that both **Cash 96 Corporation** and **Check Cashing Unlimited** were sold to **FRED MORGENSTERN**. CS-4 stated that even though Check Cashing Unlimited was sold, **MAMONE** still is involved in the day to day operation of the business and uses the store to facilitate the criminal activities of the enterprise, including, extortionate extensions of credit and illegal gambling.

A. Florida corporate records show a link between **FRED MORGENSTERN** and **Gold Coast Check Cashing** in that MORGENSTERN was listed as the customer who filed the articles of incorporation for Gold Coast Checking on April 28, 1998. As noted below, **Gold Coast Checking** is also now the apparent owner of the check cashing

20

business being operated from **Cash 96 Corporation**. Moreover, target telephone number **954-546-5599**, physically located at 3591 N. Andrews Ave, Oakland park, Florida, is now billed to Gold Coast Check Cashing Inc. at 5701 Margate Blvd, Margate Fl. This is the location of the business formerly called Check Cashing Unlimited, from which CS-4 received the extortionate loan as discussed above.

**SALVATORE LEONARDI**

41.    **Salvatore Leonardi** has provided information to agents of the FBI concerning criminal activities in South Florida, San Diego, California, South America and Italy since 1998. Leonardi was operated as a cooperating witness by the Miami Division of the FBI from 1998 to 1999. Leonardi is an Italian national who is an associate of the Benedetto Santapaola Organization, a Sicilian Mafia organization based in Catania, Sicily.

42.    Leonardi has provided information concerning members of organized crime and organized crime activities, such as money laundering, bookmaking, loansharking, narcotics trafficking, and arms trafficking. Information provided by Leonardi has been corroborated where possible, through consensual recordings, information obtained from other confidential sources, and through independent investigations conducted by law enforcement agencies. All recorded conversations involving Leonardi set forth in this affidavit are in Italian. Although your affiant does not speak

Italian, I have reviewed English language transcripts of the recorded conversations. These English transcripts were prepared by a qualified translator employed by the FBI.

43. Subsequent to Leonardi being opened as a source, Leonardi was informed on several occasions that he could not engage in unauthorized criminal activities. However, in April of 1999, Leonardi in fact engaged in unauthorized criminal activity while a source. Specifically, he possessed cocaine with the intent to distribute it and illegally possessed a firearm. After this was discovered, Leonardi was closed as a source.

A. In April of 1999, Leonardi was arrested by the FBI for possession of cocaine with the intent to distribute and illegal possession of a weapon. Subsequent to plea negotiations with the United States Attorney's Office and Leonardi's counsel, a final decision was made by the United States Attorney's Office allowing Leonardi to plea to misdemeanor charges involving simple possession of cocaine.

44. Although Leonardi was found to have been engaged in unauthorized criminal activity, your affiant believes that the information provided by Leonardi contained in this affidavit concerning the criminal involvement of the named interceptees is credible. During the course of the investigation, Leonardi made numerous consensual recordings that corroborate other information

22

provided by Leonardi. With the exception of the general information set out in paragraph 45, and below, the evidence supplied by Leonardi has been recorded in taped conversations.

45. Leonardi has known **STEVE BRUNO RAFFA** and **GIUSEPPE BELLITTO** for several years. During an interview with FBI agents on August 11, 1998, Leonardi, who is an associate of the Sicilian Mafia, advised that **RAFFA** represents the American mafia in South Florida. **RAFFA** was appointed to this position as the replacement for Santo Trafficante, the former Boss of the Trafficante LCN Family. Leonardi was a close associate of **RAFFA**'s, and at one time laundered money for **RAFFA** and **RAFFA**'s associates. Leonardi stated that **RAFFA** is controlling a loansharking operation being operated at the **CASH 96 CORPORATION** in Oakland Park, Florida. On one occasion in 1999, Leonardi advised that he had personally observed **RAFFA** receiving large amounts of U.S. currency from **BELLITTO** in the rear office area of the **CASH 96 CORPORATION** in Oakland Park, Florida.

A. Florida corporate records established that **RAFFA** at one time was the Director of **CASH 96 CORPORATION**, 3591 North Andrews Avenue, Oakland Park, Florida. **RAFFA**, however, resigned this position on March 17, 1998. Based on the totality of the investigation, including the pen register analysis set forth below,

23

your affiant concludes that **RAFFA** still exercises influence over the **Cash 96 Corporation** now called Gold Coast Check Cashing Inc.

46.  On December 23, 1998, Leonardi met with and consensually recorded a conversation with **BELLITTO** and others at a Christmas party in Hollywood, Florida, hosted by **RAFFA**.  Although this conversation was not intelligible, FBI agents observed and photographed several LCN figures entering and leaving the restaurant where this party was held.  Specifically, FBI agents observed and photographed **RAFFA, MAMONE, TOBIA, FIORE** and **BELLITTO** either entering or leaving the restaurant.  While at this party, **BELLITTO** provided his business card to Leonardi which read **Cash 96 Corp.**, D.B.A. Oakland Park Check Cashing, 3591.N. Andrews Ave., Unit A, Oakland Park, Florida, telephone: **(954) 564-5599** (target telephone number).

47.  On December 28, 1998, Leonardi recorded a conversation with **BELLITTO** in which **BELLITTO** invited Leonardi to participate in an illegal bookmaking operation being conducted by the Trafficante family.  **BELLITTO** provided Leonardi with several telephone numbers (not the target telephone), as well as numbers to identify gamblers, that were being used to conduct the illegal gambling operation.

48.  On January 15, 1999, Leonardi recorded a telephonic

24

conversation over target telephone number **(954) 564-5599** that related to the illegal bookmaking operation. During this conversation, Leonardi advised **BELLITTO** that he was prepared to assign an identification number (previously provided by **BELLITTO**) to a gambler. **BELLITTO** advised Leonardi that he had a new identification number to provide this Gambler. Leonardi then asked if it would be better for **BELLITTO** to provide this new number in person. **BELLITTO** responded that it did not matter if the number were provided over the telephone.

49. On January 8, 1999, **RAFFA** telephonically contacted Salvatore Leonardi. This conversation, which was in Italian, was consensually recorded by Salvatore Leonardi. Leonardi asked **RAFFA** about the possibility of getting a job at the **CASH 96 CORPORATION** being managed by **BELLITTO**. **RAFFA** responded by saying, whenever you want we'll talk and Joe (**BELLITTO**) is the boss there. Leonardi stated that he could work 2 to 4 days per week and **RAFFA** again advised that whenever Leonardi wanted, they could meet at **CASH 96 CORPORATION** and discuss job opportunities. Salvatore Leonardi has advised agents of the FBI that during this January 28, 1999 conversation, both Leonardi and **RAFFA** were talking about **BELLITTO** when they referred to Joe.

50. On February 4, 1999, Leonardi met with and consensually

25

recorded a conversation with **BELLITTO** at the **CASH 96 CORPORATION** in Oakland Park, Florida under the guise of looking for a job at the **CASH 96 CORPORATION**. At this time **BELLITTO** solicited Leonardi to assist in making a loan to a restaurant owner named Alfonso Ruggiero. During the course of this conversation, **BELLITTO** asked Leonardi, how much money he had. Leonardi replied, about $20,000, or $25,000. **BELLITTO** asked if Leonardi could lend him $20,000. **BELLITTO** further advised that he was going to make Leonardi earn a significant amount of money if this loan were made. **BELLITTO** further discussed that they had about 160,000 out. In context, your affiant concludes that this refers to $160,000 in extortionate loans. **BELLITTO** further advised that they used to bring in about 3,000 per week. In context, your affiant concludes that the reference to 3,000 per week refers to $3,000 in payments made on extortionate loans.

51. On February 12, 1999, Leonardi made a consensually recorded conversation with **BELLITTO** at the CASH 96 CORPORATION, located at 3591 North Andrews Avenue in Oakland Park, Florida about the loan to Ruggerio. **BELLITTO** spoke of a contract being written for $20,000 at 18% weekly for 6 months. Your affiant understands that this conversation refers to an extortionate loan provided to Ruggiero.

26

52. On March 22, 1999, Leonardi met with and consensually recorded a conversation with **RAFFA** at the TMC Center, 4137 N.W. 135th Street, Opa Locka, Florida. Florida corporate records show that the TMC Center is a business owned and operated by **RAFFA**. In the recorded conversation, Leonardi requested **RAFFA**'s permission to have **BELLITTO** arrange a loan through **CASH 96 CORPORATION** for a friend. Leonardi advised **RAFFA** that he had a friend who needed a loan and that he (Leonardi) would personally guarantee this individual. **RAFFA** asked what this friend of Leonardi's had to offer as collateral. Leonardi responded that his (Leonardi's) friend had assets to use as collateral and additionally he (Leonardi) could personally guarantee the loan. **RAFFA** advised Leonardi that in order to make the loan, his (Leonardi's) friend should have collateral, such as a car, in order to secure the loan. Leonardi agreed with **RAFFA**'s request, adding that his (Leonardi's) friend possibly had a house that could be used as collateral. Leonardi advised that the loan would be for around $20,000. **RAFFA** again directed Leonardi to speak to this individual about collateral. Your affiant concludes that this conversation refers to a proposed extortionate loan to be provided to Leonardi's friend at the direction of **RAFFA** by the **CASH 96 CORPORATION** in Oakland Park, Florida.

53. Salvatore Leonardi has advised that, from December of 1998 until March of 1999, he had numerous telephone conversations with **BELLITTO** over target telephone number **(954) 564-5599** in order to discuss meeting with **BELLITTO** regarding issues pertaining to gambling and loansharking.

**CONFIDENTIAL SOURCE NUMBER 5**

54. **Confidential Source Number Five (CS-5)** came to the FBI in February of 1999 to provide information concerning the criminal activities and associations of **FRANK FIORE** and other persons. CS-5 came to the FBI after he became the victim of a usurious loan obtained from **FIORE** and others. The information provided by CS-5, where possible, has been corroborated by information obtained from other confidential sources, consensually recorded conversations, and from independent investigations conducted by law enforcement agencies, and CS-5 has been determined to be reliable. Information supplied by CS-5 has been previously used in obtaining a court authorized electronic surveillance order.

55. On April 20, 1999, CS-5 met with agents of the FBI. At this time, CS-5 advised that several months ago, **FIORE** referred CS-5 to the **CASH 96 CORPORATION**. CS-5 recalled that upon providing this referral, **FIORE** further cautioned CS-5 with respect to receiving loans from this business (**CASH 96 CORPORATION**), in that

28

the business is acting as a "front" for a Miami based Mafia group.

56. CS-5 has noted that **FIORE** telephonically contacted **BELLITTO** at **CASH 96 CORPORATION** while in the presence of CS-5, relative to advising **BELLITTO** that he had an acquaintance who needed a loan.

57. CS-5 recalled that shortly after the referral by **FIORE**, CS-5 entered the business of **CASH 96 CORPORATION**, and met with Joe (**BELLITTO**). CS-5 subsequently received a loan in the amount of $1,000 from **BELLITTO** at the **CASH 96 CORPORATION**. **BELLITTO** advised CS-5 at this time that the interest for this loan would be one (1) point per day. (This would amount to an interest rate of 365 percent a year.)

58. **BELLITTO** additionally requested that CS-5 provide a personal check in the amount of $5,000 to disguise the true nature of the extortionate loan. **BELLITTO** further requested that CS-5, who is employed as a telephone card vender, place a telephone vending machine inside **CASH 96 CORPORATION**, to use as collateral for this extortionate loan. Since securing this extortionate loan, CS-5 noted that he has been back to the business of **CASH 96 CORPORATION** approximately four times. CS-5 noted that **BELLITTO** has been present on each occasion, along with a female employee.

59. CS-5 stated that **BELLITTO** made threats of physical

29

violence if CS-5 were to not promptly pay the extortionate loan which CS-5 had received. Specifically, CS-5 advised that **BELLITTO** stated that he would break CS-5's legs if CS-5 did not pay back the extortionate loan. **BELLITTO** further requested the keys to the telephone card vending machine to further secure the collateral for CS-5's outstanding extortionate loan, however, CS-5 replied that he would not be able to provide the keys for fear of losing his job as a telephone card vender. **BELLITTO** broke into the vending machine and took telephone cards in partial payment for the money CS-5 owed to **BELLLITTO**. **BELLITTO** then had locks on the vending machine repaired and added the cost of the repair to the amount of money that CS-5 owed to **BELLITTO**.

60. On June 1, 1999, CS-5 consensually recorded a telephone conversation with **BELLITTO** over target telephone number **(954) 564-5599**. During this conversation, CS-5 asked **BELLITTO** how much money he still owed on the original $1,000.00 loan. **BELLITTO** responded that CS-5 owed $2,950 dollars. CS-5 asked **BELLITTO** to confirm that $2,950.00 was owed by CS-5 to **BELLITTO**. **BELLITTO** confirmed this.

61. In the same telephone conversation, CS-5 asked **BELLITTO** if he (CS-5) could change the amount of the $5,000 check CS-5 had given to **BELLITTO**, to reflect that he (CS-5) now owed **BELLITTO** only $2,950. **BELLITTO** responded that CS-5 could not change the amount

30

of the check.   CS-5 asked **BELLITTO** why he could not alter the amount of the check.   **BELLITTO** became angry at this question, and stated to CS-5 that he should not ask 10,000 why's.

62.   On June 1, 1999, CS-5 was provided with $2,200.00 in United States currency by agents of the FBI to be utilized as payment for an extortionate loan previously received from **BELLITTO**. CS-5 subsequently provided **BELLITTO** with this money in the form of a check bearing account number 1010011815260.   The check was written in the amount of $2,200 and was subsequently provided to **BELLITTO** at **CASH 96 CORPORATION**.

63.   Upon entering the **CASH 96 CORPORATION** (June 1, 1999), CS-5 consensually recorded a conversation with **BELLITTO** discussing the payment of the extortionate loan.   According to **BELLITTO** the loan, which was established on January 26, 1999 (in the amount of $1,000.00), was now, on June 1, 1999, $2,950.00.   **BELLITTO** discussed that one (1) payment had been made by CS-5 on February 5, 1999, in the amount of $100.   **BELLITTO** further discussed that according to his (**BELLITTO**'s) records, the loan was established 109 days ago at $10.00 a day in interest.   **BELLITTO** further advised that CS-5 still owes $860.00.   CS-5 further noted that with respect to this loan, **BELLITTO** referred to a calender located inside the **CASH 96 CORPORATION** business which had initials and figures that

31

appeared to document the loan. **BELLITTO** further advised that an accountant currently has possession of the original check that documented the loan and this check will be returned to CS-5 following the payoff of the loan. CS-5 further noted that an unidentified female working at the **CASH 96 CORPORATION**, appeared to be cognizant of the conversation between **BELLITTO** and CS-5 regarding the extortionate loan. At one point during the meeting, this female read the information regarding the extortionate loan from an index card, which was pulled from other index cards, that are maintained inside the **CASH 96 CORPORATION**.

64. CS-5 has told FBI Special Agents that in January of 1999 CS-5 took out a $25,000.00 loan from **FRANK FIORE** that CS-5 had not paid off in full. On June 9, 1999, CS-5 made a recorded conversation with Richard David Gazie (a close associate of **FIORE**'s). During this conversation, CS-5 expressed concern about the physical safety of himself/herself and his/her family due to CS-5's inability to pay off this loan. CS-5 then stated that he came away very scared and that he was thinking with all that's going on, did he have anything to be worried about. Gazie stated that the guy CS-5 should be worried about is Frank (**FIORE**). Gazie explained that **FIORE** was associated with individuals who could do physical harm to CS-5.

32

65.  Gazie advised CS-5 of his (Gazie's) absolute knowledge that **FIORE** had dangerous associates, stating that Frank (**FIORE**) is "hooked up".  According to Gazie, **FIORE** is hooked up with a big connection from Jersey to Tampa.  Gazie further advised that if it is someone **FIORE** likes, he can negotiate the percentage of the juice (referring to the interest rate on extortionate loans) and run it so it's semi-legitimate.  However, Gazie reminded CS-5 that when they call it in (referring to the extortionate loan), it could be dangerous, very dangerous, there's no doubt about that part of it, it's dangerous.  Gazie again reiterated that the people **FIORE** was associated with were dangerous and that if CS-5 didn't pay up on the extortionate loan, that they would do physical harm to CS-5. Gazie further advised that CS-5 could run, but could not hide from this group.  CS-5 asked Gazie if **FIORE**'s money is actually their money (referring to the Miami based group known by the affiant as the Trafficante LCN family).  Gazie stated, the check cashing store you went to (referring to **CASH 96 CORPORATION**) belonged to the group.

66.  On June 29, 1999 CS-5 recorded a conversation with **FIORE** and Gaize in which they discussed a planned theft of approximately $15 million from an unknown person or business located in Las Vegas, Nevada.  **FIORE** was recorded soliciting CS-5 to open a bank

33

account in South Florida using CS-5's own name in order to further the theft. **FIORE** explained that he and an unknown third party intended to obtain the 15 million dollars from an unknown person or business by having the third party falsely represent that the money would be invested in a business venture. It was **FIORE**'s intent to then wire the money overseas to a bank account in Switzerland. **FIORE** told CS-5 that he would receive approximately $500,000 for his services. **FIORE** additionally indicated that CS-5 would have to relocate because law enforcement authorities would be looking for CS-5 following the successful completion of the fraud. As of this date, the fraud, however, has not occurred.

67. On July 21, 1999, CS-5 conducted a consensually recorded telephone conversation with **BELLITTO** over **(954)- 564-5599** the target telephone. At this time CS-5 asked **BELLITTO** what was owed with respect to the loan which was originally distributed from the **CASH 96 CORPORATION** in Oakland Park, Florida. **BELLITTO**'s response to this question was for CS-5 to come to the store and they would settle it.

68. Later on July 21, 1999 CS-5 was provided with FBI funds in the amount of $500.00 and subsequently met with **BELLITTO** at the **CASH 96 CORPORATION**. This money was used to pay a portion of the original $1,000 loan provided by **BELLITTO** at the **CASH 96**

34

CORPORATION in January of 1999. CS-5 paid BELLITTO the $500.00 and BELLITTO told CS-5 that he/she now owed BELLITTO $525.00 on the original $1,000 loan. BELLITTO additionally advised CS-5 that he has discontinued charging CS-5 interest on the $1,000 loan. CS-5 advised that during his meeting with BELLITTO, BELLITTO placed the $500.00 in a blue money pouch that was kept in the top drawer of a filing cabinet behind BELLITTO's desk. BELLITTO made notes about the source's loan on a post-it note which was also placed in the blue money pouch. BELLITTO additionally returned a check in the amount of $2,200 and a check in the amount of $5,000 to CS-5. These represent collateral checks given previously to BELLITTO by the source for the $1,000 loan. It was later observed that on the $5,000 check, BELLITTO had written "10% per Frank 10 days" on the top of the check. CS-5 has advised the writing on the check refers to FRANK FIORE, who initially vouched for CS-5 to receive the $1,000 loan from BELLITTO at the CASH 96 CORPORATION. This conversation between CS-5 and BELLITTO was consensually recorded.

69. On August 20, 1999, CS-5 consensually recorded a conversation over target telephone number (954) 564-5599. At this time, CS-5 spoke with an unknown male and inquired about the payoff of an extortionate loan which had been distributed by BELLITTO at CASH 96 CORPORATION. This individual responded that Joe (BELLITTO)

35

and his partner Steve (**RAFFA**) had sold the company and that the unknown person was managing the company for the new owners. The unknown person stated, however, that (**BELLITTO**) was going to maintain an office at the business for an unknown length of time.

A.   The target telephone at the business is now answered as Gold Coast Check Cashing. As noted above, **FRED MORGENSTERN**, who is associated with Gold Coast Check Cashing, is also the reported owner of Check Cashing Unlimited, a business that is associated with **MAMONE**. Based on my training and experience, this conduct concerning business ownership is consistent with the manner in which the LCN leadership hide their ownership of businesses.

70.   On August 24, 1999, CS-5 consensually recorded a conversation over target telephone number (**954**) **564-5599** with **BELLITTO**. The unknown person answered the telephone as Gold coast Check Cashing. CS-5 asked to speak with **BELLITTO**, who then came on the line. CS-5 and **BELLITTO** discussed the outstanding balance CS-5 owed on the loan. In that conversation, **BELLITTO** stated that CS-5 should speak with Frank (**FIORE**) about the outstanding balance on the loan because (**BELLITTO**) had given all the information to **FIORE**. In response to a question from CS-5 as to whether **BELLITTO** was still at the business, **BELLITTO** stated that he (**BELLITTO**) was in and out, meaning that he continues to be involved in the business.

36

BELLITTO asked CS-5 for cards to be placed in the telephone card vending machine that CS-5 placed inside the business. **BELLITTO** remarked that the vending machine no longer belonged to CS-5 but now belonged to Frank (**FIORE**). BELLITTO, however, was still asking CS-5 to provide the cards for the machine. This indicates that even though the business had been sold, it was still under the direction of **RAFFA**, **BELLITTO** and the Trafficante organization. Your affiant was present for this conversation.

71. On August 30, 1999, CS-5 recorded a conversation over the target telephone number **(954) 564-5599** with an unknown male, who was the same person that CS-5 spoke with in paragraph 69 above. CS-5 asked to speak with **BELLITTO** concerning the telephone card vending machine at Gold Coast Check Cashing, formerly called **Cash 96 Corporation**. The unknown male stated that **BELLITTO** had just left to go to lunch. The unknown male stated that CS-5 needed to speak with **BELLITTO** about the telephone card vending machine and added that **BELLITTO** was very touchy about the telephone card vending machine. CS-5 then asked why he needed to speak with **BELLITTO** if ownership of the store had changed. The unknown male responded that **BELLITTO** still worked out of this office, referring to Gold Coast Check Cashing (formerly **Cash 96 Corporation**). Your affiant was present for this conversation.

37

A.    Physical surveillance on August 31, 1999, revealed that the sign on the building is still "**CASH 96 CORP**" with the target telephone number **(954) 564-5599** appearing on the window of the building.

72.    As set forth above, the members of the conspiracy are using **CASH 96 CORPORATION/GOLD COAST CHECK CASHING** to make extortionate loans and conduct other illegal activity on behalf of the Trafficante family.  As set forth below, the target telephone is in regular contact with telephone numbers associated with members and associates of the Trafficante family and other members of the criminal conspiracy.  These telephone calls relate to the criminal activities of **RAFFA** and the Trafficante family.  This conclusion is based on the specific information from CS-5 that he/she has discussed payments of the extortionate loan with **BELLITTO** on the target telephone coupled with the ongoing nature of the criminal activity conducted by **RAFFA** and other named interceptees as set forth above.

### PEN REGISTER ANALYSIS

73.    On March 28, 1999, United States Magistrate Judge Barry S. Seltzer, United States District Court, Southern District of Florida, Northern Division, signed an Order authorizing the FBI to initiate a pen register device, a trap and trace device, and

Basic/Enhanced Caller Identification on target telephone number **(954) 564-5599** for a period of sixty (60) days. On May 12, 1999, United States Magistrate Judge Barry S. Seltzer signed an renewal Order authorizing the continued use by the FBI of a pen register device, trap and trace device, and Basic/Enhanced Caller Identification on target telephone number **(954) 564-5599** for a period of sixty (60) days. On July 16, 1999, United States Magistrate Judge Lurana S. Snow signed a renewal Order authorizing the continued use by the FBI of a pen register device, trap and trace device, and Basic/Enhanced Caller Identification on target telephone number **(954) 564-5599** for a period of sixty (60) days. On September 17, 1999, United States Magistrate Judge Lurana S. Snow signed a renewal Order authorizing the continued use by the FBI of a pen register device, trap and trace device, and Basic/Enhanced Caller Identification on target telephone number **(954) 564-5599** for a period of sixty (60) days. During short portions of the aforementioned periods the pen register and related devices did not function, thus the call frequencies set forth below may understate the total number of actual calls that occurred during the indicated time period.

74. Pen register analysis shows that from November 16, 1998 until September 22, 1999, 121 calls were place from target telephone number **(954) 564-5599** to (305) 681-3545, a telephone

39

number subscribed to by TMC Center, Inc., 4137 NW 135th Street, Opa-Locka, Florida, with the last call being placed on September 10, 1999.  Your affiant is aware through public records, that this business is associated with **RAFFA**.

75.  Pen register analysis shows that from March 29, 1999 until September 22, 1999, 24 calls were placed between target telephone **(954) 564-5599** and (305) 688-7710, a telephone number subscribed to by TMC Center, Inc., 4137 NW 135th Street, Opa-Locka, Florida, a business affiliated with **RAFFA**, with the last call being placed on August 26, 1999.

76.  Pen register analysis shows that from December 24, 1998 until September 22, 1999, 40 calls were placed between target telephone number **(954) 564-5599** and (305) 992-3784, a telephone number subscribed to by J. B. Construction Corporation, 4137 NW 13th Street, Miami, Florida, with the last call being placed on July 6, 1999.  A check of public records reveals that **RAFFA** is affiliated with this company.

77.  Pen register analysis shows that from April 14, 1999 until September 22, 1999, 2 calls were placed between target telephone **(954) 564-5599** and (954) 438-0904, a telephone number subscribed to by **RAFFA**, 15641 SW 16th Street, Pembroke Pines, Florida, with the last call being placed on August 9, 1999.

40

78. Pen register analysis shows that from April 1, 1999 until September 22, 1999, 49 calls were placed between target telephone number **(954) 564-5599** and (954) 224-6866, a telephone number subscribed to by F & F Equipment Leasing & Sales, 2499 Glades Road, Unit 308, Boca Raton, Florida, with the last call being placed on August 24, 1999. A check of public records reveals that **FIORE** is listed as being affiliated with this company.

79. Pen register analysis shows that from November 16, 1998 until September 22, 1999, 23 calls were placed between target telephone number **(954) 564-5599** and (561) 417-0880, a telephone number subscribed to by F & F Equipment and Leasing, 2499 Glades Road, Unit 308, Boca Raton, Florida, with the last call being placed on July 19, 1999. Based on public records, your affiant is aware that this business is associated with **FIORE**.

80. Pen register analysis shows that from May 12, 1999 until September 22, 1999, 8 calls were placed between target telephone number **(954) 564-5599** and (954) 614-1821, a telephone subscribed to by Gateway Freight & Systems, 9372 NW 101 Street, Medley, Florida, with the last call being placed on September 1, 1999. A check of public records reveals that **MAMONE** is affiliated with this company.

81. Pen register analysis shows that from April 19, 1999 until September 22, 1999, 10 calls were placed between target

telephone number **(954) 564-5599** and (954) 969-9563, a telephone number subscribed to by Check Cashing Unlimited, 5701 Margate Boulevard, Pompano Beach, Florida, a company known by CS-4 to be associated with **MAMONE**, with the last call being registered on August 16, 1999. As noted above, CS-4 stated that this business was recently purchased by **FRED MORGENSTERN**, who, based on public records is affiliated with Gold Coast Check Cashing. Gold Coast Check Cashing recently purchased **CASH 96 CORPORATION**.

82. Pen register analysis shows that from April 19, 1999 until September 22, 1999, 7 calls were placed from target telephone number **(954) 564-5599** to (954) 969-9691, a telephone number subscribed to by Check Cashing Unlimited, 5701 Margate Boulevard, Pompano Beach, Florida, a company known by CS-4 to be associated with **MAMONE**, with the last call being registered on August 30, 1999.

83. Pen register analysis shows that from April 16, 1999 until September 22, 1999, 4 calls were placed from target telephone number **(954) 564-5599** to (954) 474-7086, a telephone number subscribed to by L. Tobia, 1067 SW 92 Avenue, Plantation, Florida, the wife of **FRANK TOBIA**, with the last call being registered on June 29, 1999.

84. Pen register analysis shows that from April 1, 1999 until

42

September 22, 1999, 16 calls were placed between target telephone number **(954) 564-5599** and (954) 205-6240, a telephone number subscribed to by Lena Tobia, 1067 SW 92 Avenue, Plantation, Florida, the wife of **TOBIA**, with the last call being placed on May 5, 1999.

85. Pen register analysis shows that from April 1, 1999 until September 22, 1999, 47 calls were placed between target telephone number **(954) 564-5599,** and (954) 782-6672, a telephone number subscribed to by Café Sportivo, with the last call being placed on August 27, 1999. According to CS-2, **RAFFA** is the hidden owner of this business.

86. Pen register analysis shows that from March 30, 1999 to September 22, 1999, 73 calls were placed between target telephone number **(954) 564-5599** and (954) 205-8534, a telephone number subscribed to by Fraternal Order of Police, Attention: **GIUSEPPE BELLITTO**, with the last call being placed on September 10, 1999. According to CS-5, this is **BELLITTO**'s cellular telephone number.

87. Pen register analysis shows that from December 14, 1998 to September 22, 1999, 123 calls were placed between target telephone number **(954) 564-5599** and (561) 367-0949, a telephone number subscribed to by **GIUSEPPE BELLITTO**, 1290 NW 16th Avenue, Boca Raton, Florida, with the last call being placed on September 3,

43

1999.

## NORMAL INVESTIGATIVE TECHNIQUES

88.  Your affiant is aware that an investigation consists of a number of techniques being used in conjunction with each other to develop enough evidence to establish a prosecutable case against all guilty individuals.  These techniques include the use of undercover agents, confidential sources, the testimony of witnesses before the Federal Grand Jury, surveillance, analysis of toll and pen register data, and the execution of search warrants.  The requested authorization for wire interception is necessary because these normal investigative techniques have been tried, and have not resulted in sufficient evidence to prosecute all the participants in the criminal enterprise.  Furthermore, these techniques appear unlikely to produce the needed results if attempted or utilized further, or they are too dangerous, as described below.

89.  Your affiant is aware that **GIUSEPPE BELLITTO**, **JOHN MAMONE**, **FRANK TOBIA**, and **FRANK FIORE** are non member associates in a criminal organization in South Florida headed by **STEVEN BRUNO RAFFA**.  Your affiant is also aware from prior investigations and reports of other agents that made members of LCN Crime families, such as **RAFFA**, typically use LCN associates, such as **GIUSEPPE BELLITTO, JOHN MAMONE, FRANK TOBIA, FRANK FIORE**, as a go-between

44

themselves and outsiders. This buffer serves to protect the "made" member from direct dealings with undercover agents or confidential sources.

90. The FBI in 1994 attempted to introduce an undercover agent into the **RAFFA** criminal organization. Specifically, efforts were made to introduce two undercover agents to **RAFFA**. These efforts proved to be unsuccessful, and **RAFFA** later became aware of this failed operation. At present, your affiant is unaware of any undercover agents or cooperating witnesses who can infiltrate the conspiracy at a level high enough to identify all members of the conspiracy or otherwise satisfy all the goals of this investigation.

91. The use of confidential sources has been very valuable in developing information pertaining to **STEVE BRUNO RAFFA, GIUSEPPE BELLITTO, JOHN MAMONE, FRANK TOBIA, FRED MORENSTERN** and **FRANK FIORE**, and their criminal activities. The cooperation of Leonardi, CS-5 and other sources have significantly advanced the objectives of this investigation. However, even though Leonardi, CS-5 and other sources are willing to testify, they are not in a position to provide testimony concerning all the activities of this criminal enterprise. Moreover, Leonardi, if called as a witness, would be subject to severe impeachment based on his criminal failure to

45

comply with the directives of the FBI. Thus, Leonardi's truthfulness would be subject to far greater impeachment than an ordinary cooperating witness.

92. CS-1, CS-2, CS-4, and CS-5 have ongoing associations with some of the listed principal interceptees. Maione, Leonardi and CS-3 are no longer available to work in an undercover capacity for the FBI, and are not known to have any current association with the listed interceptees. However, none of the confidential sources possess complete access to all the listed interceptees. In addition, although there are other sources not mentioned in this affidavit, who have contact with some of the named interceptees, they do not have access to all of the named interceptees. Therefore, the confidential sources are not in a position to provide complete information regarding the criminal activities of those persons who comprise the enterprise under investigation herein. Moreover, many sources have expressed fear of being killed or seriously injured by members of the conspiracy if they were to testify.

93. Conducting physical surveillance of participants is a commonly used investigative technique. Surveillance has been conducted in this investigation and has assisted in disclosing some of the associations and places of meetings by the participants. However, this technique has failed to reveal the identity of all

46

the participants and has failed to provide sufficient admissible evidence of specific criminal activities. Without knowledge of the content of these meetings, surveillance alone is of limited value. While surveillance can confirm the fact that a meeting took place, under most circumstances it cannot provide the content of the discussions which facilitate the organization's illegal activities. Moreover, your affiant knows that the subjects herein are particularly sensitive to efforts to observe their activities. For example, physical surveillances were conducted on June 1, 1999 and July 21, 1999 in connection with a meeting between CS-5 and **BELLITTO** at the **CASH 96 CORPORATION**, now called Gold Coast Check Cashing.

94. Your affiant knows that any extensive surveillance risks exposure, and can compromise the covert nature of this investigation causing **STEVE BRUNO RAFFA, GIUSEPPE BELLITTO, JOHN MAMONE, FRANK TOBIA, FRANK FIORE, FRED MORGENSTERN,** and their associates to alter and/or temporarily cease their criminal operations. Continued surveillance of the residences and businesses of the principals would jeopardize the covert nature of the ongoing investigation, causing the participants to be more cautious and secretive about their ongoing criminal activity. However, surveillance, in conjunction with the interception of relevant conversations, will provide valuable evidence regarding

47

the activities of those involved in this criminal enterprise. Your affiant has caused a covert video surveillance camera to be installed in the vicinity of the exterior of **Cash 96 Corporation**. However, the images from this camera are generally not sufficiently clear to identify the persons entering and leaving the location. Moreover, because of the physical location of **CASH 96 CORPORATION** extensive physical surveillance is difficult. Specifically, the business is located on a corner and there is not a convenient location from which extensive and prolonged physical surveillance may be conducted.

95. The possibility of initiating a Federal Grand Jury investigation at this time into the illegal activities of the principals of this investigation has been considered. However, many of the possible witnesses are conspirators themselves, and there are presently not sufficient facts to determine which of the alleged conspirators, if any, should be or could be compelled to testify under a grant of immunity. Individuals who are members and associates of organized crime families often invoke their Fifth Amendment testimonial privilege, and even under a grant of immunity have been known to risk and accept contempt charges rather than testify. From your affiant's experience, as well as that of other Agents of the FBI experienced in organized crime matters, extensive overt investigations would only result in the targets further

48

camouflaging their activities, making detection even more difficult.

96. Consideration has been given to interviewing co-conspirators and associates of the principal subjects. However, the individuals who are knowledgeable of the criminal activities are generally participants in the crimes, and are therefore unwilling to provide information and testify. Even with the testimony of a co-conspirator, there would likely be insufficient evidence to successfully prosecute all co-conspirators or to develop usable information relating to the full scope of the federal violations set forth in this affidavit. The co-conspirators, in addition to being afraid of physical retaliation, are often themselves prior participants or currently involved in illegal activity, and as such refuse to cooperate with law enforcement to any significant degree. Even with the benefit of several key conspirators willing to testify, electronic surveillance, in this case, is still necessary to accomplish successful prosecution because the recorded testimony of a cooperating witness will not reveal the full nature and extent of the criminal organization.

97. From prior investigations and reports of other Agents, your affiant knows that LCN Crime families and the Sicilian Mafia are extremely sophisticated in detecting and avoiding

49

investigations by law enforcement agencies. This has made conventional investigative techniques, such as interviews, of very limited value.

98. Based upon your affiant's experience and the experience of fellow agents who have investigated organized crime activity, your affiant believes that interviews of additional co-conspirators or victims in this matter would be communicated to the principals, their subordinates, or others, who would take even more precautionary measures to avoid the further collection of evidence by law enforcement. Moreover, it is your affiant's belief that interviews with co-conspirators at this stage of the investigation could jeopardize the safety of the confidential sources.

99. Telephone toll call records of telephones used by some of the known participants have been obtained. These records have been useful in revealing some of the associations and frequency of contact of the known participants with each other. However, these records, standing alone, do not provide proof of illegal activities because the records do not reveal the content of conversations. Pursuant to lawful court orders, pen registers and trap and trace techniques have been used in this investigation. As previously outlined in greater detail, the pen register information has revealed the existence of telephonic contact between the principals of this investigation, but like toll record information these

50

records, standing alone, do not provide sufficient proof of illegal activities. The associations and frequency of contacts in themselves, do not provide evidence of criminal activity and do not identify the actual participants in the telephone contacts.

100. Based upon my experience, and the experiences of other law enforcement agents as related to me, it is my belief that the use of search warrants at this time would not provide sufficient evidence necessary to determine the full scope of the criminal conspiracies, the identify of all of the co-conspirators and the various methods used to run this criminal enterprise. Most such records are typically kept in a coded format, which is difficult to decipher absent the interception of relevant communications. Moreover, there is no corroborated information concerning the existence or location of any such records at this time.

100.1. However, it should be noted that a search warrant was executed at the residence of Richard Gaize in connection with another investigation involving extortionate loans and related criminal activities conducted by Richard Gaize, Bruce Chiusano, Irving Weiss and Chester Potash through a business owned by Bruce Chiusano and Irving Weiss. Based on current information, this investigation is separate and distinct from the crimes being committed by the named interceptees. In addition, Gaize was listed as a named interceptee in an order for electronic surveillance

involving, among other crimes, extortionate loans and related criminal activities conducted by Gaize and others. None of the named interceptees in that order are the targets of this investigation.

100.2 **FRED MORGENSTERN** is also the subject of a separate investigation concerning suspected money laundering activities. Based on current information, this investigation is separate and distinct from the crimes being committed by the named interceptees. Although there is a source in contact with **MORGENSTERN**, the source has no direct information implicating **MORGENSTERN** in money laundering.

101. Based on the foregoing, your affiant believes there is a need for electronic surveillance in this matter to fully reveal the manner and scope in which **STEVE BRUNO RAFFA**, **GIUSEPPE BELLITTO**, **JOHN MAMONE**, **FRANK TOBIA**, **FRANK FIORE**, **FRED MORGENSTERN**, the named interceptees, and others as yet unknown, are involved in the violations of federal statutes as set forth in paragraph 4 of this affidavit.

### MINIMIZATION

102. All interceptions will be minimized pursuant to Chapter 119 of Title 18, United States Code. Interceptions will be suspended when it is determined through voice identification,

52

physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined that the conversation is relevant to those matters under investigation. Even if one or more of the named intercepteees or their confederates, when identified, is a participant in the conversation, monitoring will be suspended if the conversation is non-pertinent to those matters under investigation. Intermittent spot monitoring will be conducted to ensure that a minimized conversation has not become relevant.

103. It is anticipated that interceptions will occur involving Italian and possibly other foreign languages. In the event such conversations occur, and an expert in that language is not reasonably available, it is requested that the Court authorize that the minimization may be conducted as soon as practicable after such interception.

## PERIOD OF INTERCEPTION

104. It is believed that the communications to be intercepted will reflect a continuing criminal conspiracy and continuing course of criminal activity, thereby necessitating the interception of communications on a continuing basis, following the first interception of communications that are the subject of this request. Therefore, it is requested that the interception not

53

automatically terminate when incriminating communications are
initially intercepted, but continue until communications are
intercepted that reveal the full nature and manner in which **STEVE
BRUNO RAFFA, GIUSEPPE BELLITTO, JOHN MAMONE, FRANK TOBIA, FRANK
FIORE, FRED MORGENSTERN,** and others as yet unknown, participate in
the illegal conduct referenced herein, the identifies of the
participants, co-conspirators, and victims, the precise nature and
scope of the criminal enterprise and illegal activity, the
individual acts committed by aiders, abettors, and co-conspirators,
the extent of their participation in these offenses, their places
of operation, the full nature of the criminal conspiracies involved
therein, and the acquisition and disbursement of proceeds derived
from criminal activity, or for a period not to exceed thirty (30)
days, such thirty-day period to begin on the day on which the
investigative or law enforcement officer first begins to conduct an

54

interception under the Order, or, ten (10) days after Order is
entered, whichever is earlier.

                                    Patrick G. Brodsky, Special Agent
                                    Federal Bureau of Investigation

        Subscribed and sworn to before me this _23_ day of September,
1999.

                                    WILLIAM P. DIMITROULEAS
                                    UNITED STATES DISTRICT JUDGE

Certified to be a true and
correct copy of the original.
Carlos Juenke. Clerk
U.S District Court
Southern District of Florida
By _____ Deputy Clerk
Date 9/23/99

55