IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.  00-6309-Cr-Seitz

UNITED STATES OF AMERICA,

                    Plaintiff,

vs.

JOSEPH RUSSO and DOREEN RUSSO,
*et al*,

                    Defendants.

_____/

**NIGHT BOX
FILED**

DEC 0 3 2001

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

## DEFENDANTS RUSSOS' OMNIBUS MOTION SEEKING FURTHER ESSENTIAL DISCOVERY AND OTHER MATERIAL(S)

The Defendants, by and through undersigned counsel, and pursuant to the points and authorities set forth *infra*, hereby move this Honorable Court to enter an Order requiring the disclosure of certain discovery and other material(s) described below. The following is set forth in support:

> Broad discovery contributes to the fair and efficient administration of criminal justice by providing the defendant with enough information to make an informed decision as to plea; by **minimizing the undesirable effect of surprise at trial; and by otherwise contributing to an accurate determination of the issue of guilt or innocence**"(emphasis added).
>
> Advisory Committee Notes to Federal Rules of Criminal Procedure 16

It is axiomatic that Rule 16 "is intended to prescribe the **minimum** amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order **broader discovery** in appropriate cases" (emphasis added).

See, Advisory Committee Note to Rule 16, *reprinted in* 62 F.R.D. 271, 308 (1974). Therefore, upon a proper showing of need, additional discovery is authorized and envisioned. We seek production of certain materials that under the unique facts and circumstances of this case are both relevant and necessary to the preparation of a proper defense.

## INTRODUCTION/FACTUAL BASIS

On October 24, 2000, an Indictment was returned charging nineteen (19) defendants[1] with RICO and various related offenses. **Defendant Joseph Russo and his wife Doreen were not charged**. On January 30, 2001, a Superseding Indictment added a number of new offenses, and again, **the Defendant and his wife were not charged**. On August 14, 2001, a **Second** Superseding Indictment was returned, this time adding the Defendant, his wife and John O'Sullivan. To avoid confusion, the body of this pleading will refer to "Defendant Joseph Russo", or "Defendant Doreen Russo", or jointly "the Defendants".

Defendant Joseph Russo is charged in only eight (8) of the current[2] fifty five (55) counts, as follows:

- Count 1   -   Conspiracy/RICO[3]
- Count 4   -   Conspiracy/Extortionate Extensions of Credit[4]

---

[1]    The initially indicted defendants and the counts they were charged in are: **Steve Raffa**, count(s) 1, 2, 3, 4, 5, 6, 7, 8-13, 14-16, 17, 18-45, 46-70, **John Mamone**, count(s) 1, 2, 3, 4, 5, 6, 7, 8-13, 14-16, 17, 18-45, 46-70, **Fred Morgenstern**, count(s) 1, 6, 17, 18-45, 46-70, **David Morgenstern**, count(s) 1, 17, 18-45, 46-70, **Joseph Silvestri**, count(s) 1, 17, 18-45, 46-70, **Julius Bruce Chiusano**, count(s) 1, 2, 4, 5, 6, 7, 8-13, 14-16, 17, 18-45, 46-70, **Michael Buccinna**, count(s) 1, 2, 5, 6, 7, 8-13, 14-16, 17, 18-45, 46-70, **Jeffrey Bass**, count(s) 1, 2, 6, **Frederick Scarola**, count(s) 3, **Giuseppe Bellitto**, count(s) 1, 2, 4, 5, **Mark Carattini**, count(s) 1, 2, 6, **Paul Difilippi**, count(s) 5, **Anson Klinger**, count(s) 1, 2, 6, **Joseph Spitaleri**, count(s) 1, 7, 8-13, 14-16, **Charles Clay**, count(s) 2, 3, **Peggy Preston**, count(s) 6, 17, 18-45, 46-70, **Mark Weiss**, count(s) 1, 4, 5, 17, 18-45, 46-70, **Jacolyn Baruch**, count(s) 1, 2, 6, and **David Bell**, count(s) 1.

[2]    The first Superseding Indictment contained ninety three (93) counts.

[3]    18 U.S.C. § 1962(d)

2

- Count 5        -        Conspiracy/Collection by Extortionate Means[5]
- Count14        -        Conspiracy/Laundering of Monetary Instrument[6]
- Counts 50-53 -        Engaging in Monetary Transactions in Property
                        Derived from Specified Unlawful Activity[7]

His wife, Defendant Doreen Russo is charged in only five (5) of those eight Counts, *to wit*: Counts 14 and 50-53. The "specified unlawful activity" alleged in Counts 50-53 is "mail fraud" and "wire fraud", from "a South Carolina based investment fraud" (hereinafter, "South Carolina fraud").

According to the Government's theory, proceeds from the South Carolina fraud were illegally "laundered" through – among other places - a business named Check Cashing Unlimited, a duly licensed Florida Corporation whose officers were at one time Grace Mamone (the wife of lead defendant John Mamone) and Defendant Doreen Russo. Notwithstanding the Government's sinister connotation, the suggestion that this was an effort to disguise or conceal the husbands' connection is easily rebutted – unknown third parties were not selected, but rather, the two people most easily identified (through both public records and public knowledge) with Mamone and Defendant Joseph Russo.

Whatever unlawful activities **may** have taken place at or in connection with Check Cashing Unlimited, a critical issue at trial would be the knowledge **of the Defendants**, specifically, whether they **knew** of any unlawful conduct. Indeed, it appears that the overwhelming majority of the indicted conduct has **not** been imputed to the Russos, *i.e.*, they are not charged in forty-seven (47) and fifty (50) counts of the Second Superseding Indictment, respectively.

---

4        18 U.S.C. § 892(a)
5        18 U.S.C. § 894(a)(1)
6        18 U.S.C. § 1956(h)
7        18 U.S.C. § 1957.

As to Counts 50-53, according to the Government's theory, a small fraction of the proceeds of the South Carolina fraud were eventually transferred to a checking account in the name of Defendant Doreen Russo. Defense counsel have participated in several conferences with the prosecution in an attempt to learn whether the Government possesses **any** direct evidence that either Russo had actual knowledge of the unlawful source of the funds, and we believe that there is no such evidence.

The specifics of each of the subject Counts are alleged as follows:

- Count 50 - January 12, 2000 wire transfer of Chemical Trust funds from Merrill Lynch account titled Check Cashing Unlimited into First Union Bank account in name of Doreen Russo ($100,000).

- Count 51 - January 12, 2000 negotiation of check payable to Linda DiCamillo from the First Union Bank account in name of Doreen Russo ($100,000).

- Count 52 - April 30, 2000 negotiation of check from Merrill Lynch account of J.M. & Son Enterprises, Inc. payable to Doreen Russo ($30,000).

- Count 53 - October 10, 2000 deposit of check payable to Doreen Russo into First Union National Bank account of Doreen Russo ($142,000).

Notwithstanding the fact that hundreds of hours of wiretap evidence were compiled during the course of this investigation, there has been but a single, brief taped conversation involving Defendant Joseph Russo, where he actually shows

4

**lack of knowledge** of the unlawful activity at issue[8]. No other electronic surveillance involving the Defendants has been disclosed to us[9]. Upon information and belief, the Government's case against the Russos is based largely upon the mere receipt of the subject funds in a checking account titled to Defendant Doreen Russo, and disbursement of same, without any **direct** evidence tending to show knowledge of the **unlawful** nature of the funds[10].

## A. EVIDENCE SHOWING <u>LACK OF KNOWLEDGE</u> OF "CRIMINALLY DERIVED" NATURE OF FUNDS

A conspiracy case carries with it the inevitable risk of wrongful attribution of responsibility to one or more of the multiple defendants. Under these circumstances, it is especially important that the defense, the judge and the jury should have the assurance that the doors that may lead to truth have been unlocked. In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact.

*Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966)

---

[8]    In that recorded conversation, taking place on January 7, 2000, Defendant Joseph Russo is discussing with lead defendant John Mamone the fact that a search warrant was being executed at the check cashing business, and **he states that "there's nothing illegal going on there, I don't think". Mamone then reassures him "there ain't nothin' goin' wrong".**

[9]    As set forth *infra*, we have reason to believe that **exculpatory** tape recordings exist.

[10]    The Defendants were arrested on August 21, 2001. According to a report authored by case agent Ron Wise, as the Russos were leaving their home with the Agents, Defendant Joseph Russo "looked at his wife ... and apologized for 'this', and Defendant Doreen Russo told him that an apology was not necessary". According to the same report, Defendant Joseph Russo told Agent Wise that his wife "knows nothing about the money, and that she wrote the checks because he told her to do so". We mention this in an abundance of caution because it is unknown at this time whether the prosecution will make any attempt to utilize these alleged statements to show prior "knowledge" on Defendant Joseph Russo's part. If so, the full context and surrounding circumstances of these alleged statements will be set forth in opposition.

1.      As set forth above, the Defendants were added in the Second Superseding Indictment[11], and charged with, *inter alia*, four violations of 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity), with the "specified unlawful activity" being the South Carolina fraud.

2.      **It appears to be undisputed that the Defendants had absolutely no active involvement in the South Carolina fraud, and that their criminal liability stems from acceptance of a fraction of the proceeds of the fraud under circumstances <u>that the Government believes</u> supports an inference of knowledge of the unlawful nature of the funds.**

3.      A competent and effective defense case would attempt to establish 1) that the Defendants had absolutely no involvement with the "South Carolina fraud", and also, 2) that neither of them had knowledge that the monetary transactions alleged in Counts 50-53 involved proceeds of that fraud. It must further be established that 3) the Russos did not know that the monies were "criminally derived property"[12] from **any** source. This latter aspect of the defense case could be established either through evidence that the funds were not **in fact** "criminally derived property", <u>or</u> that the Russos were not aware of the criminal

---

[11]     We believe that it is significant that the Russos were not part of either the initial Indictment or the First Superseding Indictment.

[12]     This is because 18 U.S.C. § 1957 does not require knowledge that the funds were derived from a "specified unlawful activity", but only knowledge that the funds were "criminally derived property". See, *i.e.*, *United States v. Baker*, 19 F.3d 605 (11th Cir. 1994)("the government must prove that the defendant knew that the property was obtained from a criminal offense"). The constitutionality of this lesser *mens rea* standard as applied to the Russos will be litigated separately.

LAW OFFICES OF STEVEN M. POTOLSKY, P.A., 100 S.E. 2ND STREET, SUITE 3550, MIAMI, FLORIDA • (305) 530-8090

nature of the funds. See. *i.e.*, affidavit of FBI Agent Patrick Brodsky dated September 23, 1999 ("Often members of these families [those allegedly connected with organized crime] will operate and invest together in business and/**or** illegal operations")(emphasis added). Use of the disjunctive "or" indicates that **lawful** joint business investments are also common. See also, testimony of Agent Ron Wise, Russo detention hearing, August 29, 2001, p. 23 ("... we have evidence that Joe Russo and John Mamone were partners in a number of enterprises going back years").

4.    **Accordingly, certain material in the Government's possession and control is "material to the preparation of the ... defense", within the meaning of Federal Rule of Criminal Procedure 16(C) (requiring disclosure)**. We therefore seek the following:

A. All material, information and physical evidence from cooperating witnesses, other alleged co-conspirators, law enforcement agents and/or victims which would tend to prove that the Defendants:

1.    were not involved in the "South Carolina fraud",

2.    were not aware that the "property" alleged in Counts 50-53 was "property derived from the "South Carolina fraud",

3.    were not aware that the "property" alleged in Counts 50-53 was "criminally derived property" from any source.

B. All material, information and physical evidence from cooperating witnesses, other alleged co-conspirators, law enforcement agents

7

and/or victims which would tend to prove that the funds allegedly received by the Russos were not **in fact** derived from the South Carolina fraud. This would include but not be limited to:

1.    evidence, information or material which would tend to show alternative, lawful sources of the funds[13],

2.    evidence, information or material which would tend to show that the funds were derived from **other** unlawful activities, whatever they might be.

5.    To whatever extent such evidence exists *via* the failure of key witnesses to inculpate or mention either Russo, our requests herein are also consistent with the holdings of various courts that have recognized the concept of "**negative exculpatory**" evidence. See, *i.e.*, *Jones v. Jago*, 575 F.2d 1164 (6th Cir. 1978) (Statement of eyewitness to crime which made no reference to the defendant was "potentially powerful exculpation" under *Brady), United States v. Storey*, 956 F.Supp. 934 (D.Kan. 1997) (Citing *Jago* for the proposition that if defendant is not mentioned in certain Government files, it is "negative exculpatory" material, that is discoverable under *Brady), United States v. Tufano*, 1993 WL 502363, (N.D.III. 1993)("... a key witness' failure to identify or refer to a defendant in reporting a criminal act can be as

---

[13]    See, *i.e.*, *United States v. Loe*, 248 F.3d 449 (5th Cir. 2001)(Where "clean" funds in commingled account exceeded aggregate amount withdrawn from account, government could not prove beyond reasonable doubt that withdrawal contained "dirty" money, as required to support defendants' money laundering convictions).

exculpatory as a witness' positive assertion that a defendant is blameless").

6.    Therefore, the Government should promptly disclose all information, evidence and material in its possession and/or control, including debriefings and/or statements of cooperating and/or non-cooperating codefendants, co-conspirators and/or victims, which in any way tend to support the Defendants' defense of lack of knowledge of the unlawful nature of the funds at issue. Only in this way can the Defendants' constitutional rights be vindicated[14].

7.    This is not a fishing expedition – the Government has conceded that it has "spoken with several defendants during the course of the investigation", See Joseph Russo detention hearing, August 29, 2001, page 14 (testimony of IRS Case Agent Wise), and numerous other cooperators have been debriefed. If any of these individuals had provided **direct** evidence of the Russo's knowledge of the unlawful source of the funds, Agent Wise would be expected to have testified to this at the detention hearing when asked under oath what evidence existed to show Defendant Joseph Russo's knowledge. Rather, he limited his answer to the **circumstantial** evidence surrounding the receipt and disbursement of the funds.

8.    More specifically, when Agent Wise was asked the dispositive question "**what evidence is there that Joe Russo knew that the money that**

---

[14]    As mentioned *supra*, the constitutionality of 18 U.S.C § 1957 and its *mens rea* requirement **as applied** to the Defendants is the subject of a separate forthcoming Motion.

went into is wife's account was illegally obtained money?", he limited his answer to three things 1) a tape recorded phone conversation where Defendant Joseph Russo sought and obtained Mamone's reassurance that nothing illegal was going on at the check store, 2) the fact that funds were deposited into Russo's wife's account rather than "directly to him", and 3) the fact that Russo and Mamone were partners in the check cashing store, but the business was put in their wives' names.

9.    These circumstances led Agent Wise to conclude that "circumstantially, it appears to me that they were trying to conceal something". See Joseph Russo detention hearing, *supra*, at p. 25-26.

10.    In addition to Agent Wise's inability to point to any direct evidence of knowledge, reference to the several affidavits prepared by FBI Agent Patrick Brodsky reveals that although a large number of cooperating individuals were debriefed in connection with the investigation, **none** appear to have mentioned any involvement of Defendant Joseph Russo in either the South Carolina fraud, or any knowing acts related to "laundering" the illegal proceeds or "knowledge" thereof.

## B.    BILL OF PARTICULARS – COUNTS 4 and 5, 50-53, AND IDENTITIES OF ALLEGED CO-CONSPIRATORS

1.    *Federal Rules of Criminal Procedure* 7(f) provides that "[t]he court may direct the filing of a bill of particulars". The Committee Notes to the 1966 Amendments states that "[t]he amendment ... eliminating the

10

requirement of a showing of cause is designed to encourage a more liberal attitude by the courts toward bills of particulars without taking away the discretion which courts must have in dealing with such motions in individual cases".

2.     The purpose of a bill of particulars is to aid the defendant in the preparation of his defense. *United States v. Linn*, 889 F.2d 1369 (5th Cir. 1989). More specifically, the purpose is "to inform an accused of the charges against him with sufficient particularity to reduce trial surprise, to enable adequate defense preparation with the exercise of due diligence and to allow a defendant to plead double jeopardy"). *United States v. Vesich*, 726 F.2d 168 (5th Cir. 1984).

3.     *Sub judice*, the Defendants require a bill of particulars regarding Counts 4 and 5, and 50-53 of the Second Superseding Indictment, and also regarding the identities of alleged co-conspirators. Each of these requests will be addressed *seriatim*.

Counts 4 and 5

4.     Count 4 charges Defendant Joseph Russo and co-defendants Mamone, Buccinna, Bell, O'Sullivan and Weiss with conspiracy "from in or about 1996, and continuing ... up to the date of this Indictment ... to make extortionate extensions of credit ... to numerous individuals in South Florida". Count 5 charges Defendant Joseph Russo and the same co-defendants with a same-time frame conspiracy to "participate

11

in the use of extortionate means to collect and attempt to collect extensions of credit ... from numerous individuals in South Florida".

5.      Notwithstanding the approximately six (6) year span of the alleged conspiracies, no overt acts are alleged in either count, no "victim" is identified in either the respective counts or elsewhere in the Indictment, and no other count contains any information which would tend (by reference) to supply any information whatsoever concerning the specifics of the charge(s) or Defendant Joseph Russo's alleged involvement.

6.      During informal discovery conferences with the prosecution, the only specific reference to Defendant Joseph Russo's alleged involvement in the "extortionate activity" alleged in the Indictment was an incident years ago involving individuals named Huey Steinhardt and Jeffrey Braverman.

7.      This is particularly important because Defendant Joseph Russo is also charged in Count 1 (RICO Conspiracy), which alleges a **large number** of types of offenses as the "Pattern of Racketeering Activity", including "collection of extensions of credit by extortionate means and conspiracy to do so", and "making extortionate extensions of credit and conspiracy to do so". Significantly, **each of the other defendants charged in Counts 4 and 5 are alleged in Count 1 to have been involved in "a loanshark business that involved making extortionate loans to borrowers and using threats of violence and**

12

**physical violence in collecting debts from either borrowers or losing bettors who incurred gambling debts to the enterprise"**[15].

Although this language provides *some* guidance as to why each of the **others** were charged in Counts 4 and 5, Defendant Joseph Russo is not named in the quoted passage from Count 1.

8.    In fact, of the twenty seven (27) paragraphs in Count 1 describing what the alleged members of the RICO conspiracy actually did, Defendant Joseph Russo is named only once, in paragraph 21, which alleges that "defendants    Mamone,    Russo,    Buccinna,    Weiss    and    other coconspirators would provide the services of various check cashing stores for the purpose of promoting the operation and concealment of the illegal proceeds derived from telemarketing fraud committed by other coconspirators and other persons ...".

9.    Accordingly, to enable Joseph Russo to properly prepare a defense to the six (6) year conspiracies alleged in Counts 4 and 5, a bill of particulars setting forth details of **his** alleged participation is necessary.

Counts 50-53

10.    As set forth *supra*, Counts 50-53 allege that the Defendants committed violations of 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity), with the "specified unlawful activity" alleged in these counts being "mail fraud" and "wire fraud" from "a South Carolina based investment fraud".

---

[15] See Second Superseding Indictment, page 9, paragraph 14.

LAW OFFICES OF STEVEN M. POTOLSKY, P.A., 100 S.E. 2ND STREET, SUITE 3550, MIAMI, FLORIDA • (305) 530-8090

11.   Although an essential element of the charge(s) is that "... the defendant knew that the property was obtained from a criminal offense", *United States v. Baker, supra,* the Indictment is devoid of any factual allegation that would even hint at how the Defendants would have known that the funds were tainted.

12.   Because the essence of the defense case is lack of knowledge of the unlawful nature of the funds, the Defendants will be greatly prejudiced in the preparation of their defense to Counts 50-53 unless a bill of particulars provides the missing details. Otherwise, the defense is left to simply hazard a guess at the Government's theory and the best way to prepare an adequate defense to these Counts.

13.   The "aid" to the defense via a bill of particulars has been described by the Fifth Circuit in several closely related ways, *i.e.,* "to provide a defendant with more detail about the charges than is provided in the indictment", *United States v. Montalvo,* 820 F.2d 686 (5th Cir. 1987), to "minimize the danger of surprise at trial", *United States v. Linn, supra,* and to give "sufficient notice of a charge for its defense", *United States v. Nixon,* 816 F.2d 1022 (5th Cir. 1987).

14.   In this analysis, "it is no answer that the defendant should know the facts demanded, for the defendant is presumed innocent". *United States v. Ramirez,* 602 F.Supp. 783 (S.D.N.Y. 1985), *United States v. Greater Syracuse Board of Realtors,* 438 F.Supp. 376 (S.D.N.Y. 1977).

LAW OFFICES OF STEVEN M. POTOLSKY, P.A., 100 S.E. 2ND STREET, SUITE 3550, MIAMI, FLORIDA • (305) 530-8090

15.    Under any of the above descriptions, a bill of particulars regarding Counts 50-53 is clearly appropriate, since without "sufficient notice of a charge for its defense", the "danger of unfair surprise" in this case is great.

16.    Additionally, a bill of particulars addressed to the knowledge element would be invaluable to a proper resolution of the Defendants' Motion attacking the constitutionality of 18 U.S.C. § 1957 as applied to them[16], and also to a proper resolution of the Defendants' Motion addressed to the Grand Jury proceedings[17].

**Names of alleged co-conspirators**

17.    The Defendants also seek the names of **all** alleged co-conspirators known to the Government, whether the Government intends to call them as witnesses or not.

18.    In *United States v. Barrentine*, 591 F.2d 1069 (5th Cir. 1979), the Fifth Circuit noted that "[a] bill of particulars is a proper procedure for discovering the names of unindicted coconspirators who the government plans to use as witnesses". See also, *United States v. Espy*, 1996 WL 637759 (E.D.La. 1996)("Courts have generally found that the government should disclose the identity of all uncharged coconspirators ... The Court finds that the identification of uncharged

---

[16]    See, *DEFENDANTS' JOINT MOTION TO DISMISS COUNTS 50-53 BECAUSE 18 U.S.C. § 1957 IS UNCONSTITUTIONAL AS APPLIED.*
[17]    See, *JOINT MOTION FOR PRODUCTION OF, OR IN THE ALTERNATIVE, JUDICIAL REVIEW OF, GRAND JURY TRANSCRIPTS.*

LAW OFFICES OF STEVEN M. POTOLSKY, P.A., 100 S.E. 2ND STREET, SUITE 3550, MIAMI, FLORIDA • (305) 530-8090

coconspirators will be helpful to the defendants' preparation of their defense and grants their request")(citations omitted).

19. A detailed analysis on this issue was performed by the District Court in *United States v. DeGroote*, 122 F.R.D. 131 (W.D.N.Y. 1988). There, the Court began with the recognition that "[t]he rule is well settled that 'a bill of particulars is a proper procedure for discovering names of coconspirators the Government plans to call as witnesses at trial'", and held that "If the Government plans to call any ... unnamed co-conspirators at trial, it should provide a bill of particulars disclosing their names". The Court then confronted the remaining issue of "whether the government must furnish in a bill [of particulars] the names of co-conspirators known to them and who **will not** be called as prosecution witnesses at trial", and listed the applicable cases cited by the defense in its request: *United States v. Chovanec*, 467 F.Supp. 41, 47 (S.D.N.Y. 1979) (citing *United States v. Rosenstein*, 303 F.Supp. 210, 213 (S.D.N.Y. 1969)(government directed to "(i)dentify each co-conspirator alleged in the indictment as 'diverse other persons to the Grand Jury unknown,' by name and address, as such conspirators become known to the prosecution"). See *United States v. Ramirez*, 602 F.Supp. 783, 793 (S.D.N.Y. 1985)(government ordered to furnish "[a] statement of the names of other co-conspirators with whom Gonzalez allegedly conspired with or dealt with directly"); *United States v. King*, 49 F.R.D. 51, 53 (S.D.N.Y. 1970) (Mansfield, J.) ("the

16

Government is directed to furnish the names of any co-conspirators who become known to it prior to trial").

20. The Court concluded that "the government must provide the names of individuals referred to in Count I by the phrase 'and with other individuals both known and unknown to the grand jury'".

21. We seek identical relief here.

## C.    *BRADY, GIGLIO* AND *JENCKS* MATERIALS

This Motion seeks production of *Brady*, *Giglio* and *Jencks* materials sufficiently in advance of trial for the Defendants to make beneficial use in the preparation of their defense[18]. As noted *supra*, the Advisory Committee Notes to Federal Rules of Criminal Procedure 16 recognize that "[b]road discovery contributes to the fair and efficient administration of criminal justice by providing the defendant with enough information to make an informed decision as to plea; by **minimizing the undesirable effect of surprise at trial; and by otherwise contributing to an accurate determination of the issue of guilt or innocence**" (emphasis added). In a case where – as here - the facts and circumstances are so arguably consistent with innocence, these considerations are magnified.

---

[18]    Of course, the requests contained in other sections of this Motion arguably also qualify for disclosure under this section.

LAW OFFICES OF STEVEN M. POTOLSKY, P.A., 100 S.E. 2ND STREET, SUITE 3550, MIAMI, FLORIDA • (305) 530-8090

### Brady/Giglio[19]

The Defendants request **immediate** production of all *Brady* and *Giglio* material known to the Government. The key to **meaningful** *Brady* and *Giglio* is disclosure **in time to make proper use of it for defense purposes**.

As the District Court recognized in *United States v. McVeigh*, 923 F.Supp. 1310 (D.Col. 1996), "[w]hat is most persuasive is that the purpose of the Brady duty is to give the defendants a fair opportunity to prepare their defenses well in advance of trial". Numerous other District Courts have concurred on this point. See, *i.e.*, *United States v. Richards*, 94 F.Supp.2d 304 (E.D.N.Y. 2000)("The government is directed to continue to fulfill its ongoing *Brady* obligations, and to provide any impeachment and exculpatory material sufficiently in advance of trial to allow the defense to use the information effectively in the preparation and presentation of its case"), *United States v. Volpe*, 42 F.Supp.2d 204 (E.D.N.Y. 1999)("The court thus directs the government to continue to fulfill its ongoing *Brady* obligations, and to provide any impeachment and exculpatory material sufficiently in advance of trial to allow the defense to use the information effectively in the preparation and presentation of its case"), *United States v. Green*, 144 F.R.D. 631 (W.D.N.Y. 1992)("the government is presumably aware that certain *Brady* and *Giglio* material is of such significance that it must be provided to the defendant well in advance of the trial so as 'to allow the defense to use the favorable material effectively in the preparation and presentation of its case').

---

[19]    The Defendants have included an Appendix which sets forth – for illustrative purposes - a number of categories of *Giglio* that likely exist in this case.

LAW OFFICES OF STEVEN M. POTOLSKY, P.A., 100 S.E. 2ND STREET, SUITE 3550, MIAMI, FLORIDA • (305) 530-8090

One of the earlier cases to recognize this requirement was *United States v. Partin*, 320 F.Supp. 275 (E.D.La. 1970), where the District Court well-stated the policy considerations for prompt disclosure of favorable evidence:

> **Common sense dictates that evidence in the government's possession favorable to the defendant should be made available to him** far enough in advance of trial to allow him sufficient time for its evaluation, preparation, and presentation at trial. Otherwise, the trial might well have to be interrupted for an inordinate length of time until the defendant has had an opportunity to explore all the ramifications of the government's disclosure, track down distant witnesses, examine documents, or the like. **Such probable delay could sensibly be avoided by pretrial disclosure in those cases where disclosure is called for.**

Many District Courts throughout the Country have adopted the *Partin* standard in appropriate cases. *United States v. Moscony*, 1989 WL 55386 (E.D.Pa. 1989)("the Government shall disclose all evidence in its possession favorable to defendant which is material either to guilt or to punishment including such impeachment evidence where the reliability of the witness may be determinative of the defendant's guilt or innocence sufficiently in advance of trial to permit effective evaluation, preparation and presentation at trial"), *United States v. Germain*, 411 F.Supp. 719 (S.D. Ohio 1975)("The Court will, however, remind the United States Attorney of its belief that the duty arising under *Brady* encompasses the requirement that known exculpatory evidence be made available to defendants in advance of trial so as to allow the defendants sufficient time for its evaluation, preparation, and presentation at trial"), *United States v. Deutsch*, 373 F.Supp. 289 (S.D.N.Y. 1974)("With this basic understanding it becomes plain 'that evidence in the government's possession favorable to the

defendant should be made available to him far enough in advance of trial to allow him sufficient time for its evaluation, preparation, and presentation at trial").

See also, *United States v. Ahmad*, 53 F.R.D. 186 (M.D.Pa. 1971)("material bearing on ... defense preparation will be supplied to the defendants thirty days prior to trial"), *United States v. Wang*, 1999 WL 138930 (S.D.N.Y. 1999)("The Court notes that although *Brady* does not explicitly prescribe time limits within which disclosure must happen, the prosecutor is under a duty to disclose such evidence upon demand"), *United States v. McVeigh*, *supra* (ruling, after finding that *Giglio* material was required to be disclosed on same schedule as other *Brady* material, that all exculpatory or impeaching witness statements be immediately produced).

Finally, the American Bar Association (ABA) Standards for Criminal Justice, Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993) provides that:

> [a] prosecutor should not intentionally fail to make timely disclosure to the defense, **at the earliest feasible opportunity**, of the existence of all evidence or information which tends to negate the guilt of the accused or mitigate the offense charged or which would tend to reduce the punishment of the accused" (emphasis added).

Due to the unique nature of the instant charges and the related difficulties in investigating the Government's case and preparing a defense thereto, all doubts about the timing of the Government's *Brady* and *Giglio* obligations should be resolved in the Defendants' favor.

LAW OFFICES OF STEVEN M. POTOLSKY, P.A., 100 S.E. 2ND STREET, SUITE 3550, MIAMI, FLORIDA • (305) 530-8090

### Jencks

The Defendants request that the Court **strongly encourage** the Government to provide *Jencks* materials forty five (45) days prior to trial. In unusual cases, the timing of *Jencks* Act compliance has been recognized as implicating fundamental rights. In *United States v. La Cour*, 1992 WL 346328 (N.D.Ill. 1992), the District Court observed that "[a]lthough the *Jencks* act generally requires production of *Jencks* material after the government witnesses have testified, due process and trial concerns may compel Courts to require earlier disclosure". See also, *United States v. Narciso*, 446 F.Supp. 252 (D.C.Mich. 1977)("denial of the information requested here, because of an overly strict adherence to the *Jencks* Act raises potential deprivations of due process and effective assistance of counsel").

In *United States v. Damico*, 1995 WL 221883 (N.D.Ill. 1995), the District Court recognized exactly what we argue here - "[i]n some cases, courts have held that pretrial production of *Jencks* materials is required in order to avoid long delays during trial and to provide the defendant with ample opportunity to review the material and make appropriate use of it".

Numerous other District Courts have approved early production of *Jencks*. See, *i.e., United States v. Carlisi*, 1993 WL 339079 (N.D.Ill. 1993)("The government is aware of its *Jencks* Act, *Giglio,* and *Brady* obligations, and this Court has ordered (in connection with other motions discussed above) that such materials be disclosed well in advance of trial"), *United States v. Green*, 144 W.D.N.Y. 1992)("balancing defendants' right to a fair trial against the

government's interest in non-disclosure until one week prior to trial, the Court concludes that 3500 material should be turned over to the defense no later than 30 days prior to jury selection"), *United States v. Holmes*, 722 F.2d 37 (4th Cir. 1983)("Many times ... in cases where there are many statements or where the bulk of witness statements is large, the government will agree, **or it may even be ordered,** to deliver material at an earlier time so as to avoid lengthy delays before the beginning of cross-examination") (emphasis supplied), *United States v. Snell*, 899 F.Supp. 17 (D.Mass. 1995)("nothing in the statute ... preempts the court's ability, consistent with its obligations over case management, to order earlier disclosure than required by the Act. If there is no law enforcement reason prohibiting earlier disclosure (i.e. threats to witnesses, etc) then the concerns undergirding Jencks are simply not triggered").

Even courts that have held that early *Jencks* could not be **required** have strongly encouraged such disclosure. See, *i.e.*, *United States v. McKenzie*, 768 F.2d 602 (5th Cir. 1985)("This court has recognized such early *Jencks* disclosure as a salutary practice that should be encouraged to avoid the interruptions and delay at trial that are inevitable if the defense does not receive the material until the conclusion of the direct testimony"), *United States v. Lino*, 2001 WL 8356 (S.D.N.Y. 2000) ("this Court strongly encourages the Government to produce all [Jencks Act materials] at least ten days prior to each severed trial, in order to promote sound trial management and to preserve the integrity of the proceeding"), *United States v. Percevault*, 490 F.2d 126 (2nd Cir. 1974)("pre-trial disclosure will redound to the benefit of all parties, counsel and the court[;] sound

22

trial management would seem to dictate that *Jencks* Act material should be submitted prior to trial, ..., so that those abhorrent lengthy pauses at trial to examine documents can be avoided"), *United States v. Bissell*, 954 F.Supp. 841 (D.N.J. 1996)("Although the disclosure of *Jencks* material prior to the conclusion of direct examination of the Government's witness cannot be compelled, early disclosure to obviate trial interruptions is encouraged"). See also, *United States v. Labovitz*, 1996 WL 417113 (D.Mass. 1996)(recognizing the "delays that inevitably result from literal enforcement of the *Jencks* Act").

In this case, "due process" and "effective assistance of counsel" concerns, as well as avoidance of "delay" all point strongly towards the required early production of *Jencks* materials.

## D.    EVIDENCE RELEVANT TO DEFENSES TO COUNTS 4 AND 5 - STATUTE OF LIMITATIONS AND RELATED DEFENSE

As set forth *supra*, Defendant Joseph Russo is charged in Count 4 of the Second Superseding Indictment with Conspiracy/Extortionate Extensions of Credit in violation of 18 U.S.C. § 892(a), and in Count 5 with Conspiracy/Collection of Extensions of Credit by Extortionate Means, in violation of 18 U.S.C. § 894(a)(1). Although the time frame of the alleged offenses spans "from 1996 to the date of the Indictment", upon information and belief, the predominant portion of the Government's expected proof of **Defendant Joseph Russo's** involvement in said conspiracies dates back to an incident in 1995 or 1996, **prior to the time of his imprisonment on unrelated charges**[20]. In fact,

---

[20]    Defendant Joseph Russo was incarcerated on cable box fraud charges from August 12, 1997 to August 18, 1999. See detention hearing, page 4 (AUSA McCormick).

at the Defendant's detention hearing, Assistant United States Attorney McCormick proffered that "the evidence would also show that **in 1995**, the defendant, Mr. Russo, was a partner with a co-defendant in this case, John Mamone, in the loan sharking business". See Russo detention hearing, **supra**, at p. 5 (emphasis added).

Therefore, for purposes of developing a proper statute of limitations defense to Counts 4 and 5, it is essential that Defendant Joseph Russo have access to the following information and material in the Government's possession and control:

1.    The exact date of an alleged "extension of credit" to an individual named Hughie Steinhardt[21].

2.    The exact date of an alleged incident(s) involving Hughie Steinhardt and Jeffrey Braverman.

3.    All material, information and physical evidence from cooperating witnesses, other alleged co-conspirators, law enforcement agents and/or victims which would tend to prove that the latter incident was not related in any fashion to extortionate extensions of credit and/or an attempt to collect thereupon, specifically including but not limited to any information tending to show that the subject monies were in actuality **stolen** by Braverman/Steinhardt from lead defendant John Mamone

---

[21]    It seems to be agreed that the date of this incident – not specified in the Indictment – is beyond the statute of limitations, *i.e.*, more than five years prior to August 14, 2001 (the date that the Defendant was indicted). In the absence of sufficient proof that **Defendant Joseph Russo** is accountable for continuing acts in any alleged conspiracy past the Steinhardt incident, a statute of limitations defense seems applicable to Count 4. This may or may not apply with equal force to those defendants indicted earlier (initially or in the First Superseding Indictment).

LAW OFFICES OF STEVEN M. POTOLSKY, P.A., 100 S.E. 2ND STREET, SUITE 3550, MIAMI, FLORIDA • (305) 530-8090

and/or Defendant Joseph Russo. See, *i.e.*, affidavit of FBI Agent Patrick Brodsky dated January 7, 2000, at page 20 ("Mamone and Russo blamed CS-3 for the failure of the third party to pay approximately $150,000 that Mamone and Russo thought they were owed *as a result of a business dispute*")(emphasis added). Upon information and belief, CS-3 is Steinhardt, the "third party" is Braverman, and the "business dispute" does not fall within the prohibition of 18 U.S.C. § 892 or § 894. Any evidence tending to confirm this fact directly negates an essential element of the alleged offense and is therefore exculpatory.

4.    All material, information and physical evidence from cooperating witnesses, other alleged co-conspirators and/or victims which would tend to establish that 1) any involvement of Defendant Joseph Russo in the conspiracy alleged in Count 4 did not extend past the Steinhardt incident, which was more that five years prior to the Defendant's Indictment; 2) any involvement in the conspiracy alleged in Count 5 did not extend past that incident, and 3) that the Steihardt/Braverman incident was not part of any such conspiracy.

## E.    EXCULPATORY TAPE RECORDINGS

Although Defendant Joseph Russo was incarcerated on an unrelated offense from approximately August, 1997 to August, 1999, he is charged with continuing involvement in several conspiracies that allegedly spanned 1996 to 2001. In order to refute the Government's expected claim that Russo had

knowledge of specific unlawful activities of John Mamone and others during that time, it is essential that we have access to all tape recordings of telephone conversations made by Bureau of Prisons employees or agents. These tape recordings will help prove essential defense facts – *i.e.,* that the Defendant never discussed unlawful activity with Mamone or anyone else while he (Russo) was imprisoned, and that he never indicated knowledge of any such activities during any of the calls he made or received while incarcerated.

We are aware that often, prison tape recordings are routinely destroyed after a specified period of time. However, we understand that this case involved a continuing investigation by Federal authorities, and the subject tapes may well have been preserved by law enforcement pursuant to the investigation. Additionally, agents may have listened to the tapes during the investigation. If the tapes no longer exist, but agents reviewed same and could not identify any incriminating calls involving the Defendant, then that fact, together with any related reports should be disclosed as exculpatory.

Furthermore, it appears that the Defendants' telephone may have been tapped during the months leading up to the Indictment in this case, and the Government has to date failed to disclose this fact. Similar to the prison tapes, the tapes of the Russos' home telephone – if they exist - would demonstrate their lack of knowledge of the unlawful nature of the funds involved in Counts 50-53.

As only the Government has access to these exculpatory materials and no comparable substitute exists, they are subject to disclosure under Federal Rule

of Criminal Procedure 16(C)(requiring disclosure of items "material to the preparation of the ... defense"), and *Brady v. Maryland* and its progeny.

## CONCLUSION

Based upon the points and authorities set forth *supra*, the requested disclosures are reasonable and necessary for the proper preparation of a defense in this case.

**WHEREFORE**, the Defendant respectfully requests that this Motion be granted and the Court enter an Order requiring the Government to provide the information and materials requested.

Respectfully submitted,

**JAYNE C. WEINTRAUB, Esq.**
NationsBank Tower, Suite 3550
100 S.E. 2nd Street
Miami, FL 33131
(305) 374-1818

By: _____ FOR
     **Jayne C. Weintraub, Esq.**
     **Florida Bar No. 320382**

**STEVEN M. POTOLSKY, P.A.**
NationsBank Tower, Suite 3550
100 S. E. 2nd Street
Miami, FL  33131
(305) 530-8090

By: _____
     **Steven M. Potolsky, Esq.**
     **Florida Bar No. 380601**

27

## CERTIFICATE OF GOOD FAITH EFFORT TO RESOLVE ISSUES

We have provided Assistant United States Attorneys McCormick and Fernandez with a draft copy of this pleading in a good faith effort to resolve the issues contained herein without the need for litigation, but the prosecution has not indicated that it will not make any of the requested disclosures without Court Order.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has been furnished by mail this ___3___ day of ~~November~~ DECEMBER, 2001 to **Brian McCormick, Esq. and Diana Fernandez, Esq., Assistant United States Attorneys,** 500 E. Broward Blvd., Suite 700, Ft. Lauderdale, FL 33394 and all defense counsel on the attached Service List.

By:_____

**Steven M. Potolsky, Esq.**

LAW OFFICES OF STEVEN M. POTOLSKY, P.A., 100 S.E. 2ᴺᴰ STREET, SUITE 3550, MIAMI, FLORIDA • (305) 530-8090

## APPENDIX A – *GIGLIO* MATERIALS

The explicit language of *Federal Rules of Criminal Procedure* 16(C) requires the Government to provide documents and tangible objects that are ... "material to the preparation of the defendant's defense", and **"aside from outright exculpatory items, it is difficult to imagine information more material to the preparation of the defense than credibility items for critical or major government witnesses"**. *United States v. Five Persons,* 472 F.Supp. 64, 67 (D. N.J. 1979)(emphasis added). See also, *Ogden v. United States*, 303 F.2d 724 (9th Cir. 1962)("doubts [about Rule 16 material] are to be resolved in favor of disclosure, for the Court necessarily proceeds without the benefit of counsel's more intimate knowledge of the possible significance of particular information for purposes of impeachment").

**The Government's obligation to provide *Giglio* to the defense cannot be seriously debated – the only inquiries *sub judice* concern when and what. The "catch-22" of requiring the defense to make specific *Giglio* requests is that only the Government has full knowledge of the existence and extent of the sought-after material. Some of the specific categories of *Giglio* material that have not been provided include, but are not limited to:**

### A) 5(K)(1) AND RULE 35 MOTIONS, LETTERS, PLEA/IMMUNITY AGREEMENTS, *ETC.*

"Government memorandum or motions to a court requesting a downward departure from the Sentencing Guidelines on behalf of a witness who has provided 'substantial assistance' ... falls squarely within the ambit of *Giglio*".

*United States v. Beckford*, 962 F.Supp. 780 (E.D.Va. 1997) This category of *Giglio* is not limited to the District Court for the Southern District of Florida, but also includes State Courts and other Federal jurisdictions. See, *United States v. Owens*, 933 F.Supp. 76 (D.Mass. 1996)("The government has to reveal all promises, rewards, and inducements to include the quid for the quo. And if that quid pro quo involves other sovereigns, of course that must be revealed").

### B)    RECORDS OF PRIOR CONVICTIONS

"Records of conviction" constitute "pure impeachment material under *Giglio/Napue*". *United States v. Aiken*, 76 F.Supp.2d 1339 (S.D.Fla. 1999). See also, *United States v. Owens*, *supra* ("Obviously prior convictions that would be admissible under Federal Rule of Evidence 609 must be revealed").

### C)    JAIL AND PRISON RECORDS

The Government has an affirmative obligation to seek out, locate and provide to defense counsel any and all impeachment materials that may be available from jail and prison records. In *United States v. Owens*, *supra*, the Court stated that "[t]he obligation to search governs all the offices of the United States Attorney and the Justice Department itself, **it governs the Bureau of Prisons** ..."). See also, *Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) ("The state had an obligation, before putting Dunbar on the stand, to obtain and review Dunbar's corrections file, and to treat its contents in accordance with the requirements of *Brady* and *Giglio*"). See generally, *United States v. Griffin*, 856 F.Supp. 1293 (N.D.IL.1994) (Government's failure to disclose unit log books from correctional facility which contained evidence of illegal drug acquisition and illegal

drug use by cooperating government witnesses around time of their testimony and its failure to disclose taped conversations involving cooperating witnesses over United States Attorney office's phone line revealing substantial drug trafficking was *Brady* material that should have been produced by government counsel).

### D)   PSI AND PROBATION RECORDS

If these types of records exist, the Government should conduct a thorough inquiry and disclose appropriate material to the defense. See, *United States v. Strifler*, 851 F.2d 1197 (9th Cir.1988)("A defendant is entitled to material in a probation file that bears on the credibility of a significant witness in the case"), *United States v. Mitchell*, 178 F.3d 904 (7th Cir. 1999)("Generally, presentence reports are helpful in effectively cross-examining witnesses because these reports may contain impeachment material")(citing *United States v. Canino*, 949 F.2d 928, 942 (7th Cir. 1991).

### E)   PRIOR UNCHARGED CRIMES AND/OR BAD ACTS

The Government should provide all materials, evidence and/or facts known to the Government that would tend to prove the commission of other uncharged criminal conduct or bad acts by any of its witnesses, including but not limited to any such admissions made by the witnesses during debriefings or similar settings. See, *United States v. Owens*, *supra* ("within the scope of the statute of limitations all prior bad acts must be disclosed and if we're dealing with a witness who has received either immunity or any sort of promise, inducement, or reward, the prior bad acts which must be revealed must be within the scope of

the statute of limitations read backwards from the time the witness received the promise, inducement, or reward **... It is not necessary that they have resulted in prior convictions or arrests, but simply that the acts were committed and the witness may be biased to testify in favor of the government to avoid prosecution by either state or federal government for the misconduct"**)(emphasis added).

### F)    INFORMATION RELATING TO ALCOHOLISM, DRUG USE, OR PSYCHIATRIC HISTORY

Any information of this type known to the Government should be disclosed. See, *United States v. Bontkowski*, 49 F.Supp.2d 1075 (N.D.Ill. 1999)("...the government is ordered to produce ... information relating to alcoholism, drug use, or psychiatric history of witnesses"), *United States v. Owens, supra* ("... the government must produce any data that it has with respect to the testimonial faculties of any witness. That witness' ability to observe, remember, or relate coming to this case. That means the government must produce any psychiatric data that it has which bears on the witness' ability to observe the conduct about which the witness is going to testify, or the witness' ability to remember or relate such conduct at the time when the witness comes on to testify ...").

### G)    WITNESSES' BIAS

Whether or not this is viewed as a catchall category of *Giglio*, such material must be disclosed. See, *United States v. Bontkowski*, 49 F.Supp.2d 1075 (N.D.Ill. 1999)("...the government is ordered to produce ... any known bias or prejudice of witnesses towards [the defendant]"), *United States v. Owens,*

*supra* ("All documents which tend to show the bias, prejudice, personal interest of any government witness to testify in favor of the government or against any defendant, and any documents which tend to show a special relationship of the witness or hostility of the witness either to any other government witness or to any of the defendants in a trial").

### H)    WITNESSES' REPUTATION FOR TRUTHFULNESS

This most fundamental of impeachment tools is often overlooked by the Government as *Brady/Giglio*, but should nonetheless be disclosed. See, *i.e.*, *United States v. Owens, supra* ("The government is required to reveal any evidence that it has of prior bad acts which go to the reputation of the witness for truth or veracity or any specific acts which point to the witness having lied on other occasions"), *United States v. Strifler*, 851 F.2d 1197 (9th Cir. 1988)(witness' probation file, which contained "among other things, probation reports showing a tendency in [the witness] to 'overcompensate' for actual or perceived problems; [and] ...reports of repeated instances of [the witness] lying to authorities ...would have provided a basis for impeaching [the witness]").

### I)    THREATS

The following cases illustrate an important *Brady/Giglio* subset with regard to cooperating witnesses – **the antithesis of promises**:    *United States v. Bontkowski*, 49 F.Supp.2d 1075 (N.D.Ill. 1999)("...the government is ordered to produce ... consequences of not testifying communicated to witnesses"), *United States v. Sutton*, 542 F.2d 1239, 1242 (4th Cir.1976)("no difference between concealment of a promise of leniency and concealment of a threat to prosecute"),

*United States v. Chitty*, 760 F.2d 425 (2nd Cir.1985) ("Not disclosed to defense counsel, however, was the fact that [the witness] had been notified that he was the target of an investigation by the United States Attorney's office. The information that [he] had been told that he was under investigation was discloseable pursuant to *Brady* [and] *Giglio*, ... [as] it provided a motive to testify favorably to the Government, and the fact was known to the prosecutor's office"), *United States v. Cody*, 722 F.2d 1052 (2nd Cir. 1983)(where "[o]ne of the agents began to argue with [the witness] and apparently lost his temper saying that if [the witness] did not follow instructions he would throw [him] out the window or inform [the defendant] that [he] was an informant .... it would have been better for the government to disclose the threats since they did bear upon [the witness'] credibility).

### J) SPECIAL TREATMENT

If any such treatment exists (at jails or otherwise), it should be disclosed. See, *Banks v. United States*, 920 F.Supp. 688 (E.D.Va. 1996)("The information regarding ... conjugal visits was clearly favorable in that it could have been used to attack the credibility of Weathers and of the government's agents who arranged the "sting" operation").

### K) POLYGRAPH MATERIALS

If any of the witnesses have been polygraphed at any time, this should be disclosed. See, *United States v. Bontkowski*, 49 F.Supp.2d 1075 (N.D.Ill. 1999)("...the government is ordered to produce ... information regarding polygraph examinations of witnesses relating to their testimony"). Furthermore,